Y

1    ROBERT JON HENDRICKS (SBN 179751)
     LARRY M. LAWRENCE (SBN 232720)
2    MORGAN, LEWIS & BOCKIUS LLP
     300 South Grand Avenue
3    Twenty-Second Floor
     Los Angeles, CA 90071-3132
4    Tel: 213.612.2500
     Fax: 213.612.2501
5    E-mail: rhendricks@morganlewis.com
     E-mail: llawrence@morganlewis.com
6
     Attorneys for Respondent
7    AMERICAN AIRLINES, INC.

8                 AMERICAN ARBITRATION ASSOCIATION

9

10

| | |
|---|---|
| ROBERT S. MAWHINNEY, | AAA Case No. 73 166 00371 11 |
|           Claimant, | **SUPPLEMENTAL SPECIFICATION OF DEFENSES OF RESPONDENT AMERICAN AIRLINES, INC.** |
|     vs. | |
| AMERICAN AIRLINES, INC. | |
|           Respondent. | |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 25150242.1

1    **SUPPLEMENTAL SPECIFICATION OF DEFENSES OF RESPONDENT AMERICAN**

2    **AIRLINES, INC.**

3         In an abundance of caution, Respondent supplements its specification of claims to

4    specifically state a mixed motive defense.  As set forth in Respondent's submission to the

5    Department of Labor in connection with the Air21 proceeding (*See* May 11, 2012 Letter at pp 11-

6    13), and also as submitted to Claimant and the Arbitrator in this proceeding, Claimant was

7    terminated for his refusal to select one of the options offered to him in the Career Decision Day

8    Advisory.  Specifically, Claimant was given the following options:

9         Option #1:    Return to work after signing a "Letter of Commitment" agreeing to

10                       comply with all Company Rules and Policies, inclusive of both

11                       satisfactory work performance and personal conduct.

12        Option #2:    Sign an agreement not to exercise grievance rights, and in term, the

13                       Respondent would accept his resignation and provide him with

14                       specifically enumerated transition benefits.

15        Option #3:    Elect to terminate his employment with the option to grieve.

16        Pursuant to Respondent's longstanding policies, and as Claimant was repeatedly advised,

17   the failure to affirmatively choose an option would be treated as though he elected Option #3 and

18   his employment was terminated.

19   ///

20   ///

21   ///

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 25150242.1

1

SUPPLEMENTAL SPECIFICATION OF
DEFENSES OF RESPONDENT AMERICAN

1

2    **TWENTY-FIRST DEFENSE**

3    (Mixed Motive)

4    1.    Respondent alleges that, to the extent discrimination was a motivating factor in the

5    decisions affecting Claimant (which Respondent denies), legitimate reasons (standing alone)

6    would have induced Respondent to make the same decisions.

7

8

9    Dated: June 12, 2014            MORGAN, LEWIS & BOCKIUS LLP
                                      ROBERT JON HENDRICKS
10                                    LARRY M. LAWRENCE

11                                    By:  _Larry M. Lawrence /es_
                                      Larry M. Lawrence
12                                    Attorneys for Respondent
                                      American Airlines, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 25150242.1

2                    SUPPLEMENTAL SPECIFICATION OF
                     DEFENSES OF RESPONDENT AMERICAN

z

RE: Looks like I'm DISCHARGED
FROM: Montes, Jose
TO: steven24rd@yahoo.com
• Gibbs, Jeanette
• Vaughn, Lynn                                    Friday, September 23, 2011 4:21 PM
                          **Message body**

Steve,

As requested and for your reference, the LOC is attached but should not be
misunderstood as a viable option at this time.

On September 3, 2011 when you were issued the Career Decision Day Letter (CDD), you
were offer a copy of a Letter of Commitment (LOC) to review. Despite my urging you to
take the letter with you, you refused. You also refused to take the CDD and LOC with
you later that same day, when you came into work.

When you returned from your CDD off on Sunday, September 4, 2011, you advised me
you were not going to select an option from the CDD. As a result you were advised, per
the Peak Performance Through Commitment Policy, your failure to select an option
would default to option #3, termination with the right to grieve. This was reiterated to you
in my letter dated September 6, 2011.

Therefore, in accordance with the company's Peak Performance Through Commitment
Policy when you come into work tonight, you will be issued a final advisory with the
right to grieve.

I will meet you by the escalator in the baggage claim area, the same location I met you on
the evening of September 4th.

Jose Montes
Manager Aircraft Maintenance – San Diego
American Airlines
O – 619-231-7213
C – 424-672-5695

## LETTER OF COMMITMENT

I acknowledge that I have a performance problem, which I fully admit I have not corrected.

In consideration for my continued employment with American Airlines, I agree that I will
immediately correct my performance problem by complying with all company standards, as well as
maintaining a satisfactory work performance.  Moreover, I understand that if I do not correct my
performance problem, I will be discharged without further warning.

I agree that this Letter of Commitment shall be final and binding and that

RSMawhinney
Ref. # E · · 0 7 8

ENTERED
2 2 4

my decision is irrevocable and shall not be the basis of any grievance or claim of any kind against the Company.

I have carefully read and understand all of the above.

_____          _____
Employee's Signature                                    Date

_____          _____
Employee's Printed Name                              Employee Number

_____          _____
Manager's Signature                                      Date

cc:    Personnel File

RSMawhinney
Ref. # 2 . . 0 7 9

225
ENTERED



1    THE ARBITRATOR:  And the Letter of Commitment

2    says, "I acknowledge that I have a performance

3    problem, which I fully admit I have not corrected.

4    In consideration for my continued employment with

5    American Airlines, I agree that I will immediately

6    correct my performance problem by complying with all

7    company standards, as well as maintaining a

8    satisfactory work performance.  Moreover, I

9    understand that if I do not correct my performance

10   problem, I will be discharged without further

11   warning.  I agree that this Letter of Commitment

12   shall be final and binding and that my decision is

13   irrevocable and shall not be the basis of any

14   grievance or claim of any kind against the company."

15        So it's not the options you're saying that

16   were not offered to you.  It's -- you're saying, if

17   I signed the Letter of Commitment, then I have to

18   give up my right to grieve?

19   THE WITNESS:  To grieve.  And they could take

20   immediate action saying that I was not performing or

21   that I was not cooperating.  They could take action

22   against me for any reason at all immediately; and

23   that's what -- where we were at.  And if they're

24   going to terminate me, terminate me now.  I'm going

25   to maintain my option to grieve, and that's why we

466

1    are here today.

2         THE ARBITRATOR:   No.   If you retain your option

3    to grieve, then you would be with the labor board in

4    a grievance.

5         THE WITNESS:   Right.   According to the

6    settlement agreement that I have with American

7    Airlines, my grieving process could take the route

8    of the union or this arbitration.

9         THE ARBITRATOR:   Correct.

10        THE WITNESS:   And I used the arbitration.

11        THE ARBITRATOR:   Yes.   What I'm saying is if you

12   needed an opportunity to grieve, that's a labor

13   term.   You would be in the labor forum.   If you

14   weren't exercising that opportunity to grieve, you

15   were going to exercise a complaint in arbitration --

16   a demand in arbitration, then that would be under

17   your settlement agreement.   Those are different

18   routes, as you know, because you've been through

19   both of them, so you know that.

20        THE WITNESS:   Well, I was -- yeah.   I was

21   interpreting it as my options to grieve, that I was

22   giving up all of my rights and I was saying, "I have

23   a performance problem."   And then they could just

24   take an action at any time.

25             Well, now they were taking an action.   I

BB

ON FRIDAY NOVEMBER 5TH AROUND 3:15 AM I WAS
NOTIFIED ~~THAT~~ BY STEVE MAWHINNEY THAT A/C 200
DIDN'T HAVE THE OIL SERVICING BLOCKS SIGNED. MY FIRST
RESPONSE WAS THAT HE (STEVE) SHOULD PUT A
POST-IT NOTE ON THE PAGE AND KEN/ MECHANIC WOULD
GET IT LATER ON WHEN HE CAME IN SATURDAY AFTERNOON.
STEVE THEN WANTED ME TO SIGN IT. I RESPONDED
THAT I DIDN'T DO THE WORK. AGAIN I SUGGESTED THE
POST-IT. HE THEN ASKED HOW HE COULD RELEASE THE
LOG BOOK AND IN A DEMEANING TONE ASKED - DON'T
YOU KNOW THE FAR's. I TOLD HIM I DO.
I THEN SUGGESTED HE SEND THE MECHANIC ASSIGNED
TO THAT AIRCRAFT OUT TO LOOK AT THE OILS,
STEVE SAID YOU SIGNED OFF THE OTHER PLANE
WHY WON'T YOU SIGN THIS ONE. I TOLD HIM AGAIN
I DIDN'T DO THE WORK.

     ~~B~~ I ASKED STEVE WHY HE WAS BEING SO
DIFFICULT AS THE POST IT NOTE IS A GENERAL
PRACTICE FOR MISSING SIGNATURES.
(EARLIER IN THE EVENING STEVE GOT AN ACHECK
CHANGED TO A PS. RENDERING THE ALREADY SIGNED
OIL SERVICE SIGNATURES USELESS. I INFORMED HIM
THAT I COULD SIGN THOSE OILS OFF SINCE I HAD
ASSISTED KEN™ WHEN HE SERVICED THOSE OILS IF I
WENT AND PHYSICALLY CHECKED OIL LEVEL. &
SECURITY OF OIL CAPS. THAT WAS A/C 536)

     BY THIS TIME KEN BURNS HAD ENTERED
THE OFFICE. SINCE KEN HAD BEEN CAUGHT
WITH A CAMERA - SPY CAMERA - ATTACHED TO HIS
BUTTON HOLE ON HIS SHIRT I TOLD HIM TO
GET OUT. KEN STAYED. AGAIN I TOLD HIM
GET OUT WITH THE EXPLANATION THAT OUR



EXHIBIT
22
Robert Mawhinney
Lisa DiGiovanni 11989
4-11-14

AA/Mawhinney 000437

CONVERSATION DID NOT CONCERN HIM. KEN STAYED AND STEVE MADE NO EFFORT TO HAVE KEN LEAVE US TO DISCUSS THIS MATTER OURSELVES, THE THIRD TIME I TOLD KEN TO GET THE FUCK OUT, THIS TIME KEN WAITED AWHILE BUT DID LEAVE. STEVE ASKED ME WHY I CUSSED. SO BEFORE KEN LEFT I DID APOLOGIZE FEELING EMBARASSED THAT I LOST MY COOL. I WAS ANGRY THAT STEVE HAD SAID IF I DIDN'T SIGN THE BLOCKS HE WOULD TAKE THE PLANE OUT OF SERVICE. I TOLD HIM I WOULD NOT SIGN FOR WORK I DIDN'T ACCOMPLISH. AND THEN GIVE HIM AMMUNITION TO TURN ME IN TO THE FAA FOR THAT SERIOUS VIOLATION.

AFTER KEN WAS GONE I EXPLAINED TO STEVE - BUT USED A VOICE LOUD ENOUGH FOR KEN AND MAYBE OTHERS TO HEAR - THAT I DIDN'T WANT TO BE INVOLVED IN ANY DISCUSSION WHERE KEN COULD FILM OR RECORD ME. HE WAS IN A POSTURE AND A POSITION THAT HE COULD HAVE HAD HIS SPY CAMERA AGAIN.

STEVE HAD HIS CREW FOR ANOTHER 5 HOURS TO MOTOR ENGINES AND CHECK OIL, YET HE WAS TAKING A STAND ON TAKING THE A/C OUT OF SERVICE. ALTHOUGH HE HAD IT SUGGESTED TO HIM TO HAVE HIS CREW CHECK IT THEN SIGN IT OFF. LATER AFTER SWAPPING A/C - WHICH BURDENS ROUTING AND OTHERS - HE CALLED JOSE AND DID DO WHAT WAS SUGGESTED BY ME IN THE FIRST PLACE.

AA/Mawhinney 000438



IF STEVE WANTS TO BRAG ABOUT HIS KNOWLEDGE OF THE FARS THEN WHY DIDN'T HE KNOW THAT GIVING ME AN ULTIMATUM TO SIGN SIGNATURE BLOCKS IS A GRAVE MISTAKE IF I HAD DONE IT. I RESENT HIM BULLYING ME BY HIS AUTHORITY TO TRY AND MAKE THAT MISTAKE WHICH COULD COST ME MY JOB AS WELL AS A FINE FROM THE FAA.

THE PROOF IS THERE THAT STEVE WILL PUT THE COMPANY OPERATION IN JEOPARDY IN ORDER TO ACCOMPLISH HIS OWN PERSONAL VENDETTA'S, HE LACKS THE ABILITY OF SOMEONE WHO IS RESPONSIBLE FOR OTHERS, IN MY OPINION.

AS FAR AS THE ULTIMATUM GIVEN TO ME, HE MAY HAVE GOTTEN SOMEONE WITH LESS EXPERIENCE TO SIGN FOR WORK NOT PERFORMED, WHICH IS JUST CRIMINAL.

1069635
11/9/10

AA/Mawhinney 000439

ENTERED 230

CC

(1) Rebuild or alter any aircraft, aircraft engine, propeller, or appliance manufactured by him under a type or production certificate;

(2) Rebuild or alter any appliance or part of aircraft, aircraft engines, propellers, or appliances manufactured by him under a Technical Standard Order Authorization, an FAA-Parts Manufacturer Approval, or Product and Process Specification issued by the Administrator; and

(3) Perform any inspection required by part 91 or part 125 of this chapter on aircraft it manufactured under a type certificate, or currently manufactures under a production certificate.

(k) Updates of databases in installed avionics meeting the conditions of this paragraph are not considered maintenance and may be performed by pilots provided:

(1) The database upload is:

(i) Initiated from the flight deck;

(ii) Performed without disassembling the avionics unit; and

(iii) Performed without the use of tools and/or special equipment.

(2) The pilot must comply with the certificate holder's procedures or the manufacturer's instructions.

(3) The holder of operating certificates must make available written procedures consistent with manufacturer's instructions to the pilot that describe how to:

(i) Perform the database update; and

(ii) Determine the status of the data upload.

[Doc. No. 1993, 29 FR 5451, Apr. 23, 1964, as amended by Amdt. 43-4, 31 FR 5249, Apr. 1, 1966; Amdt. 43-23, 47 FR 41084, Sept. 16, 1982; Amdt. 43-25, 51 FR 40702, Nov. 7, 1986; Amdt. 43-36, 61 FR 19501, May 1, 1996; Amdt. 43-37, 66 FR 21066, Apr. 27, 2001; Amdt. 43-39, 69 FR 44863, July 27, 2004; Amdt. 43-43, 74 FR 53394, Oct. 16, 2009; Amdt. 43-45, 77 FR 71096, Nov. 29, 2012]

# §43.5   Approval for return to service after maintenance, preventive maintenance, rebuilding, or alteration.

No person may approve for return to service any aircraft, airframe, aircraft engine, propeller, or appliance, that has undergone maintenance, preventive maintenance, rebuilding, or alteration unless—

RSMawhinney
Ref. # 12 . 1803
231

(a) The maintenance record entry required by §43.9 or §43.11, as appropriate, has been made;

(b) The repair or alteration form authorized by or furnished by the Administrator has been executed in a manner prescribed by the Administrator; and

(c) If a repair or an alteration results in any change in the aircraft operating limitations or flight data contained in the approved aircraft flight manual, those operating limitations or flight data are appropriately revised and set forth as prescribed in §91.9 of this chapter.

[Doc. No. 1993, 29 FR 5451, Apr. 23, 1964, as amended by Amdt. 43-23, 47 FR 41084, Sept. 16, 1982; Amdt. 43-31, 54 FR 34330, Aug. 18, 1989]

# §43.7   Persons authorized to approve aircraft, airframes, aircraft engines, propellers, appliances, or component parts for return to service after maintenance, preventive maintenance, rebuilding, or alteration.

(a) Except as provided in this section and §43.17, no person, other than the Administrator, may approve an aircraft, airframe, aircraft engine, propeller, appliance, or component part for return to service after it has undergone maintenance, preventive maintenance, rebuilding, or alteration.

(b) The holder of a mechanic certificate or an inspection authorization may approve an aircraft, airframe, aircraft engine, propeller, appliance, or component part for return to service as provided in Part 65 of this chapter.

(c) The holder of a repair station certificate may approve an aircraft, airframe, aircraft engine, propeller, appliance, or component part for return to service as provided in Part 145 of this chapter.

(d) A manufacturer may approve for return to service any aircraft, airframe, aircraft engine, propeller, appliance, or component part which that manufacturer has worked on under §43.3(j). However, except for minor alterations, the work must have been done in accordance with technical data approved by the Administrator.

(e) The holder of an air carrier operating certificate or an operating certificate issued under Part 121 or 135, may approve an aircraft, airframe, aircraft engine, propeller, appliance, or component part for return to service as provided in Part 121 or 135 of this chapter, as applicable.

(f) A person holding at least a private pilot certificate may approve an aircraft for return to service after performing preventive maintenance under the provisions of §43.3(g).

(g) The holder of a repairman certificate (light-sport aircraft) with a maintenance rating may approve an aircraft issued a special airworthiness certificate in light-sport category for return to service, as provided in part 65 of this chapter.

RSMawhinney
Ref. # 12 · 1 8 0 4
ENTERED 232

(h) The holder of at least a sport pilot certificate may approve an aircraft owned or operated by that pilot and issued a special airworthiness certificate in the light-sport category for return to service after performing preventive maintenance under the provisions of §43.3(g).

[Amdt. 43-23, 47 FR 41084, Sept. 16, 1982, as amended by Amdt. 43-36, 61 FR 19501, May 1, 1996; Amdt. 43-37, 66 FR 21066, Apr. 27, 2001; Amdt. 43-39, 69 FR 44863, July 27, 2004]

# §43.9   Content, form, and disposition of maintenance, preventive maintenance, rebuilding, and alteration records (except inspections performed in accordance with part 91, part 125, §135.411(a)(1), and §135.419 of this chapter).

(a) *Maintenance record entries.* Except as provided in paragraphs (b) and (c) of this section, each person who maintains, performs preventive maintenance, rebuilds, or alters an aircraft, airframe, aircraft engine, propeller, appliance, or component part shall make an entry in the maintenance record of that equipment containing the following information:

(1) A description (or reference to data acceptable to the Administrator) of work performed.

(2) The date of completion of the work performed.

(3) The name of the person performing the work if other than the person specified in paragraph (a)(4) of this section.

(4) If the work performed on the aircraft, airframe, aircraft engine, propeller, appliance, or component part has been performed satisfactorily, the signature, certificate number, and kind of certificate held by the person approving the work. The signature constitutes the approval for return to service only for the work performed.

(b) Each holder of an air carrier operating certificate or an operating certificate issued under Part 121 or 135, that is required by its approved operations specifications to provide for a continuous airworthiness maintenance program, shall make a record of the maintenance, preventive maintenance, rebuilding, and alteration, on aircraft, airframes, aircraft engines, propellers, appliances, or component parts which it operates in accordance with the applicable provisions of Part 121 or 135 of this chapter, as appropriate.

(c) This section does not apply to persons performing inspections in accordance with Part 91, 125, §135.411(a)(1), or §135.419 of this chapter.

(d) In addition to the entry required by paragraph (a) of this section, major repairs and major alterations shall be entered on a form, and the form disposed of, in the manner prescribed in appendix B, by the person performing the work.

**RSMawhinney**
Ref. # 12 - 18 05

№ 233 ENTERED

[Amdt. 43-23, 47 FR 41085, Sept. 16, 1982, as amended by Amdt. 43-37, 66 FR 21066, Apr. 27, 2001; Amdt. 43-39, 69 FR 44863, July 27, 2004]

# §43.10   Disposition of life-limited aircraft parts.

(a) *Definitions used in this section.* For the purposes of this section the following definitions apply.

*Life-limited part* means any part for which a mandatory replacement limit is specified in the type design, the Instructions for Continued Airworthiness, or the maintenance manual.

*Life status* means the accumulated cycles, hours, or any other mandatory replacement limit of a life-limited part.

(b) *Temporary removal of parts from type-certificated products.* When a life-limited part is temporarily removed and reinstalled for the purpose of performing maintenance, no disposition under paragraph (c) of this section is required if—

(1) The life status of the part has not changed;

(2) The removal and reinstallation is performed on the same serial numbered product; and

(3) That product does not accumulate time in service while the part is removed.

(c) *Disposition of parts removed from type-certificated products.* Except as provided in paragraph (b) of this section, after April 15, 2002 each person who removes a life-limited part from a type-certificated product must ensure that the part is controlled using one of the methods in this paragraph. The method must deter the installation of the part after it has reached its life limit. Acceptable methods include:

(1) *Record keeping system.* The part may be controlled using a record keeping system that substantiates the part number, serial number, and current life status of the part. Each time the part is removed from a type certificated product, the record must be updated with the current life status. This system may include electronic, paper, or other means of record keeping.

(2) *Tag or record attached to part.* A tag or other record may be attached to the part. The tag or record must include the part number, serial number, and current life status of the part. Each time the part is removed from a type certificated product, either a new tag or record must be created, or the existing tag or record must be updated with the current life status.

(3) *Non-permanent marking.* The part may be legibly marked using a non-permanent method showing its current life status. The life status must be updated each time the part is removed from a type certificated product, or if the mark is removed, another method in

RSMawhinney
Ref. # 12 - 1 8 0 6

ENTERED
2 3 4

this section may be used. The mark must be accomplished in accordance with the instructions under §45.16 of this chapter in order to maintain the integrity of the part.

(4) *Permanent marking.* The part may be legibly marked using a permanent method showing its current life status. The life status must be updated each time the part is removed from a type certificated product. Unless the part is permanently removed from use on type certificated products, this permanent mark must be accomplished in accordance with the instructions under §45.16 of this chapter in order to maintain the integrity of the part.

(5) *Segregation.* The part may be segregated using methods that deter its installation on a type-certificated product. These methods must include, at least—

(i) Maintaining a record of the part number, serial number, and current life status, and

(ii) Ensuring the part is physically stored separately from parts that are currently eligible for installation.

(6) *Mutilation.* The part may be mutilated to deter its installation in a type certificated produce. The mutilation must render the part beyond repair and incapable of being reworked to appear to be airworthy.

(7) *Other methods.* Any other method approved or accepted by the FAA.

(d) *Transfer of life-limited parts.* Each person who removes a life-limited part from a type certificated product and later sells or otherwise transfers that part must transfer with the part the mark, tag, or other record used to comply with this section, unless the part is mutilated before it is sold or transferred.

[Doc. No. FAA-2000-8017, 67 FR 2110, Jan. 15, 2002]

# §43.11   Content, form, and disposition of records for inspections conducted under parts 91 and 125 and §§135.411(a)(1) and 135.419 of this chapter.

(a) *Maintenance record entries.* The person approving or disapproving for return to service an aircraft, airframe, aircraft engine, propeller, appliance, or component part after any inspection performed in accordance with part 91, 125, §135.411(a)(1), or §135.419 shall make an entry in the maintenance record of that equipment containing the following information:

(1) The type of inspection and a brief description of the extent of the inspection.

(2) The date of the inspection and aircraft total time in service.

**RSMawhinney**
Ref. # ℞ · 1 8 0 7

ENTERED
№ 235

(3) The signature, the certificate number, and kind of certificate held by the person approving or disapproving for return to service the aircraft, airframe, aircraft engine, propeller, appliance, component part, or portions thereof.

(4) Except for progressive inspections, if the aircraft is found to be airworthy and approved for return to service, the following or a similarly worded statement—"I certify that this aircraft has been inspected in accordance with (insert type) inspection and was determined to be in airworthy condition."

(5) Except for progressive inspections, if the aircraft is not approved for return to service because of needed maintenance, noncompliance with applicable specifications, airworthiness directives, or other approved data, the following or a similarly worded statement—"I certify that this aircraft has been inspected in accordance with (insert type) inspection and a list of discrepancies and unairworthy items dated (date) has been provided for the aircraft owner or operator."

(6) For progressive inspections, the following or a similarly worded statement—"I certify that in accordance with a progressive inspection program, a routine inspection of (identify whether aircraft or components) and a detailed inspection of (identify components) were performed and the (aircraft or components) are (approved or disapproved) for return to service." If disapproved, the entry will further state "and a list of discrepancies and unairworthy items dated (date) has been provided to the aircraft owner or operator."

(7) If an inspection is conducted under an inspection program provided for in part 91, 125, or §135.411(a)(1), the entry must identify the inspection program, that part of the inspection program accomplished, and contain a statement that the inspection was performed in accordance with the inspections and procedures for that particular program.

(b) *Listing of discrepancies and placards.* If the person performing any inspection required by part 91 or 125 or §135.411(a)(1) of this chapter finds that the aircraft is unairworthy or does not meet the applicable type certificate data, airworthiness directives, or other approved data upon which its airworthiness depends, that persons must give the owner or lessee a signed and dated list of those discrepancies. For those items permitted to be inoperative under §91.213(d)(2) of this chapter, that person shall place a placard, that meets the aircraft's airworthiness certification regulations, on each inoperative instrument and the cockpit control of each item of inoperative equipment, marking it "Inoperative," and shall add the items to the signed and dated list of discrepancies given to the owner or lessee.

[Amdt. 43-23, 47 FR 41085, Sept. 16, 1982, as amended by Amdt. 43-30, 53 FR 50195, Dec. 13, 1988; Amdt. 43-36, 61 FR 19501, May 1, 1996; 71 FR 44188, Aug. 4, 2006]

# §43.12   Maintenance records: Falsification, reproduction, or alteration.

RSMawhinney
Ref. # 12 . 1 8 0 8
ENTERED
236

(a) No person may make or cause to be made:

(1) Any fraudulent or intentionally false entry in any record or report that is required to be made, kept, or used to show compliance with any requirement under this part;

(2) Any reproduction, for fraudulent purpose, of any record or report under this part; or

(3) Any alteration, for fraudulent purpose, of any record or report under this part.

(b) The commission by any person of an act prohibited under paragraph (a) of this section is a basis for suspending or revoking the applicable airman, operator, or production certificate, Technical Standard Order Authorization, FAA-Parts Manufacturer Approval, or Product and Process Specification issued by the Administrator and held by that person.

[Amdt. 43-19, 43 FR 22639, May 25, 1978, as amended by Amdt. 43-23, 47 FR 41085, Sept. 16, 1982]

# §43.13   Performance rules (general).

(a) Each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, or other methods, techniques, and practices acceptable to the Administrator, except as noted in §43.16. He shall use the tools, equipment, and test apparatus necessary to assure completion of the work in accordance with accepted industry practices. If special equipment or test apparatus is recommended by the manufacturer involved, he must use that equipment or apparatus or its equivalent acceptable to the Administrator.

(b) Each person maintaining or altering, or performing preventive maintenance, shall do that work in such a manner and use materials of such a quality, that the condition of the aircraft, airframe, aircraft engine, propeller, or appliance worked on will be at least equal to its original or properly altered condition (with regard to aerodynamic function, structural strength, resistance to vibration and deterioration, and other qualities affecting airworthiness).

(c) *Special provisions for holders of air carrier operating certificates and operating certificates issued under the provisions of Part 121 or 135 and Part 129 operators holding operations specifications.* Unless otherwise notified by the administrator, the methods, techniques, and practices contained in the maintenance manual or the maintenance part of the manual of the holder of an air carrier operating certificate or an operating certificate under Part 121 or 135 and Part 129 operators holding operations specifications (that is required by its operating specifications to provide a continuous airworthiness maintenance and inspection program) constitute acceptable means of compliance with this section.

[Doc. No. 1993, 29 FR 5451, Apr. 23, 1964, as amended by Amdt. 43-20, 45 FR 60182, Sept. 11, 1980; Amdt. 43-23, 47 FR 41085, Sept. 16, 1982; Amdt. 43-28, 52 FR 20028, June 16, 1987; Amdt. 43-37, 66 FR 21066, Apr. 27, 2001]

RSMawhinney
Ref. # 12-1809
237 ENTERED

DD

**AA** General Procedures Manual

   a. Narrowbody B Checks

3. QA inspector or QA management or higher who holds Aircraft Release authority (A241) (Refer to Section 19.03):

   a. C Check or equivalent

   b. Widebody B Check or equivalent

## 05.06.4 Procedure — Aircraft Release

A. For all SC, PS, A, B, C, ETOPS 1, and OTS Work Packs

1. Personnel with Aircraft Release Authorization (A241)

   a. Make sure that all E6 AML items and the Work Pack Review are correctly signed (if applicable).

   b. Make sure that the Master Work Card and signature is complete (if applicable).

   c. Make sure that all RII Items, Critical Items Checks, and Confirmation Checks are done.

   d. Make sure that all signatures are recorded correctly.

   e. Examine E6 AML from last A Check to present.

   f. Make sure that all deferred maintenance items are transferred to the Maintenance Item Control (MIC) sheet correctly and that correct placards are in position.

   g. Make sure that all items closed in the E6 AML are also closed on the MIC sheet.

   h. Make sure sufficient time remains for MEL, CDL and MIC items.

   i. Make sure that the Bill of Work documents are complete.

   j. If a FCF is necessary:

     1) Person with Aircraft Release Authorization (A241)

       a) Contact the MOD-MOC to coordinate the FCF.

       b) Tell the MOD-MOC of Bill of Work status (complete or not complete).

     2) MOD-MOC

       a) Authorize FCF.

       b) Send spotting message.

     3) Person with Aircraft Release Authorization (A241)

     NOTE: If the Bill of Work is not complete, coordinate all open items with the flight crew. (Refer to Section 10.01).

       a) Record the statement that follows in the Action Taken column of the subsequent new logsheet:

         (1) Aircraft released for FCF to _____ (refer to spotting message) _____. Bill of Work # _____ (complete/not complete). The aircraft has been inspected and found to be in a safe condition for flight.

       b) After a successful FCF:

         (1) Close all open items and Bill of Work (if applicable).

         (2) Record the items that follow to complete the Aircraft Release section:

EE

# AIR TRANSPORT LOCAL 564

## WESTERN UNITED STATES

TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO

100 West Imperial Avenue Suite R, El Segundo, CA 90245
Phone: 310-640-7430 – Fax:310-640-7432

August 7, 2003

Re:    Trial notification regarding charges filed against S. Mawhinney

This letter is to notify you that the following charges have been filed against you:

> That you violated the TWU Constitution Article XIX, Section 5, *"The following enumerated acts are set forth as typifying conduct unbecoming a member of the Union. This enumeration shall not be construed to exclude from disciplinary action other forms of unbecoming conduct. (e) Maliciously publishing or circulating among the membership false reports or misrepresentations, (g) Willfully wronging a member of the International Union, (h) Using abusive language or disturbing the peace or harmony of any meeting in or around any office or meeting place of the International Union or Local Union.*

> That you violated the TWU Local 564 By-laws Article XV, Section 2, *"No member shall perform his/her duties on the job in such a manner as to place an unfair burden on his or her fellow worker or as to bring discredit to his or her Union."*

Specifically, the charges are as follows:

1.  That you did falsely accuse one Ken MacTiernan of violations of American Airlines company rules and FAA regulations.
2.  That you planned or conspired with another TWU Local 564 member and acted on those plans in an attempt to have his Union brothers disciplined or discharged from American Airlines.
3.  That you did place Ken MacTiernan under an unfair burden to defend himself from these charges to keep the FAA from removing his right to use his Aircraft Maintenance License privileges.
4.  Several other Union brothers were also required to defend themselves of the charges of company rule violations.

A Trial Committee has been assembled to hear arguments from the parties involved regarding the charges. You are entitled to state arguments in your defense on the date of

RSMawhinney
Ref. # [illegible] 5 9 2
ENTERED 239

their time off from the company for the date of the hearing.

Case 3:15-cv-00259-MMA-BLM   Document 1-4   Filed 02/09/15   PageID.1317   Page 27 of 249

The following persons have been selected for the Trial Committee:

| | | |
|---|---|---|
| William Henneberg | Title I | LAX |
| Obied Kahn | Title I | LAX |
| Roger Timms | Title 1 | SFO |

The Local has scheduled a hearing at the following time and place:

Place:      UAW Hall Old Town
            2266 San Diego Ave
            San Diego, CA

Date:       September 16, 2003

Time:       0900

Fraternally,


Chris Oriyano
Treasurer
TWU Local 564 AFL-CIO

Cc:    Local file
       F. Krznaric
       O. Kahn
       R. Timms

2

**RSMawhinney**
Ref. # 5 9 3

ENTERED
0240

FF

# AIR TRANSPORT LOCAL 564

## WESTERN UNITED STATES

### TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO

100 West Imperial Avenue Suite R, El Segundo, CA 90245
Phone: 310-640-7430 – Fax:310-640-7432

October 2, 2003

Re:    Results of the Trial of S. Mawhinney

The charges brought against you by Brother Frank Krznaric were heard before a Trial
Committee comprised of your fellow members on September 16, 2003. After hearing all
the arguments and reviewing the evidence, the Trail Committee came to the following
conclusion.

That because of your actions against Brothers Aaron Klippel and Ken MacTiernan;

1. You violated Article XIX, Section 5, (e), (g), & (h) of the TWU Constitution.
2. You violated Article XV, Section 2 of the Local 564 Bylaws.

*TWU Constitution Article XIX, Section 5, "The following enumerated acts are set
forth as typifying conduct unbecoming a member of the Union. This enumeration
shall not be construed to exclude from disciplinary action other forms of unbecoming
conduct. (e) Maliciously publishing or circulating among the membership false
reports or misrepresentations, (g) Willfully wronging a member of the International
Union, (h) Using abusive language or disturbing the peace or harmony of any
meeting in or around any office or meeting place of the International Union or Local
Union.*

*TWU Local 564 By-laws Article XV, Section 2, "No member shall perform his/her
duties on the job in such a manner as to place an unfair burden on his or her fellow
worker or as to bring discredit to his or her Union."*

Per Article XX, the Local Executive Board is acting upon the recommendations of the
Trial Committee. The Executive Board convened on October 1, 2003 and hereby has
placed you in bad standing with the Union for a period of three years from the date of the
Executive Board Meeting.

If you believe this action was unjust you have the right to appeal the decision per the
TWU Constitution Article XX, Section 9 to the International Committee on Appeals. If
you have any questions, feel free to contact myself at the Hall.

**RSMawhinney**

**Ref. #** 5 8 9

Fraternally,

Chris Oriyano
Treasurer
TWU Local 564 AFL-CIO

Cc:    Local file
       M. Rasco
       J. Farris
       F. Krznaric
       O. Kahn
       R. Timms

CPO/cpo

RSMawhinney
Ref. #    590

242
ENTERED

GG

# AIR TRANSPORT LOCAL 564

## WESTERN UNITED STATES

### TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO

100 West Imperial Avenue, Suite R, El Segundo, CA 90245
Phone: 310-640-7430 – Fax: 310-640-7432

January 8, 2004

David Strauss, Esq.
555 West Beech Street, Suite #302
San Diego, CA 92101

Re.     TWU Local 564: Charges and Trial of Robert Mawhinney

Dear Mr. Strauss,

After careful review of the trial and special circumstances surrounding Mr. Mawhinney, Local 564's
Executive Board has determined that the results of the trial are rescinded; and the Charges against Robert
Mawhinney have been dismissed. No further action will be taken in this Matter and Local 564's Executive
Board now considers the issue closed.

Respectfully,

Chris Onyano
Financial Secretary Treasurer
TWU Local 564 AFL-CIO

cc:     M. Rasco, Local 564 President
        R. Mawhinney
        R. Silber, Esq.

CPO/cpo

**RSMawhinney**
Ref. # ■ . 5 4 5

ENTERED
243

**HH**

# STRAUSS & ASHER

ATTORNEYS AT LAW

DAVID P. STRAUSS
N. DENISE ASHER
MARK A. BENNETT

555 W. BEECH STREET, SUITE 302
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 237-5300
FACSIMILE (619) 237-5311
E-MAIL: sanda@straussandasher.com

*Via Facsimile Transmission and United States Mail*
*(310) 640-7432*

September 4, 2003

Mr. Chris Oriyano
Treasurer
TWU Local 564 AFL-CIO
100 West Imperial Avenue, Suite R
El Segundo, CA 90245

Re: **August 7, 2003 Trial Notification Regarding Charges Against S. Mawhinney**

Dear Mr. Oriyano:

This office represents Steve Mawhinney. We are in receipt of the August 7, 2003 "Trial Notification" which enumerates TWU Constitutional and local By-laws sections which Mr. Mawhinney has allegedly violated. Having reviewed the notice and TWU Constitution Article XIX, it is apparent that the notice is deficient and violative of Mr. Mawhinney's rights under the very Constitution that you purport to uphold in initiating this sham action. For the reasons that follow, Mr. Mawhinney demands that the Local Executive Board, pursuant to Article XIX, Section 3, deem the charges to be improper and so notify the "charging member," presumably Mr. MacTiernan (and possibly others). If this action is not taken, Mr. Mawhinney reserves the right to pursue all available legal remedies -- whether under applicable provisions of federal labor law, breach of contract, defamation, and/or other tort claims -- against the Union, responsible individuals within the Union, Mr. MacTiernan, and anybody else determined to have been responsible for the chain of events leading to the defective trial notification of August 7, 2003 and any adverse consequences that may befall him as a result. I suggest you consult with your legal representatives about the issues raised in this letter.

Section 1 of Article XIX requires that a charge be "specifically set forth in writing signed by the member making the charge and it **must state the exact nature of the alleged...offenses, and if possible, the period of time during which the...offenses allegedly took place.**" As is patently clear from your trial notification, there is nothing **exact** whatsoever about the four charges included. There is also **nothing** there which demonstrates the period of time during which the alleged offenses took place.

Specifically:

1. What is the false accusation that Mr. Mawhinney allegedly made about Mr.

RSMawhinney
Ref. # ·  · 6 0 9
0 2 4 4

Mr. Chris Oriyano
September 4, 2003
Page 2

MacTiernan? It is not specified. How can anybody be expected to identify witnesses or prepare a defense when he is not apprised of the **"exact nature"** of the "false" accusation? And why is the period of time during which this occurred not identified?

2.      With whom did Mr. Mawhinney plan or conspire in an attempt to have which Union brothers disciplined or discharged from American Airlines? Once again, the charge is bereft of the **"exact nature"** of the alleged offense, the identities of those purportedly effected, and the period of time during which all of this supposedly occurred.

3.      What is the **"exact nature"** of the charges Ken MacTiernan defended and what is the **"exact nature"** of the "unfair burden" he allegedly was subjected to in having to defend himself? Once again, during what time period did this occur?

4.      Who were the other Union brothers who were required to defend themselves of which company rule violation(s)? What is the **"exact nature"** of those charges, what was the "exact nature" of the "unfair burden" placed on these other Union brothers, and why is there no time period specified as to when this occurred?

As you are aware, Section 2 of Article XIX states that charges **must be submitted to the Recording Secretary...within sixty (60) days of the time the complainant first became aware, or reasonably should have been aware, of the alleged offense....** Because the charge is bereft of this information, and indicates no reason why it cannot be provided, it is plain from the face of the charge that it is time-barred pursuant to this Constitutional provision. In fact, if the charging parties had appropriately and truthfully complied with the requirement of identifying the time period in which these allegations took place, these charges would be time-barred because they stem from Mr. Mawhinney's safety/regulatory complaints to the Federal Aviation Administration pursuant to American Airline's ASAP protocol, on December 7, 2000.

The required investigation of these complaints was completed by the United States Department of Labor on February 4, 2002 when Frank Strasheim, Regional Administrator, determined that American Airlines had violated 49 U.S.C., Section 42121. (A copy of Mr. Strasheim's decision is enclosed.)   Mr. Mawhinney returned to the workforce early in 2003. While I commend the decision to your perusal for other reasons (see discussion below), please review Findings Nos. 7) and 8) on page 5 of the decision, which make it clear that the issues identified in your August 7, 2003 charge against Mr. Mawhinney occurred **earlier** than October 29, 2001. That being the case, they are obviously time-barred pursuant to your own Constitution.

The United States Department of Labor Findings of February 4, 2002 are also pertinent for another reason. The supposed charges contained in your August 7, 2003 notice to Mr. Mawhinney attempt to rehash, revisit, and disavow a finding in Mr. Mawhinney's favor already made by the United States government. As a review of the decision will reveal, Mr.

**RSMawhinney**

**Ref. #** 2 · · 6 1 0

N° 2 4 5 ENTERED

Mr. Chris Oriyano
September 4, 2003
Page 3

Mawhinney's activities were all **protected under the employee protection provision of 49 U.S.C., Section 42121 of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (the AIR Act).**  The activities he undertook were all legal and in furtherance of the public policy to promote air traffic safety.   Please educate yourself, if you have not already, on the provisions of this law and the protections it affords Mr. Mawhinney -- as well as his Union brothers -- with respect to retaliation as a consequence of these protected activities.  Contrary to your beliefs, Mr. Mawhinney's ethical and legal duties under the law to report safety and maintenance complaints to the Federal Aviation Administration -- and the protections the law affords him for so doing -- trump the time-barred and insufficient charges contained in your August 7, 2003 Trial Notification.

Mr. Mawhinney recognizes that mistakes can happen; that additional information arrives after actions are taken; that a charging party may not necessarily be forthcoming with the facts required for the Union to accurately assess a situation before acting; and that even Union brothers may have motives incompatible with the goals of the organization as a whole.  Accordingly, please consider this notice to the Local Executive Board, that the charges in the August 7, 2003 Trial Notification must now be considered **improper** and the trial cancelled for the following reasons -- all found within Article XIX, Section 3, of your Constitution:

(a) The charges do not state the exact nature of the alleged offense as required by SECTION 1 of this Article;

(b) The charges are untimely under SECTION 2 of this Article;

(c) The act complained of does not sustain a charge of a violation of the Constitution or conduct unbecoming a member of the Union.

Please be advised that if the Union persists in this improper activity, Mr. Mawhinney will pursue his full panoply of legal rights against the Union, its responsible individual governing members, and his accusers.  Please advise all concerned.

Very truly yours,

STRAUSS & ASHER

DAVID P. STRAUSS

Enclosure
cc: Steve Mawhinney (w/o enclosure)

RSMawhinney
Ref. # _____ 6 1 1

NO. 2 4 6

# STRAUSS & ASHER

ATTORNEYS AT LAW

DAVID P. STRAUSS
N. DENISE ASHER
MARK A. BENNETT
JULIANNE MIZER

555 W. BEECH STREET, SUITE 302
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 237-5300
FACSIMILE (619) 237-5311
E-MAIL: sanda@straussandasher.com

*Via Federal Express*

October 17, 2003

John K. Kerrigan
International Secretary-Treasurer
TWU of America, AFL-CIO
1700 Broadway
New York, New York 10019

Re:   **Notice of Appeal of Air Transport Local 564's Unjust Actions
Against Robert Steven Mawhinney dated October 2, 2003,
Received by Mr. Mawhinney on October 6, 2003; TWU
Constitution Article XX, Section 9**

Dear Mr. Kerrigan:

This office represents Steve Mawhinney and files this appeal on his behalf. Pursuant to Article XX, Section 9 attached hereto please find the following:

(a) A copy of the August 7, 2003 charges preferred against Mr. Mawhinney;

(b) A copy of the October 2, 2003 decision of the Executive Board of Local 564;

(c) A copy of this firm's September 4, 2003 letter to Mr. Chris Oriyano, Treasurer of TWU Local 564 with its attachment, the February 4, 2002 Findings of Mr. Frank Strasheim, Regional Administrator of the Occupational Safety and Health Administration of the United States Department of Labor. This letter and the Findings of Mr. Strasheim constitute the initial basis as to why the decision of the Local Executive Board dated October 2, 2003 should be set aside and the determination that Mr. Mawhinney be placed in "bad standing with the Union for a period of three years" be overruled.

The above-referenced letter was provided to the local union in ample time for it to cancel the trial, and/or rectify omissions in its charging documents. The local did neither. As a result, Mr. Mawhinney was forced to defend against time-barred charges and more recent charges stemming from the time barred charges which lacked the required "exactness" necessary to put him on notice to present a defense. Moreover, as indicated in the September 4, 2003 letter and

**RSMawhinney**

Ref. # ░░░ **5 9 ░**

ENTERED
2 4 7

Mr. John K. Kerrigan
October 17, 2003
Page 2

the Department of Labor's February 4, 2002 Findings, Mr. Mawhinney was engaged in activity protected under law.

As evidence of who the real culprit is please consider the following email posted on a mechanic's website by Mr. McTiernan about Mr. Mawhinney on January 22, 2003, 4 days after Mr. Mawhinney returned to his duty station in San Diego on January 18, 2003. In it Mr. McTiernan compares Mr. Mawhinney to "Preparation H." (Attached hereto as Exhibit "d") From that point forward Mr. McTiernan has conducted a campaign of retribution against Mr. Mawhinney that led to his admission in the hearing that he had advocated that Mr. Mawhinney be fired from American Airlines. Why this conduct is not violative of Article XIX, Section 5 of your Constitution defies credulity. Equally mystifying is why your local union feels it has license to retaliate against Mr. Mawhinney for having conducted his job in accordance with Federal Law which protects his ability to advise the government of safety and maintenance issues that can harm the public.

Pursuant to Article XXII, Section 5, appellant Mawhinney requests that in addition to vacation of the decision below, the International Executive Council direct Local 564 to compensate Mr. Mawhinney $2,500.00 representing his attorney's fees for having to apprise the Local of its failings in bringing charges and in filing this appeal.

Very truly yours,

STRAUSS & ASHER

DAVID P. STRAUSS

Enclosures
cc: Steve Mawhinney ✓

RSMawhinney
Ref. #        5 9 6

ENTERED
2 4 8

JJ



# AIR TRANSPORT LOCAL 564
## WESTERN UNITED STATES
Transport Workers Union of America  AFL-CIO
*Aircraft Mechanics and Related Classifications*
11222 S. La Cienega Blvd., Suite 248, Inglewood, California  90304-1102
Tel.: (310) 665-0215  •  Fax: (310) 665-0296
637-M

12-18-01

Mr. Nick Sebastian
United States Department of Labor
OSHA District # 9

I Richard P. Di Marco affirm that the following events transpired on October 29th and 30th 2001.

On October 29th at 1000 hrs I was dispatched to SAN to represent a T.W.U member Robert S. Mawhinney employee # 177487 .

I arrived at SAN production control at approximately 1420 hrs on October 29th and met briefly with Mr. Mawhinney in private to discuss his situation . After a few minutes we were with T.W.U. SAN Vice-Chairman Larry Costanza entered a conference room . Present at the meeting for the Company ( American Airlines Inc . ) were A.A. Human Resources Representative Sherry Kennedy ,A.A. class II stations Regional Manager , Aircraft Maintenance Michael J. Di Stefano and A.A. SAN Aircraft Maintenance Supervisor Ken Harmon .At the beginning of the meeting Mrs.Kennedy advised us of the nature of the meeting and said it would be a 29 F meeting , in two parts . First would be the conclusion of a prior 29 F and then would move forward with a separate 29 F .During the meeting Mr. Harmon stated that the allegations that Mr. Mawhinney had made had placed an undue burden on himself and the station during the investigations by the various Federal Agencies and the Company and that no violations were found .The subject of Job performance was brought up and a job description form was presented to Mr. Mahinney . Mrs. Kennedy asked him if he had ever signed one before . Mr. Mawhinney stated "no" . I then interjected that I had never signed one of those documents either .Mrs.Kennedy seemed surprised that I had not signed one .During the meeting Mr.Mawhinney disagreed on a number of statements the Company tried to confirm from previous meetings relating to the matter of his health and ability to perform Aircaft Maintenance assignments . Mr. Di Stefano then discussed the findings of the internal and federal investigations of allegations that Mr.Mahwinney had made relating to wrong doing by local A.A.Aircraft Maintenance personnel . Mr. Di Stefano stated that no charges were substantiated the investigations .During the course of the hearing Mrs. Kennedy and Mr. Harmon stated that they cared for Mr. Mawhinney`s health and wanted him to return to work .Mr.

RSMawhinney

Ref.

5
249

Mawhinney advised them that his doctor had cleared him back to work months ago . After some discussion on the matter the Company and the Union excused Mr.Mawhinney and went off the record . At 1920 hrs the hearing reconvened to adjourn for the evening . A.A. Human Resources and A.A. Management wanted to have a meeting with the SAN Aircraft Maintenance crew the following morning to discuss any issues the crew might have on all matters ,including Mr.Mawhinney . I requested to be present and the Company granted that request . At that time I left the property .

At approximately 0645 on October 30th 2001 the affore mentioned individuals minus Mr.Costanza and Mr. Mahwinney were present with the night and day shift at the SAN terminal maintenance area to discuss various issues including problems they had with Mr.Mahwinney . At the meeting some T.W.U. represented employees said they felt uncomfortable working around Mr.Mahwinney and what was the status of the complaints they had filed against Mr.Mawhinney . I do not recall her response .The crew basically stated that Mr.Mawhinney`s return to the workplace would create a hostile work environment . After the meeting I was going to return to the Union hall at LAX . At approximately 0920 hrs Mr. Harmon told me he was going to reinstate Mr.Mawhinney on a Career Decision Day letter ( the last level of dicipline prior to termination ). I was led to believe based on the previous nights dialogue that Mr. Mawhinney would be reinstated on a 2nd step letter ( a lesser form of discipline ) . At approximately 1042 hrs we reconvened the final 29F . At this time Mr. Harmon read to Mr. Mawhinney the terms of his reinstatement per the Career Decision Day letter and instructed him to report back to his office at 0630 hrs on November 1st 2001 with his reply . At that time the meeting adjourned and I returned to the Union hall at LAX . This is my recollection of these events.

Respectfully submitted,

Richard P. Di Marco
Vice-President
T.W.U. local 564 AFL-CIO

**RSMawhinney**

**Ref. #** . . 5 7 6

ENTERED
2 5 0

**KK**



**SAN DIEGO OFFICE OF APPEALS**    (619) 521-3300
3517 Camino Del Rio South, #310
SAN DIEGO CA 92108

| | |
|---|---|
| ROBERT S MAWHINNEY<br>SSN:  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<br>Claimant-Appellant | Case No. **903009**<br><br>Date Appeal Filed: 12/27/2002<br><br>EDD:  0060   BYB:  07/28/2002 |

**Date and Place of Hearing(s):**
(1)  02/20/2003    San Diego

**Parties Appearing:**
Claimant

---

# DECISION

The decision in the above-captioned case appears on the following page(s).

The decision is final unless appealed within 20 calendar days from the date of mailing shown below.  See the attached "Notice to Parties" for further information on how to file an appeal.  If you are entitled to benefits and have a question regarding the payment of benefits, call EDD at 1-800-300-5616.

Susana Halfon, Administrative Law Judge

Date Mailed:

MAR 2 2003

RSMawhinney

Ref. # 645

ENTERED
251

CLT/PET:  Robert S. Mawhinney          ALJ:  Susana Halfon
Parties Appearing:  Claimant
Parties Appearing by Written Statement:  None

## STATEMENT OF FACTS

The claimant appealed from a Notice of Claim Status, which held that his claim for unemployment insurance benefits was invalid under section 1277 of the unemployment insurance code on the basis that he was not paid nor did he earn sufficient amount of wages and that he did not perform work during the period in question.

The claimant had been a long term employee of American Airlines as an aircraft maintenance technician. The claimant's benefit year for the instant case began July 28, 2002.

The period in question for determination of whether he has a valid claim under section 1277 is July 29, 2001 through July 27, 2002.

Administrative notice is taken of Case No. 545038, which is currently closed. That case was decided by another administrative law judge for a different benefit year, for an issue under section 1253(c). In that case the administrative law judge found that the claimant was not ineligible for benefits under 1253(c) because he was able and available to work despite the restrictions imposed by his employer, American Airlines.

There is extensive documentation in the file as exhibits which lay out the claimant's status with his employer and his numerous attempts to return to his position on a full-time basis. It is particularly important to note the following from those documents.

At the root, of the difficulties between the claimant and his employer, American Airlines, is the fact that the employer imposed a series of adverse actions against the claimant, which eventually led to his "constructive discharge" in retaliation for communicating safety and maintenance complaints to the Federal Aviation Administration.

Administrative notice is also taken of the complaint that the claimant filed with the U. S. Department of Labor (DOL) under the whistleblower protection provisions of the Aviation Investment and Reform Act for the 21st Century (AIRA).

030327-903009                    2                    

RSMawhinney
Ref. # . . 6 4 6

ENTERED
2 5 2

Finally the claimant asserts that he has followed every directive from the employer in his efforts to return as soon as possible to work on a full-time basis. This has included submitting to medical and psychiatric evaluations as well as pursuing the matter internally through the labor representative. One of the conclusions drawn by the investigation was that the employer felt pressure from the claimant's coworkers to terminate the claimant because of his whistle blower activities.

## REASONS FOR DECISION

Section 1277 of the Unemployment Insurance Code provides that notwithstanding section 1281, if the base period of a new claim includes wages paid prior to the effective date of, and not used in the computation of the award for, a previous valid claim, the new claim shall only be valid if, during the 52-week period beginning with the effective date of the previous valid claim, either of the following applies:

(a)  The individual earned or was paid sufficient wages to meet the eligibility requirements of section 1281 of the code and performed some work.

(b)  The individual did not receive unemployment benefits, and was disabled, and was entitled to receive unemployment disability or workers compensation benefits.

In *Oliver v. California Unemployment Insurance Appeals Board* (1983) 143 Cal.App.3d 215, the claimant was discharged. She filed a complaint with the National Labor Relations Board and received back-pay for a period of time she was not working. The claimant would have been employed but for the wrongful action of the employer. The court held the back-pay award was wages whether she was reinstated or not. The court further held the claimant's involuntary idleness met the "some work" requirement of section 1277 of the code.

In the instant case the claimant has been able and available and willing to return to work on a full-time basis. However, the employer for whatever its reasons has not allowed or permitted the claimant to do so. The claimant has vigorously pursued his rights through various internal as well as external regulatory agencies, and the undersigned finds that he has meet the twin requirements of the lag test on two basis.

The claimant has received "compensation" which surpasses the lag test requirements as reported in the check stubs, despite the fact that the checks themselves were voided.

030327-903009          3



RSMawhinney
Ref. #

ENTERED
2 5 3

The claimant has also met the work requirement on the basis that he went to his work site on two days in October, 2001.

Moreover, and in the alternative, pursuant to the provisions set forth in the *Oliver v. California Unemployment Insurance Appeals Board* case cited above, the preliminary order from the U S Department of Labor ordering the employer to compensate the claimant for lost wages and other compensation further meets the wages requirement as well as the some work requirement of section 1277.

For the foregoing reasons, claimant's claim under section 1277 is valid for the period 7-29-01 through 7-27-02.

<u>DECISION</u>

The Department notice of determination is reversed. The claimant's claim is not invalid pursuant to section 1277 of the code.

SD:gb



030327-903009                    4                    RSMawhinney
                                                      Ref. #

LL

Case 3:15-cv-00259-MMA-BLM Document 1-4 Filed 02/05/15 PageID.1339 Page 49 of 249



# Transport Workers Union of America
*Affiliated with American Federation of Labor-Congress of Industrial Organizations*
*Aircraft Mechanics and Related Classifications*

## Local 564

637-M

## STATEMENT OF GRIEVANCE

Name of Employee **Ken MacTiernan**          Employee No. **066961**

Station **SAN**          Shop or Section **A/C Maintenance**          Classification **AMT**

Name of Immediate Supervisor **Jose Montes**

**EMPLOYEE'S STATEMENT OF GRIEVANCE:**

On 7-30-11 crew chief Steve Mawhinney performed RON inspection on A/C 592. It is not the responsibility of crew chiefs to perform or accomplish overnight inspections. This is an AMT's job function. Overtime was not offered for 6th day night shift for 7-30-11 to cover the work load performed by the crew chief. I hereby grieve being not offered overtime for night shift on 7-30-11. I wish to be made whole for 10 hours of overtime pay.

TO ENSURE PROPER HANDLING GRIEVANT MUST PROVIDE CURRENT ADDRESS AND PHONE

**8724 Villa La Jolla Dr. #91**
PRINT ADDRESS

**La Jolla  CA          92037**
CITY, STATE          ZIP CODE

**(619) 395-6681**
HOME PHONE          WORK PHONE

I authorize the Transport Workers of America as my representative to act for me in the disposition of this grievance.

Date **8-5-11**          Signature of Employee *Ken MacTiernan*

Signature of Union Representative _____

          Print Name of Rep.          Title

Date presented to Supervisor _____ Station _____

**This Statement of Grievance is to be made out in TRIPLICATE. All three are to be signed by the employee and the TWU officer handling the case. Forms No. 1 and 2 are to be given to the Supervisor. No. 3 is to be given to the Local.**

**RSMawhinney**
This Form may be retained by
Repr. Company

**1    105**

**ENTERED NO. 255**

**Transport Workers Union of America**

Affiliated with American Federation of Labor-Congress of Industrial Organizations

Aircraft Mechanics and Related Classifications

**Local 564**

● ⬡ 637-M

LOCAL ADDRESS

_____

_____

_____

_____

## STATEMENT OF GRIEVANCE

Name of Employee **Ken MacTiernan**     Employee No. **066961**

Station **SAN**     Shop or Section **A/C Maintenance**     Classification **AMT**

Name of Immediate Supervisor **Jose Montes**

**EMPLOYEE'S STATEMENT OF GRIEVANCE:**

On 7-31-11 Crew Chief Steve Mawhinney performed a ~~Routine Service~~ Periodic Inspection on A/C 3BF. It is not The Responsibility of Crew chiefs to perform or Accomplish overnight inspections. This is an AMT's job Function. Overtime was not offered For 6th Day Night Shift For 7-31-11. To cover The work load performed by The Crew chief. I hereby grieve being not offered over time For Night Shift on 7-31-11. I wish To be made whole For 10 hours of overtime pay.

TO ENSURE PROPER HANDLING GRIEVANT
MUST PROVIDE CURRENT ADDRESS AND PHONE

**8724 Villa La Jolla DR. #91**
PRINT ADDRESS

**La Jolla   CA        92037**
CITY, STATE                ZIP CODE

**(619) 395-6681**
HOME PHONE          WORK PHONE

I authorize the Transport Workers of America as my representative to act for me in the disposition of this grievance.

Date **8-5-11**     Signature of Employee **Ken MacTiernan**

Signature of Union Representative _____

Print Name of Rep. _____     Title _____

Date presented to Supervisor _____     Station _____

**This Statement of Grievance is to be made out in TRIPLICATE. All three are to be signed by the employee and the TWU officer handling the case. Forms No. 1 and 2 are to be given to the Supervisor. No. 3 is to be given to the Local.**

**1**

**RSMawhinney**
This Form may be retained by
Ref. company 2106

ENTERED
NO. 256

MM

1    MR. HENDRICKS:  Okay.

2    Q.   BY MR. MAWHINNEY:  Let me get the

3    statement.  "This is in a small part a problem of

4    the AMT because some AMTs will not write up items

5    they found because of the 'inconvenience' of having

6    to write."

7         Was that your email?

8    MR. HENDRICKS:  Objection.  Relevance.

9    THE ARBITRATOR:  I'm not oriented here to this

10   email.  What's the subject?

11   MR. MAWHINNEY:  The documentation of maintenance

12   and that there are some AMTs that do not document

13   because of inconvenience to having to write.

14   THE ARBITRATOR:  Is that the case,

15   Mr. MacTiernan?  There are some --

16   THE WITNESS:  I'm trying to find the section

17   that Steven was reading.

18   Q.   BY MR. MAWHINNEY:  Okay.  It starts here.

19   A.   Okay.  I'm not aware of mechanics that

20   don't write things up.  I -- this was coming from a

21   member of the Transport Workers Union who was

22   working on manning hourwise with the company to see

23   how long a specific task would take, a specific

24   inspection.

25        And he had told me that the company would

821

1  go back and look at how often technicians would

2  write up nonroutine items. And it was his opinion

3  that, you know, a mechanic may not say, "Hey, I

4  changed a reading light that was out," because it's

5  actually more time writing up a reading light than

6  changing the light.

7      Q.   So that didn't come from you; that came

8  from someone else?

9      A.   Yes.  After speaking with other people

10  about -- see, the nature for this email was American

11  reducing the level of inspection.  And I personally

12  didn't agree with it and the reasoning that the

13  company gave for reducing the amount of man-hours.

14  That's the nature behind this email, with other

15  like-minded technicians.

16      Q.   So it's your email?

17      A.   Yes.

18      Q.   And these are your -- this -- you typed

19  that in, but that's -- those are not your words?

20      THE ARBITRATOR:  Maybe you can explain it,

21  Mr. MacTiernan.  The message is -- says, "From:

22  mactiernan," and then to -- it has a long list of

23  people.

24      THE WITNESS:  Yes.

25      THE ARBITRATOR:  The date sent and the subject

1    re: looks like forward, "AA & TWA" --

2         THE WITNESS:   "...overnight aircraft at a

3    maintenance station with no check..."

4         THE ARBITRATOR:   All right.  So then the

5    paragraph under that, the content of the message, is

6    that something you wrote or something you forwarded

7    on that was written by someone else or a

8    combination?

9         THE WITNESS:   It might be a combination.  I

10   don't recall exactly.  But I'm not saying that this

11   is, in a small part, because mechanics will not

12   write up items because I'm not aware of mechanics

13   that I have worked with that have done that.  Coming

14   from a union rep that was working with man-hours, he

15   was saying that that was one of the reasonings that

16   the company may have reduced the man-hours is

17   because -- his opinion was, well, people just don't

18   bother to write changing a reading light.

19        THE ARBITRATOR:   "His opinion" being -- "his"

20   being the union rep?

21        THE WITNESS:   Yes, ma'am.

22        Q.   BY MR. MAWHINNEY:   So the overall message

23   is that a mechanic could not document work performed

24   on an aircraft.  Is that what we're saying here?

25        MR. HENDRICKS:   Misstates the testimony.

                           823

NN

**To:** Dittmer@dellepro.com ; Yogi1K@aol.com ; Glenn & Ami Olsen
**Cc:** Yogi1K@aol.com ; DL87OOLDS@aol.com ; tulsadriller@cox.net ; amfa002@cox.net ; Bossmania2000@aol.com ; Seadog727@aol.com ; Safdie4@aol.com ; ENZOSJETS@aol.com ; GOLDENSIL@aol.com ; hcarb@bellsouth.net ; JEFYG@aol.com ; PEREZ43@yahoo.com ; Indycar2@juno.com ; flotilla@dellepro.com ; joejett3@attbi.com ; yats00@yahoo.com ; jereese@bellsouth.net ; mshorowitz@hotmail.com ; Mikemomcl@aol.com ; prjacks@dellepro.com ; P2CARUSO@aol.com ; RICKATMIA@aol.com ; B777Rick@aol.com ; Aajetfixer@aol.com ; SReginello@aol.com ; Gameovre@aol.com ; TWood13383@aol.com ; UFA143116@aol.com ; stammerer@bellsouth.net
**Sent:** Sunday, May 11, 2003 7:33 AM
**Subject:** Re: Fw: AA & TWA overnight aircraft at a maintenance station with no check as...

On several occasions I have had to change a tire on an over night because of a tie bolt being broken. Don't forget the fuel/hydraulic/lav. leaks that could be found on an over night. But then again, it was explained to me in my little meeting with Mike Distefano that the company did not do this "over night". There were committees with Crew Chiefs, Tech. Crew Chiefs, Supervisors, etc. and they looked at histories of these systems and discovered that it is not necessary to look at them because the frequency that these items caused a problem do not warrant their constant inspection. (Funny, I do not remember ever being asked MY input. Or the input of anyone from my station. How about your station? I honestly don't remember if the twu was involved or not. I think they should have been involved though since it affected our jobs. Not that the twu would of cared.) It was told to me as an example, why inspect the CSD oil level every night when it is rarely serviced? They looked at non-routine item cards and E-6 log pages as well as MELs. This is in a small part a problem of the AMT because some AMTs will not write up items they found because of the "inconvenience" of having to write. This 0912 reduction is just like a certain station not stocking a NO GO item because they have historically only used it maybe once a year. They are playing the odds. It is as simple as that. You can play the odds for just so long. But as we all know, the house will eventually win. I also feel that AA will bring back some of the laid off AMTs after they are done with the RIFs. The company will lay off too many people like they always do. Then offer to recall these laid off AMTs as part time. Am I wrong? I hope so. But do we have part time language in our Industry Leading Contract? Yes. Will the twu stop the company from doing this? No. Do we have a choice? Yes. Get rid of the twu and get a union that will fight for us and our profession.   Ken MacTiernan  C/C SAN

**RSMawhinney**
**Ref. #     6 4 4**



OO

*One-engine-inoperative-Cruise Speed* means a speed within the certified operating limits of the airplane that is specified by the certificate holder and approved by the FAA for —

    (1) Calculating required fuel reserves needed to account for an inoperative engine; or

    (2) Determining whether an ETOPS alternate is within the maximum diversion time authorized for an ETOPS flight.

*South Polar Area* means the entire area South of 60° S latitude.

[Doc. No. FAA-2002-6717, 72 FR 1878, Jan. 16, 2007]

# §121.9   Fraud and falsification.

(a) No person may make, or cause to be made, any of the following:

    (1) A fraudulent or intentionally false statement in any application or any amendment thereto, or in any other record or test result required by this part.

    (2) A fraudulent or intentionally false statement in, or a known omission from, any record or report that is kept, made, or used to show compliance with this part, or to exercise any privileges under this chapter.

(b) The commission by any person of any act prohibited under paragraph (a) of this section is a basis for any one or any combination of the following:

    (1) A civil penalty.

    (2) Suspension or revocation of any certificate held by that person that was issued under this chapter.

    (3) The denial of an application for any approval under this part.

    (4) The removal of any approval under this part.

[Doc. No. FAA-2008-0677, 78 FR 67836, Nov. 12, 2013]

# §121.91   Applicability.

This subpart prescribes rules for obtaining approval of routes by certificate holders conducting domestic or flag operations.

[Doc. No. 28154, 61 FR 2610, Jan. 26, 1996]

# §121.105   Servicing and maintenance facilities.

RSMawhinney
Ref. # K·1823

ENTERED
0261

PP


**Section 17.18 — Recording of Repair, Alteration, and Maintenance Items by Aircraft Maintenance Ref. FAR 121.380**

| 14CFR | 121.380(a)(2)(vii) | | |
|-------|--------------------|---|---|
| CEME | U1A | V21 | V24 |

## 17.18.1 GENERAL

A. The following outlines AA's requirements for recording all work in the form of repair, alteration, and maintenance corrective actions in Aircraft Maintenance (FAA - FAR 121.380).

## 17.18.2 RECORDING OF REPAIRS

A. A record will be made of all work accomplished resulting from discrepancies found during aircraft maintenance checks and inspections.

B. All aircraft corrective action items will be recorded and signed for on one of the following:

NOTE: For each method of recording corrective action as listed there is a corresponding rejection method. The following describes the method and references the specific GPM Section.

| | Document | Reject Method | GPM Ref. |
|---|----------|---------------|----------|
| a. | Work Card | E-58-2 | Section 17.11 |
| b. | Shop Order | E-58-2/Repairable Reject | Section 17.11/Section 30.01 |
| c. | Special Items Card | E-58-2 | Section 17.11 |
| d. | ECO/FCD Card | E-58-2 | Section 17.11 |
| e. | E6 Aircraft Log | E-58-2/E6 | Section 05.01/Section 18.01 |
| f. | FMR Print-out (For FMWC Bills-of-Work or MAPS Bills-of-Work) | E-58-2/FMR | Section 17.11/Section 16.03 |
| g. | FMR work cards (for MAPS Bills-of-Work) | E-58-2/FMR | Section17.18/Section 16.03 |
| h. | E58 Repair Item Form (also referenced as a non-routine) | E-58-2 | Section 17.11 |
| i. | Non-Routine Item Page | E-58-2 | Section 17.11 |
| j. | DWMS-Electronic Signature | Electronic Non-routine Reject | Section 17.11 |

C. For contract services on customer aircraft, AA must accomplish the requested services in accordance with the customer's approved maintenance program and manuals. Procedures and associated manuals for completion of customer's work cards, EOs, EAs, and MJOs must be provided by the customer.

D. All repair, alteration, and maintenance actions will be recorded and signed for by a qualified mechanic, inspector, or person qualified to approve such actions, to comply with Federal Aviation Regulations (FARs). (See Section 17.11.)

E. As mechanics and inspectors in their normal work routine discover the need for corrective action, they will record such discrepancies on the appropriate Repair Item Form and submit that form to supervision for work scheduling purposes.

1. Corrective action on mechanic-originated non-routine items should normally be entered on the Repair Item

RSMawhinney

QQ



reason for rejection in the discrepancy block. The closing requirement will be set to QA or RII. The inspector will then sign the rejected item on the card in red ink and include the serial number of the newly generated non routine.

3. If a routine task card is reopened, the completion statement panel is cleared but the statement is retained in the Work in Progress panel. After making the required corrections to paper copy, the card will need to be recompleted. Once the card is in the closed status, it is ready for Audit.

C. No individual may signoff for another person's work. In the event an individual performs work and then goes off duty without signing the required work records, the person in charge of that work area may complete the record as follows:

1. Ensure that the required work is satisfactorily completed.

2. Print the name of the individual who actually completed the work in the space provided on the work record.

NOTE: In the event that repair/corrective action information is transcribed from one work record to another, it must remain unchanged and accurately reflect the original entry.

3. The person in charge will sign his/her name and enter the date in the record card space just below that of the printed name. Signature signifies that the person in charge accepts responsibility that the work has been satisfactorily completed.

D. Maintenance actions taken by a technician who does not hold a fleet qualification or task specific training shall be co-signed by the technician who performed the work and the technician who provided guidance for the work. Technicians providing guidance must be appropriately certificated and properly trained or qualified to perform the work. The technician providing guidance is responsible for insuring the work was performed in accordance with the applicable approved maintenance data.

1. Technical Services/MOD may provide such guidance by phone, fax, or other means provided the information is sufficient to ensure the correct accomplishment of the work. Sign off for a maintenance action taken in this situation is not required to be co-signed but the sign-off must indicate that guidance was provided by Technical Services/MOD and note by name and payroll number who provided the guidance.

### 09.03.4 ENTRIES

A. Personnel making card/form entries are responsible for the accuracy and legibility of such entries.

B. For all blocks or spaces left blank:

1. Use NR for Not Required.

NOTE: If certain conditions are met, some maintenance tasks and/or documents are not required. N/R may be used when task is not required in order to comply with maintenance specifications.

Individuals signing off tasks as NR are certifying that he/she has reviewed the maintenance specifications and determined the task is not required in order to comply with the specifications. Individuals signing tasks as NR must also note authorizing source (e.g. maintenance manual, IPC, work cards, etc.) and any other pertinent information.

2. Use NA for Not Applicable.

NOTE: If certain conditions are met, some maintenance tasks and/or documents are not applicable. N/A may be used when conditions exist such as model/fleet effectively, modification level, task duplication or when a task cannot be accomplished.

Individuals signing off tasks as NA are responsible for ensuring that all NA tasks are duplicated on other open documents and/or the tasks are not applicable per other authorizing sources (e.g., maintenance manual, IPC, work cards, etc.). Individuals signing tasks as NA must also note the other open document or the authorizing source and/or other pertinent information.

When a work card contains text indicating that it is not applicable under certain specific conditions and those conditions are met, the entire work card may be signed off as not applicable. In an area adjacent to the conditions statement, it should be noted, "Card not applicable" and signed by both Production and Quality Assurance.

RR

## Discussion Record

| 00177487 | R | MAWHINNEY | SAN | 7/31/1989 | 2010 | 868988 |
|----------|---|-----------|-----|-----------|------|--------|
| Employee No | Initial | Lastname | Sta.Code | Co. Seniority Date | Year | Discussion Nbr. |

| Date of Incident or Action | Subject or Incident Discussed | Details/Action Taken/Commendation/Other Remarks<br>Briefly Explain What Was Discussed/Commitments Made<br>Include Any Significant Date/Time/Place. Supervisor"s Signature/Date Following Each Entry |
|---|---|---|
| 11/2/2010 | Expectations SAN Aircraft Maintenance | The purpose of this discussion with Mr. Steven Mawhinney is to discuss the expectations for all San Diego Aircraft Maintenance Personnel. These expectations were discussed in a recent Crew Chief Meeting conducted on October 12th. At this time I would like to take the opportunity to convey these expectations to Steven:<br><br>-Knowing responsibilities/roles for all shifts including Proper Turnovers from shift to shift.<br><br>Day Shift – Constant monitoring of MAPS to stay ahead of any changes for the overnight workload, the ordering of parts accordingly, and work package buildup.<br><br>Afternoons – The balancing of workload between afternoons and nights, along with the recent afternoon Crew Chief/A1 expectation list posted on 10/19/2010<br><br>Nights – Proper Prioritizing of overnight workload with concentration on Engine Wash and MEL completion.<br><br>-Training Expectations for all Employees<br><br>Not being qualified is a burden to the operation. Discussed with Steven that he will be expected to obtain and maintain the necessary qualifications for any job assignment (Fleet Qualifications, LMP, ER, etc…). I also expressed to Steven that when required training class's become available, he will be given advanced notice to attend.<br><br>-Workplace Environment Expectations<br><br>Expressed to Steven that the workplace environment is to remain professional at all times. Personal differences are to remain outside of the workplace, and the focus is to remain concentrated on work-related content. I also advised Mr. Mawhinney that if and when he is aware of unprofessional or any other inappropriate behavior in the workplace, I would expect that he would notify me immediately in order to properly address the issue.<br><br>JOSE MONTES<br>00598733 / SAN<br>11/2/2010 |

*177487*
*11-2-10*

RSMawhinney

Ref # [      ] 214

ENTERED
2 6 4

SS

1      MR. HENDRICKS:  This is asked and answered.

2      MR. MAWHINNEY:  Did I -- did we already ask

3  that?

4      THE ARBITRATOR:  I don't believe he's asked it

5  of this witness.

6      MR. HENDRICKS:  I thought he asked whether he

7  gave Klippel a CR1, and we went over it.

8      MR. LAWRENCE:  He's asking about the one --

9      MR. MAWHINNEY:  It is a CR1.

10      MR. LAWRENCE:  -- that Mr. Klippel testified to

11  earlier.

12      THE ARBITRATOR:  Yes.

13          So go ahead, Mr. Montes.

14      THE WITNESS:  Which --

15      Q.   BY MR. MAWHINNEY:  151 is page 214.  It

16  will be in this book.

17      A.   151.  Okay.

18      Q.   Did you present Mr. Klippel with one of

19  these expectations of aircraft maintenance in

20  San Diego CR1?

21      A.   Yes.

22      Q.   Okay.  How about Mr. MacTiernan?

23      A.   I'm pretty sure, yes, as well.

24      Q.   Okay.

25      MR. MAWHINNEY:  Exhibit 336.  I have another

1024

TT

1   book.

2      A.   Okay.

3      THE ARBITRATOR:  Do you recall, Mr. Klippel,

4   getting a CR1 from Mr. Montes?

5      Q.   BY MR. MAWHINNEY:  And it references -- the

6   subject is titled "Expectations of San Diego

7   Aircraft Maintenance."

8      A.   Not a disciplinary, but he --

9      Q.   Correct.

10     A.   Yeah.

11     Q.   Oh, you did?

12     A.   He -- yeah.  Everybody got one.

13     Q.   Okay.  Do you know -- do you know what it

14  says here, that -- if you want to read along,

15  it's --

16     A.   Where am I now?

17     Q.   It was -- that was 214.

18     MR. LAWRENCE:  I don't think it's Exhibit 214.

19     MR. HENDRICKS:  What exhibit number is it?

20     MR. MAWHINNEY:  151.

21     Q.   And so you were presented one with your

22  name where my name would be?

23     THE ARBITRATOR:  So take a look at this --

24     THE WITNESS:  I'm sure I was.

25     THE ARBITRATOR:  -- this document.  You

UU

**Section 09.03 — Maintenance Records - General Requirements Ref. FAR 121.380, 121.369(C)/43.12, FAR Part 145.219**

| 14CFR | 43.12 | 119.59 | 121.369(c) | 121.380 |
|-------|-------|--------|------------|---------|
| CEME  | U1A   |        |            |         |

NOTE:   Any revisions to this Section must be coordinated with the Chief Inspectors for the FAR145 Repair Stations (TUL and AFW).

## 09.03.1 GENERAL

A.  FAR 121.380 specifies the maintenance record requirements and the specific period for which the records are to be kept. These requirements are:

1.  The total time and cycles in service of the airframe.

2.  The current status of life-limited parts of each airframe, engine, rotor and appliance.

3.  The time since last overhaul of all items installed on the aircraft, which are required to be overhauled on a specified time basis.

4.  The identification of the current inspection status of the aircraft, including the times since the last inspections required by the inspection program under which the aircraft and its appliances are maintained.

5.  The current status of applicable Airworthiness Directives (ADs), including the method of compliance.

6.  A list of current major alterations to each airframe, engine, rotor and appliance.

B.  American Airlines requires maintenance records of work accomplished on airframes, engines and accessories in accordance with FAR 121.369(c). Your signature and employee number, in the area provided for a signature and employee number, indicates that you have accomplished the task described. This applies to all aircraft maintenance forms such as, but not limited to, maintenance manual work cards, MCM cards, FMR workcards (MAPS Bills-of-work), E6 Logbook, non-routine discrepancy forms, ECOs and FCDs. These records are required to show the work accomplished, by whom and on what date. These records shall be retained and made available to the FAA or NTSB as per paragraph D. and E. of this section. Records are also used to determine reliability trends and for condition monitoring purposes. These same records may be generated, completed, and stored within DWMS.

C.  A federal statute governing air commerce provides for criminal penalties of a fine and/or imprisonment for up to five (5) years for any person who intentionally:

1.  Fails to make or retain a required report or record; or

2.  Falsifies, mutilates or alters a required record or report; or

3.  Files a false record or report. Furthermore, FAR 43.12 prohibits any person from making or causing to be made:

    a.  Any fraudulent or intentionally false entry in any maintenance record or report;

    b.  Any reproduction, for fraudulent purpose, of any maintenance record or report;

    c.  Any alteration, for fraudulent purpose, of any maintenance record or report.

D.  The commission of any of the above acts is a violation of American Airlines policy and AA Regulations and would be the basis not only for appropriate company disciplinary action up to and including discharge, but also for a civil penalty or for suspending or revoking applicable airman certificates by the FAA.

E.  All maintenance records must be completed and handled as specified by procedures in the following Sections of the GPM:

1.  Section 09.04 Aircraft Maintenance Records

2.  Section 26.01 Power Plant Maintenance Records



VV

1   THE ARBITRATOR:  So is there a question for the

2   witness?

3   Q.   BY MR. MAWHINNEY:  Would you agree with

4   Mr. Klippel's statement to me that said, "Put a

5   Post-It note on for Kenny to sign for on another

6   day," being Saturday afternoon?  Would you agree

7   with that statement?

8   MR. HENDRICKS:  I'm going to object as being --

9   first of which, the document speaks for itself.

10  This is argumentative.

11  THE ARBITRATOR:  Yes.

12      Rephrase it.

13  Q.   BY MR. MAWHINNEY:  Okay.  Mr. Klippel wrote

14  that I should put a Post-It note on the service

15  inspection for the oil service and that

16  Mr. MacTiernan would sign for it on a different day,

17  being a Saturday afternoon.  Would you agree with

18  that?

19  THE ARBITRATOR:  Would it be -- agree that that

20  would have been acceptable to do that night?

21  MR. MAWHINNEY:  Correct.

22  THE WITNESS:  I think the intent that

23  Mr. Klippel had was, he knows that Mr. MacTiernan

24  did do the work.  It just wasn't signed for on the

25  work card.  So I think he's passing that along to

1004

1    Steve saying, "Hey, I know he did the work.  He just

2    forgot to sign for it."

3         THE ARBITRATOR:  So it would be all right to use

4    the Post-It note for that -- for Mr. Mawhinney to

5    put the Post-It note there?

6         THE WITNESS:  It's kind of an individual call.

7    Somebody may be comfortable with leaving a Post-It

8    note.  Some would say, "Hey, you know, someone needs

9    to sign off that block."  It is, at the time, an

10   accepted practice to leave Post-It notes.  Does

11   everyone have to conform to that policy?  No one's

12   saying you have to, but it's just kind of a general

13   practice.

14        Q.   BY MR. MAWHINNEY:  But you also said that

15   not knowingly doing that and releasing the aircraft?

16        MR. LAWRENCE:  Misstates the testimony.

17        THE ARBITRATOR:  Yes.  Sustained.  It's

18   incomplete.

19        Q.   BY MR. MAWHINNEY:  Okay.  But -- so you're

20   agreeing that it's a general practice to put a

21   Post-It note on the oil service of an aircraft and

22   have a crew chief release that aircraft into service

23   releasing it?

24        THE ARBITRATOR:  He hasn't testified to that.

25        MR. HENDRICKS:  That misstates the testimony.


1005

**WW**

1    released into service?

2         A.    In relation to what?

3         Q.    In relation to a Post-It note in the place

4    of an unsigned-for block of -- that documents

5    someone performed the oiling of an aircraft?

6         MR. HENDRICKS:  I'm going to object as to

7    relevance.

8         THE ARBITRATOR:  The objection's overruled.

9             You may answer.

10        MR. LAWRENCE:  You're talking about for American

11   or any airline?

12        THE ARBITRATOR:  We're only talking about

13   American.

14        THE WITNESS:  Is it acceptable to leave a

15   Post-It note --

16        THE ARBITRATOR:  Have you ever seen someone put

17   the Post-It note in there for --

18        Q.    BY MR. MAWHINNEY:  In place of the

19   signature where there was no signature, and then the

20   aircraft would be allowed to be released?

21        A.    Not knowingly, no.

22        Q.    Not knowingly.

23        A.    Not if -- if a work package is reviewed

24   after the plane's left or -- and you discover a

25   missing signature, we get back to that mechanic and

1000

1    say, "Hey, you forgot a block here."

2         Q.    That wouldn't be intentional?

3         A.    No, that's not intentional.

4         Q.    But knowingly, that would be a problem to

5    release an aircraft with unsigned maintenance blocks

6    and put a Post-It note there for somebody to come

7    along another day to sign for it?

8         THE ARBITRATOR:  So can you rephrase that?

9         MR. MAWHINNEY:  I'm sorry.

10        Q.    So it would not be appropriate to release

11   an aircraft that had unsigned signature blocks for

12   the oiling of that aircraft and in place had a

13   Post-It note; is that true?

14        A.    If --

15        Q.    It would not be appropriate to release the

16   aircraft?

17        THE ARBITRATOR:  He's already testified, I

18   think, that you don't do it knowingly.  If they

19   discover it after the fact, there may be a Post-It

20   note or maybe some notation in there that they have

21   to get that signature in the block --

22        MR. MAWHINNEY:  Correct.  Okay.

23        THE ARBITRATOR:  -- but they don't do it in

24   advance.  They don't try to use Post-It notes

25   instead of signatures, I think is the intention.

                          1001

**xx**

1  object as to relevance on this issue.  I'm not

2  seeing the connection between the particular claims

3  as to why he was disciplined versus that particular

4  document.

5      THE ARBITRATOR:  Well, there are a couple of

6  alternative theories on this.  One is in terms of

7  who is disciplined and who is not.  I think there's

8  no dispute that Mr. MacTiernan didn't do what he was

9  required to do.  Now the question is, Mr. Montes, as

10  the supervisor or the person in charge of the

11  San Diego office, he finds out about this after the

12  fact.

13      And so now we're going into a question of,

14  were you familiar with the requirements for the oil

15  servicing and the EMOIL policy, why they're -- why

16  they have this policy?

17      THE WITNESS:  Yeah.  Now that I have -- I read

18  it, it's essentially conveying the importance of

19  documenting oil properly so that we can monitor the

20  engine consumption and the health of the engine for

21  all American flights, especially ETOPS flights,

22  which is our extended twin operation over water.

23      THE ARBITRATOR:  All right.  There's no dispute

24  about this either?

25      THE WITNESS:  No.

992

ARBITRATION- VOL. IV

YY

**EMOIL Data Entry Requirements: From M&E bulletin G-09-55**  Proper and timely entry of oils added in EMOIL is imperative to determine oil consumption for engines and APU's.  It is especially important for ETOPS flights.  If oil consumption is not calculated properly (due to incorrect information) for an ETOPS flight, the safety of the passengers and crew could be at risk and American Airlines certificate to operate ETOPS could be restricted.  All personnel involved with the release, closing, and auditing of the work cards, logbooks, and E165's must verify that the EMOIL entries MATCH EXACTLY with documentation.

Hollins Smith / Aircraft Maintenance Compliance Manager Western Division/ American Airlines  / 7000 WorldWay West / Los Angeles, CA 90045
Phone: 310.6426870/ Cell: 310.4627254/Fax: 310.6466497/ E-mail: hollins.smith@aa.com

**AmericanAirlines**  We know why you fly.<sup>SM</sup>

CONFIDENTIALITY NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipients(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer system.

**RSMawhinney**

Ref. # _____

ZZ

1       A.    Correct.

2       Q.    It doesn't address the -- that he did not

3  accomplish the duties as crew chief on this

4  5 o'clock shift and --

5       THE ARBITRATOR:  Stop.

6       MR. MAWHINNEY:  Excuse me.  You're right.  Too

7  many questions.

8       THE ARBITRATOR:  One question at a time.

9          So does the CR1 address any issues about

10  whether he accomplished his duties as the crew chief

11  that evening?

12      THE WITNESS:  No, it doesn't.

13      Q.    BY MR. MAWHINNEY:  Did Mr. Klippel receive

14  a First Advisory for not accomplishing his duties as

15  crew chief on the 5 o'clock shift for that day,

16  11 -- November 5th, 2010?

17      MR. HENDRICKS:  That assumes facts not in

18  evidence.  It lacks foundation.

19      THE ARBITRATOR:  It does.  So we'll rephrase the

20  question.

21          Did he receive a First Advisory?  Did you

22  determine whether he was sufficient in accomplishing

23  his duties as the crew chief?  Let's take it one at

24  a time.

25      THE WITNESS:  So was there a failure of

1013

AAA

1    Q.   BY MR. MAWHINNEY:   The policies of oiling

2    these aircraft are the GPM 8.08.   If we want to

3    bring up Exhibit 303 for your recollection here,

4    it's going to be --

5    THE ARBITRATOR:   That's all right.   You don't

6    have to pull that up.   There are GPMs that apply to

7    requirements for servicing aircraft; is that

8    correct?

9    THE WITNESS:   Yes.

10   Q.   BY MR. MAWHINNEY:   So when an aircraft

11   mechanic goes home and hasn't documented how much

12   oil he's put in but you're asking for another

13   mechanic to just go out and put some more oil in it,

14   would you recognize that the chain of accuracy on

15   how much oil went in the aircraft has been broken?

16   MR. HENDRICKS:   Objection.

17   THE ARBITRATOR:   Well, it's -- I think what he's

18   referring to is that the amount -- the consumption

19   of oil by that aircraft may be --

20   THE WITNESS:   In dispute?

21   THE ARBITRATOR:   Right.

22   -- may be in question if you just put some

23   more oil in without documenting how much was put in

24   the night before.

25   THE WITNESS:   Well, you know, you can only go by

993

1    what you found.  So if Mr. Mawhinney and his team

2    went to that airplane and they didn't have to

3    service the oil, then they can only go by that.  If

4    they had to service the engine with oil, then they

5    would document that and go from there.

6         Q.    BY MR. MAWHINNEY:  Yes.  That would be the

7    case.

8              But when Mr. MacTiernan had gone home and

9    we didn't know what kind of oil that he put in, that

10   amount of oil was not going to be included in our --

11   in American's accurate oil consumption of each of

12   those engines; correct?

13        MR. HENDRICKS:  That's --

14        THE ARBITRATOR:  Yes.  Let's break that down.

15             You're referring to if Mr. MacTiernan did

16   not enter the amount of the oil that he put in when

17   he serviced the night before and went home, then

18   even if a mechanic comes along subsequently and puts

19   oil in, there's no record of what Mr. MacTiernan put

20   in; is that correct, if he doesn't document it?  You

21   can answer.  If he doesn't know the answer, you can

22   tell us.

23        THE WITNESS:  It's kind of like a given; right?

24   I mean, you don't know what he did.  At that point,

25   all we can do is accomplish the task again.  I don't

994

BARKLEY
Court Reporters

1    know if there's a right or wrong answer for that.

2        Q.    BY MR. MAWHINNEY:   Okay.   Now, I had

3    emailed you asking for assistance trying to figure

4    out how I could document the paperwork for this

5    dilemma that I was unable to determine how much oil

6    went in that aircraft by Mr. MacTiernan; is that

7    true?

8        THE ARBITRATOR:   On that night of November 5th,

9    2010?

10       MR. MAWHINNEY:   Correct.   Correct.

11       MR. HENDRICKS:   Objection.   The email speaks for

12   itself.

13           What exhibit is that?

14       MR. MAWHINNEY:   You mean my email?

15       MR. HENDRICKS:   That you're referring to, yes.

16       THE ARBITRATOR:   So, Mr. Montes, do you recall

17   receiving an email from Mr. Mawhinney asking for

18   your assistance on this issue that night?

19       THE WITNESS:   I would have to see the email.

20       MR. MAWHINNEY:   Okay.

21       MR. LAWRENCE:   It's Exhibit O.

22       MR. MAWHINNEY:   You have it as O?

23       MR. LAWRENCE:   I believe that's what you're

24   referring to.

25       MR. MAWHINNEY:   Correct.

BARKLEY
Court Reporters

BBB

## AMERICAN ARBITRATION ASSOCIATION

Matter # 76 166 00371 11 DECR

Robert S. Mawhinney, Claimant
and
American Airlines, Inc., Respondent

### REPORT OF ARBITRATION MANAGEMENT CONFERENCE #1
### AND SCHEDULING ORDER

An Arbitration Management Conference ("AMC") was conducted by telephone on February 25, 2014 at 9:00am PST. Present on the call were Arbitrator Hon. Alice D. Sullivan (Ret.); Claimant Robert S. Mawhinney on behalf of himself; Robert Jon Hendricks, Esq. and Larry M. Lawrence, Esq. Counsel for Respondent. Also on the call was AAA Case Manager Denise Crow. The following timeline and ORDERS are established for the Arbitration.

DIRECT EXCHANGE
Counsel agree to Direct Exchange. All communication between Counsel and the Arbitrator must be in writing, copied to all counsel and the Case Manager. Requests for a conference call, if needed, shall be submitted in writing. All written communications may be submitted by email.

| | |
|---|---|
| Robert S. Mawhinney | SteveN24RD@yahoo.com |
| Robert Jon Hendricks, Esq. | rhendricks@morganlewis.com |
| Larry M. Lawrence, Esq. | llawrence@morganlewis.com |
| Hon. Alice D. Sullivan (Ret.) | Judge@privatejudge.com |
| Bobbie J. Fincher | bfincher@privatejudge.com |

(Bobbie Fincher is Judge Sullivan's assistant and should be copied on all correspondence to Judge Sullivan)
Denise Crow                    crowd@adr.org

### I. ARBITRATION HEARING DATES
July 14-18 and July 21-25, 2014

Arbitration hearing dates are firm. Parties and witnesses are to reserve dates accordingly. Direct testimony [may] be submitted by affidavits. Affidavits of direct testimony are to be exchanged by  TBD  .

PLEASE ADVISE YOUR CLIENTS AND WITNESSES TO RESERVE DATES NOW.
A cancellation fee of 50% is charged by the Arbitrator if reserved hearing time is cancelled with less than 30 calendar days notice. If cancelled time is rebooked, the cancellation charge is reduced accordingly.

The Parties shall cooperate in production of their witnesses and coordination of dates for testifying.

[NOTE: The Parties have "AIR 21" Administrative proceedings pending; no hearing date set.]

LOCATION
San Diego, CA
Mr. Hendricks will reserve a hearing locale and provide notice to all.



DEMAND
- Wrongful termination;
- Retaliation;
- Breach of contract;
- Fraud;
- Harassment; and
- Intentional infliction of emotional distress.

Claimant seeks:
- Income;
- Expenses; and
- Exemplary damages.

SPECIFICATION OF CLAIMS
Mr. Mawhinney will provide a written narrative explanation of the claims, setting forth the allegations regarding who, what, when and where no later than March 11, 2014.
[Please note the list of items in Mr. Hendricks' correspondence of February 24, 2014 on pg. 2.]

RESPONSE & SPECIFICATION OF DEFENSES
American Airlines will produce the brief it previously filed in the OSHA proceedings by March 14, 2014 regarding the basis of the termination of employment of Mr. Mawhinney. In addition, American shall disclose any affirmative defenses asserted in response to Claimant's Specification of Claims, and any other defensive matters on which Respondent bears the burden of proof.

AMENDED PLEADINGS
If any amended Claims / Counterclaims / are filed, please submit in redline/track changes format so modifications are clearly noted.

**II. EXCHANGE OF INFORMATION**
If any discovery or other issues arise, the parties will meet and confer. If parties are unable to resolve any issues, parties shall timely request a call to submit the issue for prompt resolution. Delay in completing discovery is not grounds for continuation of the hearing.

DOCUMENT EXCHANGE
Document exchange shall be completed by March 28, 2014.
The Parties shall immediately provide their initial document requests. The requests may be supplemented after the Specification of Claims and Response and Specification of Defenses have been exchanged.

All documents upon which a Party intends to rely shall be produced. Document requests shall be limited to documents that 1) are reasonably believed to exist in the other Party's possession or control; 2) are sufficiently identified; and are 3) relevant or will lead to the discovery of admissible evidence in the dispute.



DISCLOSURE OF POTENTIAL WITNESSES
WITH BRIEF SUMMARY OF EXPECTED TESTIMONY/ROLE IN THE CASE
Shall be submitted by April 7, 2014.
This shall include the name and last known address or other contact information of each witness;
and a brief description [approximately 4-5 sentences] of their expected testimony or role in the
case. *For example:*
Jonathan Rios
1234 Date Drive, Lansing, California
1.444.352.7890
jrios@yahoo.com
Mr. Rios will testify that he was present at the meeting with _____ and _____
on [date] when he saw/heard [the event].

EXPERTS
None

MOTIONS
If a dispositive prehearing motion is requested, please submit a request to file the motion
demonstrating in a short letter, or in a conference call, why the motion is likely to be granted and
likely to produce savings in arbitration time and or expense, and a proposed briefing schedule.
If the request is granted, a briefing schedule will be established.

DISCOVERY CUT OFF
Discovery shall be completed by June 13, 2014.

## III. BRIEFS – EXHIBITS – AWARD
ARBITRATION BRIEFS
Prehearing Briefs are to be filed with testimonial affidavits and key exhibits no later than five (5)
calendar days prior to hearing. Each Party shall provide its exhibits on electronic disc or flash
drive to the Arbitrator with its Prehearing Brief.

*A witness binder of all exhibits is required at the hearing. Each proposed exhibit shall be pre-
marked for identification and must have been provided to the other party during discovery.
Please be advised that the AAA does not need a copy of the parties' exhibits. Exhibits need not
be lodged in advance with the ARBITRATOR except any "key" exhibits which a Party wants the
Arbitrator to read before commencement of the hearing. Any "key" exhibits shall be furnished
with the prehearing briefs.*

**Pre-Hearing Briefs/Statement of Relief Requested   TBD**
Counsel are required to provide a brief "Statement of relief requested", as to each Claim and
Counterclaim thirty days (30 days) prior to commencement of the hearing. This Statement would
typically be 1-3 pages. It is not a summary of the factual evidence. The Parties will have the
opportunity to submit prehearing briefs.

The "Statement of Relief Requested" should include:
1. the relief requested, including dollar amounts, as to each Claim and Counterclaim;
   proposed injunction language and term if applicable; the *citations* to the statutes or cases
   supporting such relief; and

Mawhinney v. American Airlines, Inc.
February 26, 2014
Page 3 of 5

2. if pre-judgment interest is sought, specify the percentage requested, source of the entitlement to interest (e.g., specify statute, contract section, etc.), and commencement and termination dates of the interest calculation, for each claim.

It is not required that you do the final calculation of interest requested until the close of evidence.

## HEARING WITNESS LIST / EXHIBIT EXCHANGE

No later than _____ TBD ___, the parties shall exchange their lists of witnesses expected to be called at the hearing. All witnesses must have been disclosed in the discovery/prehearing phase, unless exclusively a rebuttal witness. If a witness' testimony is to be offered by videotape or transcript, the party offering the testimony shall so identify it on the witness list.

Exhibit lists shall be exchanged by ___ TBD _____.

## TYPE OF AWARD
☐ Standard
☐ Reasoned
☐ Findings of fact and conclusion of law
☑ TBD

## COURT REPORTER
☐ Yes
☐ No
☑ TBD

Parties advised that retention of a reporter is at the requesting party's (ies) expense and administrative responsibility.

## VIDEO CONFERENCE
☐ Yes
☐ No
☑ TBD

## LANGUAGE TRANSLATOR
☐ Yes
☐ No
☑ TBD

## IV. RULES/FEES
RULES
Per Section b)(i) of the Settlement Agreement and Release signed December 17, 2002:
"The arbitrator shall be bound by the arbitration procedures set forth in the Model Employment Arbitration Procedures of the American Arbitration Association, including the requirement for a written decision."

ATTORNEY FEES & COSTS
Per Section b)(i) of the Settlement Agreement and Release signed December 17, 2002:
"Each party shall bear his or its own attorney's fees and costs except that American shall bear the cost of the arbitrator and any other costs unique to arbitration as opposed to litigation. The arbitrator shall have the authority to order any legal and or equitable relief or remedy which would be available in a civil or administrative action."



**CLOSING ARGUMENT**
The Parties will be given the opportunity for either oral or written closing arguments. This will be decided after consultation, and in consideration of the issues and time constraints.

**V. NEXT** Arbitration Management Conference ("AMC")
April 14, 2014 at 3:00 pm PDT

       Agenda:
- Affidavits of direct testimony: Exchange date;
- Witness Statements: Exchange date;
- Exhibit List: Exchange date;
- Type of Award;
- Court reporter;
- Video conference;
- Language translator.

To the extent this scheduling Order does not accurately reflect the directives issued at the February 25, 2014 Preliminary Hearing, please send any additions or corrections to the undersigned and all counsel within five calendar days of service of this Management Conference Order.

This Order shall continue in effect unless and until amended by subsequent order of the Arbitrator. All dates herein shall be strictly enforced.


Dated: February 26, 2014          _Alice D. Sullivan_
                                    Hon. Alice D. Sullivan (Ret.)
                                    Arbitrator





American Arbitration Association

AAA 73 166 00371 11 DECR

Honorable Alice D. Sullivan

The telephonic Arbitration Management Conference (on Feb. 25, 2014), and the Report of Arbitration Management Conference #1 and Scheduling Order (Feb. 26, 2014), describes that "the parties will meet and confer" and that a "Document exchange shall be completed by March 28, 2014".

I Robert S. Mawhinney (RSM) did reach out in an amicable attempt to request American Airlines (AA) cooperation in the exchange of evidence on March 10, 2014, as per Your Honor's request that "The parties shall immediately provide their initial document requests" (Available upon request). The response was deafening and no attempt of communication was made by the opposing party (AA) until March 28, 2014, the date due for document exchange. The opposing party (AA) is displaying their *modus operandi* by refusing to cooperate with RSM's numerous attempts to "Meet and Confer", as well as with the American Arbitration Association (AAA) by:

> not notifying the AAA of the claim(s) RSM did raise for 35 days after the request for Private Arbitration on Sept. 29, 2011, RSM was provided in the Settlement Agreement of Dec. 17, 2002 (Exhibit B = ExB.pdf and Exhibit C = ExC.pdf and Exhibit D = ExD.pdf);

> not meeting the deadline for securing Arbitration before the AAA with a "filing fee" due on or before Nov. 29, 2011, and verified by AAA Case Manager Denise M. Crow on Dec. 12, 2011 (Exhibit E = ExE.pdf and Exhibit F = ExF.pdf);

> Denying the venue for Private Arbitration before the AAA, though provided for within the Settlement Agreement of Dec. 17, 2002 (Exhibit G = ExG.pdf);

Not notifying the AAA until Dec. 12, 2011 of AA exercising their option to "stay, applicable to all entities", which was implied by the Chapter 11 Bankruptcy of Nov. 29, 2011 (Exhibit G = ExG.pdf). And when given notice by the U.S.DOL-OSHA, that their investigation would continue "without AA's cooperation" (Exhibit H = ExH.pdf), AA chose to temporarily come out of their "stay" and submit what amounts to a conspiracy by numerous co-workers in an effort to ostracize RSM and an attempt of AA to justify RSM termination of employment all due to RSM's continual concern of violence in the workplace, theft from AA in the form of sleeping while on duty, the short-cuts in Aircraft Maintenance procedures RSM witnessed, the misrepresentation of Facts in signing for tasks (not)completed on AA Aircraft RSM witnessed, and for safety of the public on AA Aircraft with the results of all RSM witnessed. This was previously recognized by the U.S. DOL-OSHA on Feb. 4, 2002 (Exhibit I = ExI.pdf and Exhibit J = ExJ.pdf) and was supposed to be resolved with the Settlement Agreement of Dec. 17, 2002. However, AA continued their campaign to target RSM and made numerous attempts to find fault in only RSM by –



Insisting that RSM take short-cuts and not follow AA, FAA, and the Aircraft Manufacturer's step by step instructions at accomplishing those task(s) (Exhibit K = ExK.pdf).

Placing RSM in a hostile environment which could never be confirmed, due to AA internal investigation process (Exhibits too numerous to bring forward in this pleading).

And, ignoring similar qualities with numerous coworkers, and third-party contractors, which go with the territory (Shop Talk – language) (Too numerous, at this pleading).

Respondent's counsel objects to RSM request for evidence in the discovery stage with canned messages such as: overly broad; unduly burdensome; vague; ambiguous; unintelligible; compound. And that they: fail to specify with reasonable particularity the category of information sought;

Not reasonably calculated to lead to the discovery of admissible evidence;

Information protected by privacy, copyright, or other similar legal protection;

Information protected by FAA, TSA, or other applicable safety rules and requirements;

Information protected by one or more individuals' constitutional, statutory, and/or common law privacy rights, the attorney-client privilege, or the attorney work product doctrine;

Documents not within Respondent's possession, custody, and/or control;

Information that is equally available to Claimant.

RSM portrays before Your Honor that these excuses are disingenuous, specious and sophistry in an attempt to hide the truth from Your Honor's scrutiny. The attempt(s) made for an amicable exchange of relevant and pertinent information in an informal process were met with a formal response. It is evident that a formal process be employed for an efficient and sincere adherence to this tribunal's due process. The right to inspect under this section (C.C.P. § 2031) is not enjoyed without first obtaining order of court predicated on notice of motion and showing of good cause. (Greyhound Corp. v Superior Court (1961) 56 C2d 355, 15 Cal Rptr 90, 364 P2d 266)". And, "Production or inspection of books and papers is to be granted where applicant has special interest or right in them. (Atchison, T. & S. F. R. Co. v Superior court (1961) 191 CA2d 489, 12 Cal Rptr 788)".

It has become clear that a number of subpoena's are in order for the official request of evidence after amicable attempt(s) have failed, and, RSM move this tribunal and request the power of subpoena by Your Honor to efficiently move this case forward and to fully understand:

The details of this case;

The policies that RSM and all the others were required to live and abide by; and

That Your Honor recognizes the length's AA will go to, in an attempt to hide the truth.



The production of telephone records is in order to reveal the harassing behavior RSM, and immediate family, were subjected to during the course of employment. The immediate family of RSM encountered telephone calls in the early morning hours, between 3:30 AM and 4:30 AM, on numerous dates. These telephone calls were only meant to harass as they were initiated and allowed to ring once or twice before the telephone line would drop. A fellow co-worker encountered similar harassing telephone calls and purportedly captured the offender's telephone number, and reported the harassment to AA management.

Further request for telephone records would be evidence that AA management would not allow communication contact by screening the calls and not answering attempts made by RSM to notify AA management of difficulties encountered while RSM was left alone overseeing the entire AA Aircraft Maintenance operation. Executive decisions were necessary and a timely response required to maintain the schedule of AA itineraries.

The Subpoena(s) sought by RSM include:

1. For records relevant and pertinent to the efficient performance of RSM employment duties, formally described in the attached discovery request (Discovery Request = D1.pdf)
2. Telephone records of Robert F. and Anne Mawhinney between the months of Aug. 2010 and Feb. 2011 (858-454-3674), with the consent of Robert F. and Anne Mawhinney;
3. Telephone records of Anthony Degrazia on Nov. 5, 2010, Nov. 6, 2010, Apr. 30, 2011, Aug. 8, 2011, and Aug. 9, 2011;
4. Telephone records of Jose Montes on Nov. 5, 2010, Nov. 6, 2010, Apr. 30, 2011, Aug. 8, 2011, and Aug. 9, 2011;

It has also become apparent that subpoena(s) are in order for the demands placed on RSM by AA to attend a deposition and to produce further discovery request(s). RSM intends to cooperate with the process, however, stipulations are in order and reasons for calendaring dates need to be placed in writing to excuse RSM from other commitments. It is obvious that AA and AA counsel will reach deep within their financial means to employ the Barkley Court Reporting Company in an attempt to further defame RSM through the use of Video Recording during deposition. The date of such deposition should be after May 15, 2014 to give AA the necessary time to respond to discovery requests made by RSM, so that RSM would be in a better position to answer relevant and pertinent questions asked during deposition. The transcripts of the deposition must be made available to RSM for copying as soon as available.

Robert Steven Mawhinney, Plaintiff

Dated:        April 1, 2014

Cc:    bfincher@privatejudge.com        judge@privatejudge.com        CrowD@adr.org

        Rhendricks@MorganLewis.com        LLawrence@MorganLewis.com





American Arbitration Association

Honorable Alice D. Sullivan

Robert S. Mawhinney, Plaintiff          )

     v.          )          Case No.

American Airlines, Inc., Defendant          )          AAA 73 166 00371 11 DECR

Re:     Plaintiff's request for production of Documents to Defendant [Set No. 1]

Propounding Party:     Plaintiff Robert Steven Mawhinney

Responding Party:     Defendant American Airlines, Inc.

Set Number:     One

Pursuant to the provisions of C.C.P. § 2031, plaintiff Robert Steven Mawhinney requests that defendant American Airlines, Inc. serve a response to this request within the time prescribed by law, and produce the documents described below for inspection and copying at 10:00 A.M. on May 1, 2014 at the San Diego Central Library, 330 Park Blvd., San Diego, California 92101-7416.

A.  Instructions and Definitions
   1.  <u>Plaintiff</u>. As used herein, the term "plaintiff" shall refer to Robert Steven Mawhinney.
   2.  <u>Time Period</u>. Unless otherwise specifically stated, this Request shall be for documents prepared or dated from the beginning on Robert S. Mawhinney's employment up to and including the present.
   3.  <u>Construction of Conjunctives</u>. As used herein, the conjunctives "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other wherever such dual construction will serve to bring within the scope of this Request any documents which would otherwise not be brought within its scope.
   4.  <u>Construction of the Singular and Plural Forms</u>. As used herein, the singular form shall include the plural and vice-versa wherever such dual construction will serve to bring within the scope of the Request any document which would otherwise not be brought within its scope.
   5.  <u>Partial Production</u>. Wherever a document is not produced in full, please state with particularity the reason or reasons it is not being produced in full, and describe, to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not produced and the reasons therefor.
   6.  <u>Documents Withheld</u>. If any documents are withheld because the request therefor is objected to on grounds of any claim of privilege, work product, or any other grounds, you are directed to specify with particularity:
      a.  Legal reason for withholding;
      b.  Portion of request, i.e., request number or numbers, to which withheld document is responsive;



    c.  Parties to the documents, e.g., addressers and addressees;

    d.  Date of document;

    e.  Date upon which you first acquired knowledge of the information contained;

    f.  Subject matter of the document;

    g.  Length in pages of the document;

    h.  Location of the document;

    i.  Custodian of the document;

    j.  Identity of persons to whom the information, or any portion thereof, has been revealed.

7. <u>Orderly Response</u>.   Please produce documents in such a manner as will facilitate their identification with the particular request or category of requests to which they are responsive.

8. <u>Discuss</u>. As used herein, the term "discuss" or any variant thereof, when applied to the content of any documents, shall be understood to apply if the document mentions, describes, refers to, relates to, or in any other way deals with the subject matter described in the request in which the term "discuss" or any variant thereof appears.

9. The word "document" is used in these requests in the broad and liberal sense and means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any kind and description, whether sent, received, or neither, and all copies which differ in any way from the original (whether by interlineation, stamped received, notation, indication of copy sent or received or otherwise) regardless of whether designated confidential, privileged or otherwise and whether an original, master, duplicate or copy, including, but not limited to, papers, notes, E-mail messages, facsimile transmissions, accounts statements or summaries, ledgers, pamphlets, periodicals, books, advertisements, objects, letters, memoranda, notes or notations of conversations, contracts, agreements, drawings, telegrams, audio or video tape recordings, communications, including inter-office and intra-office memoranda, delivery tickets, bill of lading, invoices, quotations, claims documents, reports, records, studies, work sheets, working papers, corporate records, minutes of meetings, circulars, bulletins, notebooks, bank deposit slips, bank checks, canceled checks, check stubs, diaries, diary entries, appointment books, desk calendars, data processing cards and/or tapes, computer software, electronic mail messages, photographs, transcriptions or sound recordings of any type of personal or telephone conversations, interviews, negotiations, meetings or conferences, or any other things similar to any of the foregoing.

10. The term "communication" as used in these requests means any words heard, spoken, written or read, regardless of whether designated confidential, privileged or otherwise, and including, without limitation, words spoken or heard at any meeting, discussion, interview, encounter, conference, speech, conversation or other similar occurrence, and words written or read from any document(s) as described above.

11. The term "person" as used in these requests means individuals or entities of any type, including, but not limited to, natural persons, governments (or any agencies thereof), quasi-public entities, corporations, partnerships, groups, mutual or joint ventures and other forms of organizations or associations.



12. The term "date" as used in these requests shall mean the exact day, month and year, if ascertainable or if not, the best approximation thereof (including by relationship to other events).

13. As used herein, the words or phrases, "explaining"," describing", "defining", "concerning", reflecting" or "relating to" when used separately or in conjunction with one another mean directly or indirectly mentioning, pertaining to, involving, being connected with or embodying in any way or to any degree the stated subject matter.

14. The term "relate to", or any similar phrase, shall mean refer to, reflection, concern or be in any way logically or factually connected with the matter discussed.

15. If a request is made for production of documents which are no longer in the possession, custody and/or control of defendant, state when such documents were most recently in the possession, custody and/or control of defendant and what dispositions were made of them, including the identity of the person(s) believed to be presently in possession, custody and/or control of the documents. If a document has been destroyed, state when such document was destroyed, identify the person(s) who destroyed the document, and the person(s) who directed that the document be destroyed and the reasons the document was destroyed.

16. If more than one copy of a requested document (e.g., a clean copy and a copy with handwritten or other notations) exists, and if one or more documents have any writing on them which differentiate them from other copies, defendant shall produce all such copies.

### Requested Documents

1. Any and all documents relating to plaintiff's job performance.

2. Any and all documents describing the job duties of plaintiff while he worked with defendant. This includes, but is not limited to, job description.

3. Any and all documents reviewed, referred to, considered, or utilized in any way in connection with the defendant's decision to terminate plaintiff's employment.

4. Any and all documents relating or pertaining to plaintiff's termination.

5. Any and all documents which were reviewed and/or generated in connection with any investigation done of plaintiff at any time, including any investigation resulting in his termination.

6. Any and all documents which American Airlines contend constitute after-acquired evidence justifying plaintiff's termination.

7. Any and all data and/or information which defendant contends justify plaintiff's termination.

8. Any and all documents constituting plaintiff's payroll records.

9. Any and all documents relating to plaintiff's salary and/or compensation history with defendant.

10. Any and all documents which describe and/or define how salary and benefits were calculated for the plaintiff (and/or his successor) from the time of the commencement of plaintiff's employment through the present.



11. Any and all documents reflecting non-compensation benefits afforded to plaintiff and his successor including, but not limited to, documents reflecting the methodology for calculating those benefits.

12. Any and all documents which refer or relate to defendant's personnel policies, procedures and/or practices in existence during plaintiff's employment.

13. All personnel manuals in existence during plaintiff's employment.

14. Any and all company handbooks, formal, and informal policies, addressing the rights and obligations of employees in the workplace in existence during plaintiff's employment.

15. Any and all documents reflecting or pertaining to any complaint and/or criticism registered by plaintiff of or concerning any other employee or agent of defendant at any time.

16. Any and all documents reflecting or pertaining to any complaints of plaintiff pertaining to issues of workplace and/or airline safety.

17. Any and all documents relating or pertaining to the initiation of and/or investigation of any complaint about plaintiff during his employment with defendant.

18. Any and all documents reflecting or pertaining to any complaint, criticism, and/or commendation registered about plaintiff by any other employee or agent of defendant at any time.

19. Any and all documents reflecting or pertaining to any complaint, criticism, or commendation registered about plaintiff by any third party at any time, which is to include the respective Name, Address, and Telephone Number of the party to each document.

20. Any and all documents constituting plaintiff's personnel file(s), including file covers.

21. Any other file of or concerning plaintiff maintained by any person within defendant's organization, including, but not limited to, Human Resources within American Airlines, and American Airlines management personnel during plaintiff's employment.

22. Documents reflecting any policy and/or practices of defendant with respect to the ability of defendant to compel the psychiatric evaluation of an employee such as plaintiff in existence at any time from the beginning of plaintiff's employment until his termination.

23. Any and all documents which describe the reasons for and the mechanism to effect a "fitness for duty assessment" such as the one plaintiff experienced on Feb. 9, 2001.

24. Organizational charts reflecting plaintiff, his co-workers, and management of defendant while plaintiff was employed with defendant in San Diego, California.

25. Any and all calendars, Day-Timer's, appointment books, schedules, notes, memoranda, etc., of all American Airlines management, and similar agents or employees, insofar as they reference plaintiff and/or matters related to plaintiff.

26. Any and all correspondence between plaintiff and any employee and/or agent of the defendant.

27. Any and all documents comprising the file of Harold A. Cronson, M.D. pertaining to the Independent Psychiatric Evaluation conducted of the plaintiff on Feb. 9, 2001.

28. Any and all documents reviewed by Harold A. Cronson, M.D. pertaining to the plaintiff.

29. Any and all documents pertaining to the plaintiff and comprising the file(s) of the American Airlines Medical Department, including but not limited to: David K. McKenas, M.D., M.P.H.;



Tom Bettes, M.D.; Darren Neal, D.O.; Tracy Nelson, R.N; Cindy Murr, R.N; Pamela Denyer; and Sherry Kennedy.

30. Any and all documents pertaining to plaintiff and reviewed by American Airlines Medical Department, including but not limited to those previously mentioned under #29.

31. Any and all "Harassment Complaint Form(s)" filed by any employee, agent, and/or co-worker against plaintiff.

32. Any and all "Harassment Complaint Form(s)" filed by plaintiff.

33. Any and all documents generated, received, and /or maintained by American Airlines Human Resources and/or personnel department(s), management, agents, or employees which mention, discuss, pertain to, and/or relate to plaintiff.

34. Any and all American Airlines Performance Counseling Records pertaining to plaintiff.

35. Any and all documents describing the obligations of an employee such as plaintiff to contact the American Airlines EAP.

36. Any and all documents describing the repercussions that can be visited upon an employee such as plaintiff for a failure to contact the American Airlines EAP when so instructed.

37. The Aviation Safety Action Partnership (ASAP) between American Airlines Maintenance and Engineering, the Federal Aviation Administration and the Transport Worker's union in existence at the time while plaintiff was employed.

38. Any and all "AA/TWU/FAA ASP Event Form(s)" and any attachments, filled out by plaintiff from 1999 through the present.

39. Any and all documents provided by defendant to the Transport Workers Union of America (TWU) and/or TWU Local 564 which refer, mention, or relate to the plaintiff.

40. Any and all documents provided to defendant by the Transport Workers Union of America (TWU) and/or TWU Local 564 which refer, mention, or relate to plaintiff.

41. Any and all documents reflecting the content of any meetings, hearings, Board of Inquiry, and/or discussions of or concerning plaintiff between defendant and the Transport Workers Union of America (TWU) and/or TWU Local 564.

42. Any and all documents provided to any government investigator, including but not limited to, Blake Wu of the U.S. Department of Labor-OSHA, and Nicholas Sebastian of the U.S. Department of Labor-OSHA, Terry Wilmeth of the U.S. Department of Transportation-FAA, and David P. Smith of the U.S. Department of Transportation-FAA, in connection with plaintiff's complaint filed alleging a violation of 49 U.S.C. 42121 of the Aviation Investment and Reform Act for the 21st Century.

43. Any and all documents which American Airlines contend support any contention that plaintiff might commit violent acts while he was an American Airlines employee.

44. Any and all documents which American Airlines contend support any contention that plaintiff's performance as a mechanic had deteriorated such that plaintiff could not complete his duties in a professional manner.

45. Any and all documents which American Airlines contend support any contention that plaintiff's conduct in any way caused American Airlines to consider that it may have been related to an underlying and/or debilitation medical and/or psychological condition.



46. Any and all documents mentioning, referring to, or describing the "Career Decision Day" options afforded plaintiff, including but not limited to, that which occurred on October 30, 2001, and on September 23, 2011.

47. Any and all documents which demonstrate that American Airlines have held disciplinary actions in abeyance without informing an employee, pending medical clearance, then instituting a "Career Decision Day" disciplinary process, upon receipt of medical clearance, in circumstances similar to that presented by plaintiff.

48. Any and all documents, reports, testimony which led you to conclude that plaintiff at the Board of Inquiry meeting on October 29, 2001 answered any questions in such a fashion that he merited being charged with violations of company policy, misrepresentation of facts, and/or falsification of records.

49. Any and all written communications between the American Airlines Legal Department and the U. S. Department of Labor, including but not limited to, Gary Kennedy, Esq., Randall J. White, Esq., and Enza Ricciardone, Esq.

50. Any and all written communications between the American Airlines Legal Department and the U. S. Department of Transportation, including but not limited to, Gary Kennedy, Esq., Randall J. White, Esq., and Enza Ricciardone, Esq.

51. The American Airlines General Procedures Manual (GPM) Section 08.01 applicable at the time of November 5, 2011.

52. The Boeing Aircraft Maintenance Manual for the MD-80 Aircraft Chapter 12-13-01 "Engine Servicing (Oil Replenishing)", applicable at the time of November 5, 2011.

53. The overnight work packages(s) of Aircraft Maintenance performed in San Diego, California, on the evening(s) of November 5, 2010, March 20, 2011, April 29, 2011 and August 8, 2011.

54. The Investigation(s) and report(s) of Mr. Hollins Smith regarding the violations alleged by Robert S. Mawhinney on American Airlines Aircraft 3CY on April 29, 2011 and April 30, 2011, and on the violations alleged by Robert S. Mawhinney in the letter of April 7, 2010 to Mr. Robert Reding.

55. The investigation(s) and report(s) of Ms. Jeanette Gibbs regarding the violations alleged by Robert S. Mawhinney, including but not limited to, Brian Kirkpatrick, Tito Deguzman, Frank Krznaric, Robert Norris, Jose Montes, Ken Mactiernan, and others.

56. American Airlines Quality of Assurance Department's communication of upgrading Mr. Ed Kempa to the Temporary Crew Chief position on April 29, 2011 and April 30, 2011.

57. The phone records of the American Airlines Aircraft Maintenance Fax Line (619-231-5456) and (619-231-5410) on April 29, 2011 and April 30, 2011.

58. The phone records of the American Airlines Aircraft Maintenance Telephone Line (619-231-7210) on April 29, 2011, April 30, 2011, August 8, 2011, and August 9, 2011.

59. The "Performance Advisory" and "CR-1 Discussion Record" issued to Aaron Klippel, Ken Mactiernan, Tito Deguzman, Frank Krznaric, Robert Norris, Phil Clingman, Jose Montes, and Brian Kirkpatrick equivalent to those issued to Robert S. Mawhinney on March 29, 2011.

_____ Robert Steven Mawhinney, Plaintiff     Dated:        April 1, 2014





From Alice Sullivan                                          Apr 1 at 7:23 PM
To RSMawhinney     Rhendricks@morganlewis.com        llawrence@morganlewis.com
          Denise Crow    Bobbie Fincher        Alice Sullivan

Dear Mr. Mawhinney, Mr. Hendricks and Mr. Lawrence,

Mr. Mawhinney's correspondence of April 1, 2014 raises several discovery issues.  This correspondence indicates that the document production has not been completed as required.

**My assistant Bobbie Fincher will contact you to schedule a conference call within the next few days to address discovery.   Please submit a list of the following:**

    1)  documents already produced to the other party;
    2) documents agreed to be produced by ____date;
    3) documents to which you object to production.

In addition, please list any documents

 4) *which you have requested, which have not been produced by the other party,* and *which you require for presentation of your case.*

Please submit the above document lists by 5pm the evening before the date of our call. Please remember to send this information to all on the emails listed above.

We will discuss any other outstanding discovery requests so they can be promptly resolved.

Judge Sullivan

Hon. Alice D. Sullivan (Ret.)



FFF

Subject: RE: AAA 73 1600000571 M DCR Discovery Process

**From:** Alice Sullivan (judge@privatejudge.com)

**To:** steven24rd@yahoo.com; crowd@adr.org; bfincher@privatejudge.com; rhendricks@morganlewis.com; llawrence@morganlewis.com;

**Date:** Thursday, July 31, 2014 12:12 PM

Mr. Mawhinney,
In the document you sent to Mr. Lawrence (below), you refer to document numbers after each request number. Please answer the following:
1) Do you have the documents you refer to by a bates number? Are you seeking a *copy* of those numbered documents from AA or some documents in addition? If so, what else do you want?
2) Which of the numbered requests are still in dispute?
A)For example you refer to No. 63 as "answered" and quote the answer.
After each of your numbered items, can you specify what else you are seeking.
B)For example, on No. 65 you cite that Mr. Vaughn was apprised and cite numbered documents. Are you seeking emails to Mr Vaughn, or some document you believe he issued or what?
Be as specific as you can.
Thank you,
Judge Sullivan

Hon. Alice D. Sullivan (Ret.)



GGG

**AmericanAirlines** ®

October 26, 2010

**Private and Confidential**

Robert Steven Mawhinney
2415 Calle Del Oro
La Jolla, CA 92037

Dear Mr. Mawhinney:

Thank you for your patience while the investigation into your allegations was conducted. Please be assured that the Company carefully reviewed your allegations against former manager Brian Kirkpatrick, Tito Deguzman, Frank Krznaric and Robert Norris. In addition, the Company has reviewed the various work issues you have raised involving a number of your co-workers, including but not limited to your concern that some of them are sleeping at work. The investigation is now concluded, and where appropriate, recommendations and actions as deemed necessary have been taken.

With regard to your concern that employees are not remaining in the break room when they complete their work, please note that currently this is not a Company requirement. However, per the Company's Rules of Conduct, specifically Rule 3, we do expect employees to remain in the area necessary for the efficient performance of their work. Therefore, we expect employees to be within the vicinity of the break room and/or be available by telephone. As a crew chief, if you are unable to locate and/or contact your crew member for assignment, please report that matter immediately to your manager.

Mr. Mawhinney, American Airlines is sensitive to harassment issues and does not condone harassment or retaliation in any form, which is clearly stated in Policies and Procedures in eHR on Jetnet. Hence, if you have concerns regarding conduct that you believe may constitute harassment, retaliation and/or violations of the Work Environment Policy, please report the incident **immediately** in any of the following methods:

- Employee Services, Harassment Line, 1-800-4HR-2000 (press 4)
- EthicsPoint at (877) 422-3844
- Any supervisor, manager or anyone to whom your boss reports.

Likewise, please report illegal and/or unethical conduct and safety concerns that violate the Standards of Business Ethics to EthicsPoint at (877) 422-3844 or the Business Ethics, Safety and Compliance Office, 817-967-6923. In addition, please feel free to continue reporting potential safety matters to Compliance Manager, Hollins Smith, and/or applicable regulatory agencies.

Mr. Mawhinney, although the investigation is now closed, I wish to remind you of your responsibility to protect the confidentiality of the information shared with me as part of this investigation.

Sincerely,

Jeanette Gibbs
Investigator

RSMawhinney
Ref. # R. . . 2 2 1

ENTERED
2 9 4

HHH



# AmericanAirlines®

**First Advisory – Performance**

**November 13, 2010**

**To: Robert S. Mawhinney #177487    AMT Crew Chief**

On Nov 2nd 2010, I sat down with you for a documented discussion to discuss my expectations for all San Diego Aircraft Maintenance personnel. A key component to that discussion was my expectations for a professional work place environment.

On Nov 5th 2010, you discovered an open discrepancy on a work card for aircraft N200 that an afternoon mechanic forgot to sign for. Rather than assign one of your crew members to handle the 20-minute job, you took it upon yourself to document in the Aircraft's Maintenance Logbook that the mechanic had gone home without signing for work accomplished which was highly inappropriate and unprofessional, and is in steep contrast to my Nov. 2nd discussion with you regarding professional workplace environment expectations. The Aircraft Maintenance Log is a legal document for maintaining a record of mechanical discrepancy and maintenance actions taken on the <u>aircraft.</u> It is not the place to air grievances with other employees.

In addition, you swapped aircraft N200 for a later departure because you felt the original departure time of 0730 was in jeopardy, and you stated that you were at a loss as to how to release the aircraft due to an afternoon mechanic forgetting to sign for oiling the aircraft. Your justification to swap departure times and to be "At a loss as to how to release the aircraft" is unacceptable, especially in your leadership role as a crew chief. Missing signatures on a work-card are to be brought to my attention, but should not be a means of swapping departures or being at a loss as to how to release an aircraft, especially for an item that would have taken 20 minutes to accomplish if reassigned. You should have used better judgment as a Crew Chief to reassign the task to your crew for accomplishment, thus making the release of the aircraft possible.

RSMawhinney
Ref. #

Your actions as described above constitute unsatisfactory performance and must be immediately corrected. This is a First Step Advisory under the Peak Performance through Commitment process. I encourage you to carefully consider the seriousness of your actions, and correct your performance since failure to do so could result in further corrective action. I will be available to assist you in correcting these problems.

Jose Montes

Manager Aircraft Maintenance – San Diego

Personally handed to employee

Mailed to Employee

CC: Personnel File

    HR Operations Support

RSMawhinney
Ref. # M   2 0 6

III

From Alice Sullivan                                              Jun 3, 2014
To RSMawhinney
        Denise Crow      Bobbie Fincher

Mr. Mawhinney,

You will recall that we discussed your request that AA provide you with the names and
addressees of certain Prime Flight employees.   As Mr. Hendricks advised during our call
yesterday, AA does not have personal contact information for the Prime Flight employees, other
than through their place of work.  AA did not obtain the personal contact information as the
employees were interviewed at the job site.  Mr. Hendricks indicated that AA is also trying to
locate them.

To repeat, you need to locate and subpoena the Prime Flight employees if you want to call any of
those employees at the Hearing.  You know the employer Prime Flight and the employees.  As
we discussed the employees may have changed jobs or for  other reasons no longer at Prime
Flight.  Don't wait any longer to seek them out if you think they are needed for your case.  AA
may not find them.  The direct testimony of these witnesses may be offered by sworn statements
so long as they are available for cross-examination at the hearing in person, or by
video.  Testimony by telephone may also be an option if the Parties agree or the witness is
known to both parties.

You and AA provided your list of potential witnesses on April 7.  AA is to now provide you with
a list of the witnesses they intend to call at the hearing with last known contact information.  AA
requested time to review the recent Rulings to Dismiss and to Strike in order to make that
determination.

Judge Sullivan



JJJ

| | |
|---|---|
| **Subject:** | AAA731660037111DECR - RSMrequests AA Witnesses at Hearing |
| **From:** | Robert Mawhinney (steven24rd@yahoo.com) |
| **To:** | Crowd@adr.org; bfincher@privatejudge.com; judge@privatejudge.com; Rhendricks@morganlewis.com; llawrence@morganlewis.com; |
| **Bcc:** | Rmawhinney@ymail.com; |
| **Date:** | Tuesday, June 3, 2014 1:41 PM |

Mr. RJHendricks,
Please provide the list of witnesses that AA will have come to the Hearing, per
AAA Arbitrator Alice Sullivan "AA is to now provide you with a list of the
witnesses they intend to call at the hearing with last known contact information".
It has been 6 days since the Telephone Management Conference, please do
not delay any further.
I intend to cross-examine all witnesses and those responsible for statements
AA relied upon in my employment termination.
Thank You,
Robert Steven Mawhinney

**KKK**

**Subject:** RE: AAA73 166 00371 11 DECR - RSM requests Name/Address of PrimeFlight employees

**From:** Hendricks, Robert Jon (rhendricks@morganlewis.com)

**To:** judge@privatejudge.com; steven24rd@yahoo.com; llawrence@morganlewis.com;

**Cc:** Crowd@adr.org; bfincher@privatejudge.com;

**Date:** Tuesday, June 3, 2014 2:25 PM


Judge Sullivan,


My memory is, possibly mistakenly, that AA was to provide an updated list sometime after June 6th, the time that Mr. Mawhinney was given to provide further specification of his Fraud claim and specification of which factual allegations pertain to which remaining claims.  If I am mistaken in this regard, please let me know and we will of course comply with your directives.


**Robert Jon Hendricks**
**Morgan, Lewis & Bockius LLP**

One Market, Spear Street Tower | San Francisco, CA 94105
Direct: 415.442.1204 | Main: 415.442.1000 | Fax: 415.442.1001
Assistant: Kathleen Gregory | 415.442.1771 | kgregory@morganlewis.com

300 S. Grand Avenue, Twenty-Second Floor | Los Angeles, CA 90071-3132
Direct: 213.612.2500 | Main: 213.612.2500 | Fax: 213.612.2501

rhendricks@morganlewis.com | www.morganlewis.com



LLL

American Arbitration Association

Honorable Alice D. Sullivan, Arbitrator

---

Robert Steven Mawhinney, Plaintiff  )        Case No.

     v.                             )        73 166 00371 11 DECR

American Airlines,      Defendant  )

Re: Robert Steven Mawhinney response to Arbitrator Alice Sullivan Email of June 15, 2014 at 7:57 P.M.

RSMawhinney does protest any change in "Hearing Dates" for the following reasons:

> During the telephone conference of June 10, 2014 the opinion of Arbitrator Alice Sullivan voiced "no change in hearing date, with explanation included";

> It is inconceivable to believe that a Saturday will ever be an option, exercised, or included;

> RSMawhinney will be prejudiced with a delay of another 51 days;

> RSMawhinney has been acting in good faith and complied with all deadlines, requests, and suggestions.

Additionally there have been Four Telephone Conferences but only written two of the telephone conferences have a report of what transpired in the telephone conference, that of Feb. 25, 2014 and May 28, 2014. RSMawhinney has not been provided a report of the telephone conferences of May 14, 2014 and of June 10, 2014. The "Rulings of the Arbitrator" of May 27, 2014 had an error within it. RSMawhinney was promised "I will work with Judge Sullivan to get a corrected version of the Ruling out so that everyone has it in its entirety", on May 29, 2014. To this date RSMawhinney has not received the corrected version ... in its entirety.

Mr. Lawrence, during the telephone conference call of June 10 (2014), stated that RSMawhinney has made no good faith effort to meet and confer regarding discovery request. In fact, RSMawhinney did in good faith request that AA Counsel correct and clarify the discovery evidence that AA did provide on March 28 (2014) with an official request dated April 4, 2014. To this date AA Counsel has disregarded many of said requests.

AA Counsel has been acting in bad faith continuously with:

> The telephone conference report of Feb. 25, 2014 described that "The parties shall immediately provide their initial requests", and that, "Document exchange shall be completed by March 28, 2014. AA Counsel did not provide a discovery request immediately, rather the initial discovery request from AA was on March 28, 2014, the day discovery request was due;



RJHendricks has been responsible for all of the delays of initiating the AAA filing for Arbitration, securing of the Arbitration with filing fee, timeliness of compliance with Arbitrator Alice Sullivan's orders, and has been aware of this case since September 29, 2011;

RJHendricks has not complied with providing the Witness List with Names, Addresses, and contact information after numerous orders from Arbitrator Alice Sullivan.

AA Counsel has a history of delay. They wait until the last minute to proclaim they are not ready to fulfill the Arbitrators orders to meet deadlines. Arbitrator Alice Sullivan has reiterated on Feb. 25, 2014 and again on June 2, 2014 that the "'Arbitration hearing dates are firm', July 14-18 and July 21-25, 2014". Further, the June 10, 2014 "Report of Arbitrator Management Conference #2 and Scheduling Order included "To the extent this scheduling Order does not accurately reflect the directives issued at the May 28, 2014 Preliminary Hearing, please send any additions or corrections to the undersigned and all counsel within five calendar days of service of this Management Conference Order". RJHendricks did not request the telephone conference of June 10, 2014 until June 9, 2014, <u>after</u> the five days offered in the June 2, 2014 report, though RJHendricks previously agreed to the next telephone management conference of June 27, 2014, on June 3, 2014. RSMawhinney acted in good faith. The Arbitrators order to meet and confer with Mr. Lawrence was acted upon by RSMawhinney on June 13, 2014. Mr. Lawrence response was on June16, 2014, the day RSMawhinney had proposed a telephone "meet and confer". Mr. Lawrence suggested that the "meet and confer" take place on the day of deposition. RSMawhinney does not agree to "meet and confer" during deposition on June 17, 2014.

RSMawhinney believes to be prejudiced with this due process. Arbitrator Alice Sullivan displayed genuine concern with the discovery process on April 1, 2014, due to RSMawhinney's report of April 1, 2014. RSMawhinney has been acting in good faith for discovery requests since March 10, 2014. It has now been three months and RSMawhinney has been complying with every directive Arbitrator Alice Sullivan has ordered in this discovery process. AA Counsel has denied pertinent evidence and is now awaiting Arbitrator Alice Sullivan to dismiss RSMawhinney's Claim of Fraud. "... the work product of an attorney is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice". [In re Tabatha G (App.4 District 1996) 53 Cal. Rptr. 2d 93, 45 Cal. App. 4th 1159, 1167] "On discovery motions, court should resolve any factual disputes as to whether party claiming qualified privilege has established basis therefor and whether party seeking discovery has demonstrated overriding need for disclosure; court should determine whether substantial need for discovery exists which is greater than policy considerations advanced by recognition of claimed privilege or, in case of qualified work product privilege, whether denial of discovery will unfairly prejudice party seeking discovery". [Lipton v. Supreme Court (App. 2 District 1996) 56 Cal. Rptr.2d 341, 48 Cal. App. 4th 1599]

Dated:              June 16, 2014

Robert Steven Mawhinney, Plaintiff





Morgan, Lewis & Bockius LLP
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel: 213.612.2500
Fax: 213.612.2501
www.morganlewis.com

**Morgan Lewis**
C O U N S E L O R S   A T   L A W

**Larry M. Lawrence**
Associate
213.612.2500
llawrence@morganlewis.com

August 14, 2014

**VIA E-MAIL – STEVEN24RD@YAHOO.COM**

Robert Mawhinney
2415 Calle Del Oro
La Jolla, CA 92037

Re:     *Mawhinney v. American Airlines, Inc.*
        AAA Case No. 76 166 00371 11 DECR

Dear Mr. Mawhinney:

We are in receipt of your August 12, 2014 e-mails sent at 5:48 a.m., 8:34 a.m., and 8:40 a.m. concerning subpoenas to Anthony Degrazia, Dana Huntley, Ken Mactiernan, Hollins Smith, Jose Montes, Nicolai Smit, and Henry Maslon.

As a preliminary matter, you state that you have "sent and delivered to [our] Los Angeles office" a subpoena for Jose Montes. Please be advised, that we have not received any subpoena from you for Mr. Montes. Regardless, any subpoena from you for Mr. Montes is unnecessary as you have not designated Mr. Montes as a witness, but also moot because he has already been subpoenaed to attend by American.

Second, we are in receipt of the subpoena you requested for Hollins Smith. As we have previously advised you, we have been authorized by Mr. Smith to accept service of the subpoena on his behalf and have delivered it to him as required.

Third, we are in receipt of the subpoenas you have sent to our office for Henry Maslon, and Nicolai Smit. As we have repeatedly explained to you, these individuals are not employed by American Airlines and we have not been given authorization to accept any subpoenas on their behalf. Therefore, to the extent you wish to compel their attendance at the arbitration, you continue to be responsible for personally serving them with the subpoena in accordance with the applicable rules.

Fourth, we are in receipt of the subpoenas you have sent to our office for Anthony Degrazia, Dana Huntley, and Ken Mactiernan. We continue to object to these subpoenas and your stated intent to call these individuals as you failed to timely disclose them in connection with your



**Morgan Lewis**
COUNSELORS AT LAW

Robert Mawhinney
August 7, 2014
Page 2

preliminary disclosure of individuals with knowledge of your claims or timely identify them on your witness list. Regardless, we have not been authorized to accept any subpoenas on their behalf. To the extent you wish to compel their attendance at the arbitration, you continue to be responsible for personally serving them with the subpoena in accordance with the applicable rules.

Should you have any questions or wish to discuss this further, please feel free to let us know.

Sincerely,

Larry M. Lawrence



NNN

Case 3:15-cv-00259-MMA-BLM   Document 1-4   Filed 02/09/15   PageID.1416   Page 126 of 249

| **Subject:** | Mawhinney - Witness Order and Related Issues |
| **From:** | Lawrence, Larry M. (llawrence@morganlewis.com) |
| **To:** | judge@privatejudge.com; bfincher@privatejudge.com; steven24rd@yahoo.com; |
| **Cc:** | rhendricks@morganlewis.com; |
| **Date:** | Monday, August 18, 2014 11:15 AM |

Judge Sullivan,

On August 8, 2014, you requested that the parties submit an updated list of witnesses they expect to question at the hearing, as well as the proposed order that they intend to call the witnesses.

American intends to call the following witnesses, with the order currently anticipated as: Aaron Klippel, Ray Ruiz, Ed Kempa, Andrei Coval, Jose Montes, and Jeanette Gibbs (HR) and/or Lynn Vaughn (HR).

American's current intent is to present these witnesses via live testimony, with the exception of Mr. Montes whose testimony American intends to present by written statement. Mr. Montes will personally appear at the arbitration for cross-examination, but because he does not live in San Diego and has other employment, he is only available for testimony on September 9, 2014. We request that Mr. Montes' testimony be set to begin at 9:15 a.m. on September 9, 2014 so that we can ensure his testimony is completed during the period he is available.

On August 11, 2014, Mr. Mawhinney submitted a "Witness List Calendar." This list identified the following individuals, in the following order: Ray Ruiz, Charles Jancsek, Ed Kempa, Andrei Coval, Nicholai Smit, Henry Maslon, Aaron Klippel, Jose Montes, Hollins Smith, Anthony Degrazia, Ken Mactiernan, and Dana Huntley.

It is unclear if Mr. Mawhinney is simply attempting to list all of the individuals that either side has indicated they intend to call, or if he now intends to call each of these witnesses in his case-in-chief. To the extent it is the latter, American objects. Indeed, at no point were Ray Ruiz, Ed Kempa, Andrei Coval, Aaron Klippel, or Jose Montes, identified by Mr. Mawhinney as witnesses with knowledge or as witnesses whom he intended to call during his case-in-chief. In contrast, American has designated these individuals and it appears that Mr. Mawhinney is trying to disrupt the orderly presentation of American's evidence. Similarly, Mr. Mawhinney did not identify Anthony Degrazia, Ken Mactiernan or Dana Huntley. Indeed, no party has ever identified Dana Huntley as a witness with knowledge. As a result, these witnesses should be precluded from testifying to prevent undue surprise and prejudice.

(For example, American was able to depose Mr. Mawhinney on the witnesses he identified, what evidence he contends they have, and obtain a general understanding of his contentions regarding their involvement in his claims. American has been denied that opportunity as to those individuals whom Plaintiff has not identified.)

Also lacking from Mr. Mawhinney's witness list is Mr. Mawhinney. Based on the prior pre-arbitration hearing, Mr. Mawhinney indicated that he intended to testify first. It is unclear if his omission from this list was meant to convey that he no longer intends to testify, or whether this was simply and oversight.

Finally, while not requested, Mr. Mawhinney has provided proposed start times of the various witness' testimony. It is unclear how Mr. Mawhinney arrived at these estimates, but they appear to be substantially off-the-mark. For example, he indicates that he estimates Mr. Coval to testify from 10:15 a.m. until the end of the day on September 5, 2014. But according to Mr. Mawhinney's prior list of topics, his examination of Mr. Coval will be limited to "[h]is statement regarding logbook disposition" and "[k]nowledge of GPM procedures regarding inspections." It is highly unlikely that this testimony will take six hours to complete. In contrast, he seeks to schedule five witnesses, including Jose Montes, for September 9, 2014.

We request that these issues be addressed during our further pre-arbitration call. Thanks.

**Larry M. Lawrence**
Morgan, Lewis & Bockius LLP
300 S. Grand Avenue, Twenty-Second Floor | Los Angeles, CA 90071-3132
Direct: 213.612.7339 | Main: 213.612.2500 | Fax: 213.612.2501
llawrence@morganlewis.com | www.morganlewis.com

Assistant: Connie M. Torres-Gabig | 213.612.1039 | ctorres-gabig@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.





**AMERICAN ARBITRATION ASSOCIATION**

Matter # 73 166 00371 11 DECR

Robert S. Mawhinney, Claimant
and
American Airlines, Inc., Respondent

**REPORT OF ARBITRATION MANAGEMENT CONFERENCE #3
AND SCHEDULING ORDER**

A pre-hearing telephone conference was conducted on August 19, 2014 at 5:30pm PDT. Present on the call were Arbitrator Hon. Alice D. Sullivan (Ret.), Claimant Robert S. Mawhinney, and Robert Jon Hendricks, Esq. and Larry M. Lawrence, Esq. Counsel for Respondent. The call addressed scheduling of witnesses for the Hearing, marking of exhibits and any outstanding issues.

The hearing will be on September 3, 4, 5, 9, 10 and 11 starting at 9:15am each morning and continuing until approximately 5:00pm each day. If a witness can be completed by remaining after 5:00pm, the Arbitrator will be available upon request of the Parties.

WITNESS HEARING SCHEDULING

Each Party has submitted an updated witness list. Mr. Mawhinney has added witnesses who are Respondent employees, who are not on Respondent's list. These witnesses will be allowed to testify as their names and participation in events at issue are included in prior submissions and discussions. If there is any unfair surprise, Respondent may request time to obtain rebuttal if needed.

After discussion regarding the optimum scheduling of witnesses, the following schedule is agreed and the Parties will endeavor to obtain witnesses to testify on following days:

Tuesday, September 3, 2014
- Mr. Mawhinney (day one)

Mr. Mawhinney will testify in narrative format with cross-examination to follow.

Wednesday, September 4, 2014
- Ray Ruiz
- Henry Maslon
- Charles Jancsek
- Nicholai Smit



Friday, September 5, 2014
- Hollins Smith (Respondent agrees to produce)
- Ken MacTiernan (Respondent to advise by Friday, August 22, 2014 whether they will produce the witness, who is an American Airlines employee.) If not, Respondent shall provide contact information and Claimant will subpoena.
- Anthony DiGrazia (Respondent to advise by Friday, August 22, 2014 whether they will produce the witness, who is an American Airlines employee.) If not, Respondent shall provide contact information and Claimant will subpoena.

Respondent may agree to accept service via its law firm or allow service at the place of business of the witnesses in lieu of providing home contact information.

Tuesday, September 9, 2014
- Jose Montes (Direct examination has been provided by declaration.)
- Aaron Klippel
- Complete any witness(s) from prior week, if necessary.

Wednesday, September 10, 2014
- Ed Kempa
- Andrei Coval
- Jeanette Gibbs and/or Lynn Vaughn

Friday, September 11, 2014
- Conclude any direct and/or cross-examination
- Rebuttal
- Closing argument will be submitted in writing following close of the testimony.

**EXHIBITS**

Claimant will submit a numbered exhibit list with the title of document and RSM reference number. The numbering of the documents will remain in the order previously submitted. No further changes or additions to the exhibit lists are requested by either Party.

**DISCOVERY**

Documents

Claimant requests further production of emails from Respondent. Respondent replies that they have searched and produced all responsive documents. Respondent states that Claimant is unable to sufficiently identify what further production is needed or to identify what is missing from the prior productions. Claimant states that his requests make it clear what documents are sought and his correspondence identifies what documents were not produced as requested. He will submit his requests, the replies and the meet and confer letters to the Arbitrator for determination of his request for further production by Respondent.



Interrogatories

Respondent requests further clarification on Claimant's responses to Interrogatories No. 3 and No. 4. These interrogatories request identification of the specific documents constituting the complaints made to Respondent (No. 3); and specification of the actions claimed to be retaliatory by Respondent (No. 4). Claimant states the supplemental interrogatories specify that the first document number is the complaint and the following documents are identified as "supporting" information. He also provided a list of all complaints, by date, subject, to whom made, manner of complaint (written, oral, service, etc.) that Respondent has received. No further response to Interrogatory No. 3 is required. Contemporaneous documents have been provided of complaints made to Respondent.

A general discussion was had regarding the acts claimed to be retaliatory. Claimant claims that Respondent allowed a hostile work environment and failed to take action against employees who were harassing him; that this was intentional and in retaliation for his complaints, most of which he asserts were ignored; and that he was unfairly disciplined for the conduct which led to his termination; that this discipline and termination were in retaliation for his complaints regarding improper conduct in the workplace; and in violation of the settlement agreement between the Parties. Claimant also refers to his documents previously provided, including his 3 page list of complaints which state the actions which he asserts were allowed or instigated by Respondent as retaliation. No further response to Interrogatory No. 4 is required. Respondent emphasizes that there must be some causal connection between the complaints and Claimant's allegation that they led to retaliation.

**SUBPOENAS**

Claimant is again advised that he must obtain subpoenas and have them served on any witnesses he wishes to have present at the hearing unless Respondent has agreed to produce them. Respondent indicates they have not served Mr. Ruiz, for example, even though they also want to call him as a witness. Claimant cannot rely on Respondent to produce the witness who is not an employee of Respondent, but is a third party vendor employee. Counsel for Respondent states that he is unaware of any ownership/agency relationship between Respondent and the third party vendor other than as a contractor providing services.

This Order shall continue in effect unless and until amended by subsequent order of the Arbitrator. All dates herein shall be strictly enforced.

Dated: August 22, 2014          *Alice D. Sullivan*
                                 Hon. Alice D. Sullivan (Ret.)
                                 Arbitrator



**AMERICAN ARBITRATION ASSOCIATION**

Matter # 73 166 00371 11 DECR

Robert S. Mawhinney, Claimant
and
American Airlines, Inc., Respondent

**REPORT OF ARBITRATION MANAGEMENT CONFERENCE #3
AND SCHEDULING ORDER**

A pre-hearing telephone conference was conducted on August 19, 2014 at 5:30pm PDT. Present on the call were Arbitrator Hon. Alice D. Sullivan (Ret.), Claimant Robert S. Mawhinney, and Robert Jon Hendricks, Esq. and Larry M. Lawrence, Esq. Counsel for Respondent. The call addressed scheduling of witnesses for the Hearing, marking of exhibits and any outstanding issues.

The hearing will be on September 3, 4, 5, 9, 10 and 11 starting at 9:15am each morning and continuing until approximately 5:00pm each day. If a witness can be completed by remaining after 5:00pm, the Arbitrator will be available upon request of the Parties.

WITNESS HEARING SCHEDULING

Each Party has submitted an updated witness list. Mr. Mawhinney has added witnesses who are Respondent employees, who are not on Respondent's list. These witnesses will be allowed to testify as their names and participation in events at issue are included in prior submissions and discussions. If there is any unfair surprise, Respondent may request time to obtain rebuttal if needed.

After discussion regarding the optimum scheduling of witnesses, the following schedule is agreed and the Parties will endeavor to obtain witnesses to testify on following days:

~~Tuesday~~ **Wednesday**, September 3, 2014
- Mr. Mawhinney (day one)

Mr. Mawhinney will testify in narrative format with cross-examination to follow.

~~Wednesday~~ **Thursday**, September 4, 2014
- Ray Ruiz
- Henry Maslon
- Charles Jancsek
- Nicholai Smit



Friday, September 5, 2014
- Hollins Smith (Respondent agrees to produce)
- Ken MacTiernan (Respondent to advise by Friday, August 22, 2014 whether they will produce the witness, who is an American Airlines employee.) If not, Respondent shall provide contact information and Claimant will subpoena.
- Anthony DiGrazia (Respondent to advise by Friday, August 22, 2014 whether they will produce the witness, who is an American Airlines employee.) If not, Respondent shall provide contact information and Claimant will subpoena.

Respondent may agree to accept service via its law firm or allow service at the place of business of the witnesses in lieu of providing home contact information.

Tuesday, September 9, 2014
- Jose Montes (Direct examination has been provided by declaration.)
- Aaron Klippel
- Complete any witness(s) from prior week, if necessary.

Wednesday, September 10, 2014
- Ed Kempa
- Andrei Coval
- Jeanette Gibbs and/or Lynn Vaughn

~~Friday~~ Thursday, September 11, 2014
- Conclude any direct and/or cross-examination
- Rebuttal
- Closing argument will be submitted in writing following close of the testimony.

**EXHIBITS**

Claimant will submit a numbered exhibit list with the title of document and RSM reference number. The numbering of the documents will remain in the order previously submitted. No further changes or additions to the exhibit lists are requested by either Party.

**DISCOVERY**

Documents

Claimant requests further production of emails from Respondent. Respondent replies that they have searched and produced all responsive documents. Respondent states that Claimant is unable to sufficiently identify what further production is needed or to identify what is missing from the prior productions. Claimant states that his requests make it clear what documents are sought and his correspondence identifies what documents were not produced as requested. He will submit his requests, the replies and the meet and confer letters to the Arbitrator for determination of his request for further production by Respondent.



<u>Interrogatories</u>

Respondent requests further clarification on Claimant's responses to Interrogatories No. 3 and No. 4. These interrogatories request identification of the specific documents constituting the complaints made to Respondent (No. 3); and specification of the actions claimed to be retaliatory by Respondent (No. 4). Claimant states the supplemental interrogatories specify that the first document number is the complaint and the following documents are identified as "supporting" information. He also provided a list of all complaints, by date, subject, to whom made, manner of complaint (written, oral, service, etc.) that Respondent has received. No further response to Interrogatory No. 3 is required. Contemporaneous documents have been provided of complaints made to Respondent.

A general discussion was had regarding the acts claimed to be retaliatory. Claimant claims that Respondent allowed a hostile work environment and failed to take action against employees who were harassing him; that this was intentional and in retaliation for his complaints, most of which he asserts were ignored; and that he was unfairly disciplined for the conduct which led to his termination; that this discipline and termination were in retaliation for his complaints regarding improper conduct in the workplace; and in violation of the settlement agreement between the Parties. Claimant also refers to his documents previously provided, including his 3 page list of complaints which state the actions which he asserts were allowed or instigated by Respondent as retaliation. No further response to Interrogatory No. 4 is required. Respondent emphasizes that there must be some causal connection between the complaints and Claimant's allegation that they led to retaliation.

**SUBPOENAS**

Claimant is again advised that he must obtain subpoenas and have them served on any witnesses he wishes to have present at the hearing unless Respondent has agreed to produce them. Respondent indicates they have not served Mr. Ruiz, for example, even though they also want to call him as a witness. Claimant cannot rely on Respondent to produce the witness who is not an employee of Respondent, but is a third party vendor employee. Counsel for Respondent states that he is unaware of any ownership/agency relationship between Respondent and the third party vendor other than as a contractor providing services.

This Order shall continue in effect unless and until amended by subsequent order of the Arbitrator. All dates herein shall be strictly enforced.

Dated: August 25, 2014                    _Alice D. Sullivan_____
                                          Hon. Alice D. Sullivan (Ret.)
                                          Arbitrator



PPP

```
 1    have been referred to.  Thank you very much.
 2         THE WITNESS:  Thank you.  Appreciate it.
 3         THE ARBITRATOR:  The witness is excused.
 4              All right.  We'll go off the record for
 5    just a minute, and let's talk about tomorrow.
 6                   (Off-the-record discussion.)
 7         THE ARBITRATOR:  We've confirmed, then, we have
 8    Mr. Kempa available.  He will be the first witness
 9    tomorrow?
10         MR. HENDRICKS:  I believe so.
11         THE ARBITRATOR:  And we have Mr. Mawhinney's
12    examination to continue and complete.  And in
13    addition, Mr. Coval and/or Gibbs or Vaughn --
14    Ms. Gibbs or Vaughn --
15         MR. HENDRICKS:  Yeah.
16         THE ARBITRATOR:  -- may be called as witnesses,
17    but --
18         MR. HENDRICKS:  May not be.
19         THE ARBITRATOR:  May not be.  And if they are,
20    you're still expecting we will conclude by the end
21    of the day or at least early Friday?
22         MR. HENDRICKS:  Correct.  Early -- what's today?
23         COURT REPORTER:  Tuesday.
24         MR. HENDRICKS:  By early Thursday.
25         THE ARBITRATOR:  Thursday, yes.  All right.
```



**Subject:**   Re: Mawhinney - Witness Order and Related Issues

**From:**   Alice Sullivan (judge@privatejudge.com)

**To:**   llawrence@morganlewis.com; steven24rd@yahoo.com; rhendricks@morganlewis.com;

**Cc:**   bfincher@privatejudge.com;

**Date:**   Monday, August 18, 2014 8:05 PM


Dear Counsel and Mr. Mawhinney,
We will discuss the issues in Mr. Lawrence's msg below during our call on Tuesday.
Obviously the changes in the witness lists will be considered.  It is my intention to allow witnesses to
testify if they have relevant information.  if there is any unfair surprise, that will be remedied with
rebuttal or a continuance for further testimony if warranted.  As I stated at our last meeting, this
arbitration is not  about withholding of information for some strategic advantage.  Both sides will have
a fair opportunity to present their evidence.
Judge Sullivan

Hon. Alice D. Sullivan (Ret.)
8880 Rio San Diego Dr., Ste. 800
San Diego, CA. 92108
1.858.792.1330



RRR


American Arbitration Association

Honorable Alice D. Sullivan, Arbitrator

Robert Steven Mawhinney, Plaintiff  )         Case No.

      v.                 )         73 166 00371 11 DECR

American Airlines,     Defendant  )

Re: Robert S. Mawhinney's response to Larry Lawrence Email of July 22, 2014 at 4:57 P.M.

Mr. Larry Lawrence is displaying surprise at the progression of this case. It is not RSMawhinney who introduces the element of surprise. In reality it is American Airlines (AA) Counsel whose *modus operandi* is the element of surprise. The order of Arbitrator Alice Sullivan on Feb. 26, 2014 included: "The parties shall immediately provide their initial document requests";
        "Document exchange shall be completed by March 28, 2014"; and
        "Delay in completing the discovery is not grounds for continuation of the hearing".

AA Counsel did not make the request for RSMawhinney's evidence until Mar. 28, 2014, the same day the "document exchange shall be completed …". This was an attempt by AA and Counsel to minimize and restrict the evidence RSMawhinney would need to present a case. The reluctance to comply with any further discovery request made by RSMawhinney was continuous even after Arbitrator Alice Sullivan's concerns were portrayed in the Email of Apr. 1, 2014:
        "Mr. Mawhinney's correspondence of April 1, 2014 raises several discovery issues"; and
        "We will discuss any other outstanding discovery requests so they can be promptly resolved".

The last minute attempt by AA Counsel at discovery request compliance occurred on July 16, 2014 at 5:52 P.M., the day before the in-person conference before Arbitrator Alice Sullivan. This is another attempt by AA Counsel to delay this case.

RSMawhinney has made every effort to bring this case forward. The Email of Arbitrator Alice Sullivan on June 3, 2014 proclaimed "AA is to now provide you with a list of the witnesses they intend to call at the hearing with last known contact information". The witness list provided by AA Counsel on July 17, 2014 was suspiciously nondescript. Mr. Degrazia and Mr. Mactiernan were key players in the retaliation RSMawhinney was subjected to. Mr. Huntley was the MOD on duty the night of Apr. 29, 2011, and who RSMawhinney called when a difference of opinion escalated between RSMawhinney and Jose Montes. It was Mr. Degrazia who MOD called. It was Mr. Degrazia who Jose Montes called. Mr. Degrazia does not answer the phone to RSMawhinney, nor does Mr. Degrazia return calls to RSMawhinney when a message is left on



his answering machine. Mr. Huntley role was revealed in RSMawhinney's evidence (Evidence334RSM131to134), and accepted by AA HR Jeanette Gibbs on May 18, 2011.

Mr. RJHendrix has used many strategies to disrupt, confuse, and delay this case. The discovery requests made by RSMawhinney are incomplete, and the deadline for completion is July 25, 2014. The evidence provided on July 16, 2014 substantiates that further evidence exists. One such example is that the "CR-1" of both Aaron Klippel and Robert Norris were provided on July 16, 2014. What reason could AA Counsel have for not providing the "CR-1" of Ken Mactiernan, Tito Deguzman, Frank Krznaric, and Larry Costanza? The Emails provided on July 16, 2014 from Mr. Degrazia, Ms. Gibbs, and Mr. Smith did not include the responses to the issues discussed. The seriousness of these issues will need explanation for the decisions AA made.

Robert Steven Mawhinney prays that Your Honor recognizes the importance of all requests and evidence submitted, and to put an end to any further delays AA and Counsel interject.

Dated:          July 22, 2014

Robert Steven Mawhinney, Plaintiff



SSS

American Arbitration Association

Honorable Alice D. Sullivan, Arbitrator

Robert Steven Mawhinney, Plaintiff  )       Case No.

     v.                    )       73 166 00371 11 DECR

American Airlines,     Defendant  )

Re: Robert Steven Mawhinney's Discovery Request of July 18, 2014

The discovery process has been long delayed by AA and AA's Counsel. Since March 10, 2014 RSMawhinney has made numerous attempts to pinpoint the reasoning and expose the concerted effort of AA management's decision to terminate RSMawhinney's employment with AA. The most recent meet and confer, between RSMawhinney and AA Counsel on June 18, 2014, established the agreement to comply with the Honorable Alice Sullivan's Order. AA Counsel provided some of what was established in the agreement but not all.

The request for "... disciplinary history of various co-workers" (Request for Production No. 77) was partially fulfilled with the CR-1(s) of Robert Norris (AA/Mawhinney001082) and Aaron Klippel (AA/Mawhinney001083). As it is well documented within the Jeanette Gibbs Investigation conclusion letter of Oct. 26, 2010 (Evidence291RSM221) there were other violators involved in the use of "shop talk". RSMawhinney is not convinced that AA and Counsel have "...conducted a reasonable and diligent search for responsive documents", nor is it "overly broad, unduly burdensome, vague, and ambiguous". RSMawhinney contends that AA is reluctant to release the CR-1(s) of Tito Deguzman, Frank Krznaric, and Larry Costanza because it would reveal the prevalence of the use of "shop talk", and the discrimination used to target RSMawhinney when RSMawhinney was issued a "Second Advisory" toward termination.

The request for "[t]he Email response" of Lynn Vaughn, Marianne Coplin, Pete Schafer, Jeanette Gibbs, Hollins Smith, Jose Montes, and Anthony Degrazia would expose the reasoning and who was involved in the conveyance of false information.

RSMawhinney contends that Jose Montes provided false statements which were then transmitted to Lynn Vaughn via Paula King, Jeanette Gibbs, and Anthony Degrazia. Mr. Montes described RSMawhinney as disobeying Mr. Montes order to come to his office, and that Mr. Montes had to issue a directive. Mr. Montes has made a false statement which is not believable given that RSMawhinney did go to his office.

RSMawhinney contends that Jeanette Gibbs provided Lynn Vaughn with false information that "we did not violate the GPM provisions cited", according to Hollins Smith. However, Hollins Smith did email to Jeanette Gibbs that "I believe that we probably violated our CAMP process which would drive a violation of either FAR 43 or 64".



RSMawhinney contends that Anthony Degrazia is revealing a conspiracy with his comment "… I just hung up now with Lynn. We think alike :-)".

The evidence does exist. AA and Counsel do not want the evidence out, as this would be incriminating and detrimental to AA's position in this case. The discovery process is the opportunity to find the facts, it is not the opportunity to hide the truth and delay justice. AA Counsel has proven that AA does keep records and that records do exist. It goes beyond the conspiracy against RSMawhinney, to withhold the evidence. AA and Counsel are now defying the orders of the Honorable Alice Sullivan, by publishing canned statements denying the discovery process.

The "Response of Respondent American Airlines, Inc. to Complainant Robert S. Mawhinney's Third Request for Production of Documents (Erroneously Labeled Set Two)" of July 29, 2014 is evidence that AA Counsel did not put much, if any, effort into meeting the discovery request. The canned objection statements were cut and paste into the requests made.

The cut and paste method is evident on page two with "Request for Production No. 79 [Erroneously Numbered 60]", which should have been "… Erroneously Numbered 61]".

The cut and paste method is blatantly evident on page three thru page nine with (on the top of page two)"Request for Production No. 78 [Erroneously Numbered 60]", when the "Request for Production No." should have been incremented to that which follows the number 79 and printed as with "Request for Production No. 80 [Erroneously Numbered 62]". Each of the" Requests for Production No." following should have been incremented by one. The incremental sequence should be accurate all the way to page nine and end with "Request for Production No. 93 [Erroneously Numbered 75]".

RSMawhinney estimates that AA Counsel put not effort into the "Response of Respondent American Airlines, Inc. to Complainant Robert S. Mawhinney's Third Request for Production of Documents (Erroneously Labeled Set Two)" of July 29, 2014.

RSMawhinney calls upon Your Honor to recognize the deception and lack of regard that AA and Counsel portray. RSMawhinney prays that Your Honor intervenes and uncovers the truth behind this conspiracy.

DATED:        July 29, 2104

Robert Steven Mawhinney, Plaintiff



TTT

## *Hon. Alice D. Sullivan (Ret.)*

*8880 Rio San Diego Dr., Ste. 800*
*San Diego, CA 92108*
*(858) 792-1330*
*Fax (858) 461-6162*
*e-mail: bfincher@privatejudge.com*
*Judge@privatejudge.com*

### IN THE MATTER OF THE ARBITRATION

### BETWEEN

| | |
|---|---|
| **ROBERT S. MAWHINNEY,** | **AAA Case No. 73-20-1100-0371** |
| Claimant, | **RULINGS OF THE ARBITRATOR** |
| v. | **Claimant's Requests for Production of Documents** |
| **AMERICAN AIRLINES, INC.,** | **Nos. 78-93** |
| Respondent. | **[Previously Submitted as Nos. 60-75]** |
| | **Nos. 94-117** |

The Parties stipulated to binding arbitration before the undersigned Arbitrator. On August 19, 2014 both Robert Mawhinney, Claimant, and Larry M. Lawrence, Esq., on behalf of Respondent, American Airlines, Inc. submitted disputed Document Requests and Responses, including their correspondence regarding Claimant's Request for Production of Documents numbered 78-93 [previously been submitted by Claimant as Requests Nos. 60-75]. Claimant also submitted a Request for Production of Documents numbered 94-117 dated August 8, 2014. A conference call was held on August 19, 2014 with the undersigned, Mr. Mawhinney, Mr. Lawrence and Mr. Hendrix regarding prehearing matters. Claimant stated that Respondent was withholding responsive documents. Respondent denied this. The Arbitrator was requested to decide the issues and each Party submitted the documents above.

Following review of the written submissions and oral argument the following Rulings are now issued:

Respondent objects to the following Requests for Production of Documents in part on the grounds that they are duplicative of prior requests. The numbering of each Request below includes the number of the current request and the number of the prior request(s) according to Respondent. A portion of the Response is included below. [Full objection paragraphs omitted.] The meet and confer letter of Mr. Lawrence dated August 7, 2014 provides additional detail on the narrowing of the Requests and that some documents were produced.



By September 3, 2014 Respondent shall produce an affidavit of the person(s) conducting the diligent search for responsive documents describing the search(es) conducted.

The Rulings of the Arbitrator are listed below each numbered request.

**REQUEST FOR PRODUCTION NO. 78 [NUMBERED 60]:**
The CR-l(s) implemented on Tito Deguzman regarding the Mar. 14, 2010 and the Aug. 9, 6 2010 incident, when RSMawhinney notified AA management of Mr. Deguzman creating a threatening and intimidating work environment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 78 [Also NUMBERED 60]:**
Respondent objects to this request as harassing because it is duplicative of Request for Production Nos. 18 and 77.

**RULING:**
Respondent's meet and confer letter indicates that Claimant narrowed this request to a search for any CR-1 document issued to Mr. DeGuzman regarding use of profanity. Respondent further responds that it will determine if a CR-1 was ever issued to Mr. DeGrazia regarding use of profanity. That supplemental production is due immediately.

**REQUEST FOR PRODUCTION NO. 79 [Also Numbered 61]:**
The CR-l implemented on Larry Costanza regarding the Mar. 6, 2010, [incident] when RSMawhinney notified Anthony DeGrazia of Mr. Costanza creating a threatening and intimidating work environment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 79**
Respondent objects to this request as harassing because it is duplicative of Request for Production Nos. 18 and 77.

**RULING:**
Respondent's meet and confer letter indicates that Claimant narrowed this request to a search for any CR-1 document issued to Mr. Costanza regarding use of profanity. Respondent further responds that it will determine if a CR-1 was ever issued to Mr. Costanza regarding use of profanity. That supplemental production is due immediately.

**REQUEST FOR PRODUCTION NO. 80 [Also NUMBERED 62]:**
The CR-1 implemented on Frank Krznaric regarding the Aug. 25, 2009 and the Sept. 6, 2009 incidents, when RSMawhinney notified AA management of Mr. Krznaric creating a threatening and intimidating work environment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 80**
Respondent objects to this request as harassing because it is duplicative of Request for Production Nos. 18 and 77.



**RULING:**
Respondent's meet and confer letter indicates that Claimant narrowed this request to a search for any CR-1 document issued to Mr. Krznaric regarding use of profanity. Respondent further responds that a diligent search was made and no responsive documents have been located. No further production is required.

**REQUEST FOR PRODUCTION NO. 81 [NUMBERED 63]:**
The identity of who performed the investigation of Jose Montes on May 24, 2011 (AA/Mawhinney001105 - AA/Mawhinney001109).

**RULING:**
Answered. No Additional response is required.

**REQUEST FOR PRODUCTION NO. 82 [NUMBERED 64]:**
The Email response of Lynn Vaughn regarding the Email she received from Ms. Paula King on Apr. 30, 2011 at 16:04 (AA/Mawhinney001091 – AA/Mawhinney001092).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 82 [NUMBERED 64]:**
Respondent responds as follows: American has conducted a reasonable and diligent search for responsive documents. American has been unable to locate documents responsive to this request.

**RULING:**
Answered. No Additional response is required.

**REQUEST FOR PRODUCTION NO. 83 [NUMBERED 65]:**
The Email of Lynn Vaughn to Jose Montes approving the termination of Robert Steven Mawhinney's employment with American Airlines on Sept. 23, 2011.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 83 [NUMBERED 65]:**
Respondent responds as follows: American has conducted a reasonable and diligent search for responsive documents. American has been unable to locate documents responsive to this request. Claimant was terminated in compliance with American's policies for refusing to select an option in response to the issuance the Career Decision Day Advisory.

**RULING:**
Answered. No Additional response is required if Respondent has provided emails from Vaughn to Montes regarding the termination of Claimant in September 2011. If that email has not been provided, it shall be provided at the arbitration hearing.

**REQUEST FOR PRODUCTION NO. 84 [NUMBERED 66]:**
The Email response of Marianne Coplin regarding the Email she received from Ms. Paula King on Apr. 30, 2011 at 16:04 (AA/Mawhinney001091 - AA/Mawhinney001092).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 84 [NUMBERED 66]:**
Respondent responds as follows: American has conducted a reasonable and diligent search for responsive documents. American has been unable to locate documents responsive to this request.



**RULING:**
If such document(s) are located, they shall be promptly produced.

**REQUEST FOR PRODUCTION NO. 85 [NUMBERED 67]:**
The Emails of Hollins Smith from December 2010 to July 2011 regarding his reports to Dan Hodge (or Mr. Hodge's replacement) on the investigations Mr. Smith was assigned to investigate in the San Diego station.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 85 [NUMBERED 67]:**
Respondent stated it has conducted a reasonable and diligent search for responsive documents and has produced those documents it was able to locate.

**RULING:**
If such document(s) are located, they shall be promptly produced.

**REQUEST FOR PRODUCTION NO. 86 [NUMBERED 68]:**
The Emails of Anthony Degrazia regarding the complaint RSMawhinney made regarding American Airlines Aircraft 3CY on Apr. 30, 2011.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 86 [NUMBERED 68]:**
Respondent responds as follows: American has conducted a reasonable and diligent search for responsive information, and has been unable to locate any additional documents that have not already been produced.

**RULING:**
If such document(s) are located, they shall be promptly produced.

**REQUEST FOR PRODUCTION NO. 87 [NUMBERED 69]:**
The Emails of Anthony Degrazia to Jose Montes between October 2010 to September 19, 2011.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 87 [NUMBERED 69]:**
Respondent responds as follows: "American has conducted a further search for documents reflecting communications between Mr. Degrazia and Mr. Montes concerning the events leading up to your First Advisory, Second Advisory, Career Decision Day, or relating to the issues you raised on April 30, 2011 concerning Aircraft 3CY. Other than what has already been produced, American has also located the attached documents, which have been bates numbered AA/Mawhinney 1133 through 1151. If you believe there are any other specific documents that have not yet been produced, please provide us with the author, recipient, date, and subject of the e-mail so that we may conduct a further search to determine whether the document is in American's possession, custody, and/or control."

**RULING:**
Answered. No Additional response is required.

**REQUEST FOR PRODUCTION NO. 88 [NUMBERED 70]:**
The Emails of Anthony Degrazia to RSMawhinney between March 2009 to September 3, 2011.



**RESPONSE TO REQUEST FOR PRODUCTION NO. 88 [NUMBERED 70]:**
Respondent's objections include that the information is equally available to Claimant. Claimant's prior discovery responses indicate that he has the email correspondence which was sent to him.

**RULING:**
Answered. No further production is required by Respondent absent a specification by Claimant of what email traffic he is missing.

**REQUEST FOR PRODUCTION NO. 89 [NUMBERED 71]:**
The Emails of Pete Schafer to Jose Montes between October 2010 to September 2011.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 89 [NUMBERED 71]:**
As set forth in American's objections, "...this request is overly broad and fails to specify with reasonable particularity the specific documents you are seeking. You have attempted to provide greater specificity by stating you are seeking e-mail dated November 6, 2010 concerning Aircraft 200 and e-mail dated April 30, 2011 concerning Aircraft 3CY. American has already produced those e-mails it was able to locate concerning these issues. As such, no further response is required." Respondent further objects because Pete Schafer has not been designated by either side as witness or individual with knowledge about Claimant's claims.

**RULING:**
Answered. No Additional response is required.

**REQUEST FOR PRODUCTION NO. 90 [NUMBERED 72]:**
The electronic transmission of April 30, 2011 regarding the Crew Chief or temporary inspection authorization of Ed Kempa, by the American Airlines Quality Assurance Department.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 90 [NUMBERED 72]:**
Respondent objects because this request is duplicative of Request for Production Nos. 13 and 74.

**RULING:**
Respondent is required to produce the document(s) as requested by the date of Mr. Kempa's testimony at the hearing, if it has not been provided.

**REQUEST FOR PRODUCTION NO. 91 [NUMBERED 73]:**
The Emails of Jeanette Gibbs to Jose Montes between October 2010 to September 2011.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 91 [NUMBERED 73]:**
Respondent responds as follows: "American has conducted a reasonable and diligent search for documents reflecting communications between Ms. King and Mr. Montes, Ms. King and Mr. Degrazia, and Ms. Gibbs and Mr. Montes concerning the events leading up to your First Advisory, Second Advisory, Career Decision Day, or relating to the issues you raised on April 30, 2011 concerning Aircraft 3CY. Other than what has already been produced, American has also located the attached documents, which have been bates numbered AA/Mawhinney 1133 through 1151. If you believe there are any other specific documents that have not yet been produced, please provide us



with the author, recipient, date, and subject of the e-mail so that we may conduct a further search to determine whether the document is in American's possession, custody, and/or control."

**RULING:**
The objections are sustained. No further production is required.

**REQUEST FOR PRODUCTION NO. 92 [NUMBERED 74]:**
The Emails of Paula King to Jose Montes between October 2010 to September 2011.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 92 [NUMBERED 74]:**
Respondent responds as follows: "American has conducted a reasonable and diligent search for documents reflecting communications between Ms. King and Mr. Montes, Ms. King and Mr. Degrazia, and Ms. Gibbs and Mr. Montes concerning the events leading up to your First Advisory, Second Advisory, Career Decision Day, or relating to the issues you raised on April 30, 2011 concerning Aircraft 3CY. Other than what has already been produced, American has also located the attached documents, which have been bates numbered AA/Mawhinney 1133 through 1151. If you believe there are any other specific documents that have not yet been produced, please provide us with the author, recipient, date, and subject of the e-mail so that we may conduct a further search to determine whether the document is in American's possession, custody, and/or control." Respondent further objects because Paula King has not been designated by either side as witness or individual with knowledge about Claimant's claims.

**RULING:**
No further production is required.

**REQUEST FOR PRODUCTION NO. 93 [NUMBERED 75]:**
The Emails of Paula King to Anthony Degrazia between October 2010 to September 2011.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 93 [NUMBERED 75]:**
Respondent responds as follows: "American has conducted a reasonable and diligent search for documents reflecting communications between Ms. King and Mr. Montes, Ms. King and Mr. Degrazia, and Ms. Gibbs and Mr. Montes concerning the events leading up to your First Advisory, Second Advisory, Career Decision Day, or relating to the issues you raised on April 30, 2011 concerning Aircraft 3CY. Other than what has already been produced, American has also located the attached documents, which have been bates numbered AA/Mawhinney 1133 through 1151. If you believe there are any other specific documents that have not yet been produced, please provide us with the author, recipient, date, and subject of the e-mail so that we may conduct a further search to determine whether the document is in American's possession, custody, and/or control." Respondent further objects because Paula King has not been designated by either side as witness or individual with knowledge about Claimant's claims.

**RULING:**
No further production is required.



**REQUEST FOR PRODUCTION NOS. 94-117**

**RULING:**
Untimely.

This Order shall continue in effect unless and until amended by subsequent order of the Arbitrator. All dates herein shall be strictly enforced.


Dated: August 27, 2014                    *Alice D. Sullivan*
                                          _____
                                          Hon. Alice D. Sullivan (Ret.)
                                          Arbitrator

UUU

**Subject:**   RE: 3-20-100-0371/73-166-371-11 DECR Mawhinney vs. American Airlines, Inc.: Rulings of the Arbitrator
re Requests for Production of Documents

**From:**   Lawrence, Larry M. (llawrence@morganlewis.com)

**To:**   bfincher@privatejudge.com; steven24rd@yahoo.com; rhendricks@morganlewis.com;

**Cc:**   crowd@adr.org; judge@privatejudge.com;

**Date:**   Wednesday, August 27, 2014 2:12 PM


Judge Sullivan,


We are in receipt of your order regarding Claimant's Request for Production. In it you direct American to
provide an affidavit of the person conducting the diligent search for responsive documents by September
3, 2014. We will begin to prepare that declaration, however the individual who assisted in this search is a
paralegal in American's legal department. As such, we will do our best to provide sufficient information
regarding the search without disclosing attorney work product or attorney/client communications.
Additionally, she is currently on vacation and will not be returning until September 2, 2014. So, while we
will diligently try to obtain the signed declaration by September 3 and currently anticipate being able to
do so, it may be slightly delayed due to her return and we wanted to make sure you were aware of this in
advance.


Thank you.


**Larry M. Lawrence**
**Morgan, Lewis & Bockius LLP**
300 S. Grand Avenue, Twenty-Second Floor | Los Angeles, CA 90071-3132
Direct: 213.612.7339 | Main: 213.612.2500 | Fax: 213.612.2501
llawrence@morganlewis.com | www.morganlewis.com

Assistant: Connie M. Torres-Gabig | 213.612.1039 | ctorres-gabig@morganlewis.com



VVV

**Subject:**  Re: 3-20-100-0371/73-166-371-11 DECR Mawhinney vs. American Airlines, Inc.: Rulings of the Arbitrator re Requests for Production of Documents

**From:**  Alice Sullivan (judge@privatejudge.com)

**To:**  llawrence@morganlewis.com;

**Cc:**  bfincher@privatejudge.com; steven24rd@yahoo.com; rhendricks@morganlewis.com; crowd@adr.org;

**Date:**  Thursday, August 28, 2014 9:32 AM


Mr. Lawrence,
Is there someone from the client who accessed and searched documents to respond to the requests?
That would be the person to submit the affidavit.
Judge Sullivan



www

1    MORGAN, LEWIS & BOCKIUS LLP
     ROBERT JON HENDRICKS (SBN 179751)
2    LARRY M. LAWRENCE (SBN 232720)
     300 South Grand Avenue, Twenty-Second Floor
3    Los Angeles, CA  90071-3132
     Tel:  213.612.2500
4    Fax:  213.612.2501
     E-mail: rhendricks@morganlewis.com
5    E-mail: llawrence@morganlewis.com
6
     Attorneys for Respondent
7    American Airlines, Inc.

8

9

10                      AMERICAN ARBITRATION ASSOCIATION

11

12
     ROBERT S. MAWHINNEY,                    AAA Case No.:  73 1666 00371 11
13
                     Claimant,               **DECLARATION OF CYNTHIA ELLER**
14
            vs.
15
     AMERICAN AIRLINES, INC.
16
                     Respondent.
17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
  BOCKIUS LLP
 ATTORNEYS AT LAW
  LOS ANGELES

DB2/ 25290615.1                  DECLARATION OF CYNTHIA ELLER

## DECLARATION OF CYNTHIA ELLER

I, Cynthia Eller, declare as follows:

1.      I am a Senior Paralegal in American Airlines, Inc.'s ("American") Legal Department.  Beginning in early 2014, I was assigned as the Senior Paralegal in the *Mawhinney v. American Airlines, Inc.* arbitration.  Before me, my former colleague Diane Dildy was assigned as a paralegal on this litigation.  I have personal knowledge of the facts set forth in this declaration and if called as a witness, I could and would competently testify to them.

2.      Based on my review of the litigation file, I am aware that at the outset of this litigation, American's legal department issued a document retention letter directing various individuals and their staff to preserve broad categories of documents relating to Mr. Mawhinney and his employment with American that may be relevant to this litigation, including but not limited to personnel records, performance reviews, and investigation/interview records pertaining to Mr. Mawhinney.

3.      It is my understanding that Mr. Mawhinney has propounded multiple discovery requests on American in connection with this arbitration.  In my role as Senior Paralegal assigned to this arbitration, I have been responsible for overseeing and participating in American's search for documents responsive to Mr. Mawhinney's discovery requests.  I worked closely with American's counsel to search various files and databases, as well as to reach out to specific custodians to obtain documents in their custody.  I provided the documents I located to American's counsel, who I understand then reviewed the documents for responsiveness and privilege.

4.      In responding to Mr. Mawhinney's discovery requests, I searched for requested files such as Mr. Mawhinney's personnel file, discipline history, attendance file, and payroll records.  I also searched for applicable policy documents, collective bargaining agreements, job descriptions, ASAP agreements, organizational charts, and other identified files pertaining to Mr. Mawhinney.  Additionally, I searched for specific documents pertaining to third parties in response to Mr. Mawhinney's discovery requests, such as searching the CR-1 records of Mr. Mawhinney's co-workers for any records dealing with profanity.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 25290615.1

1

DECLARATION OF CYNTHIA ELLER

5.     Further, I communicated with various custodians of records and other individuals identified by counsel to coordinate and oversee the search and production of documents in their possession, including e-mail communications and other responsive documents and files. Based on my review of the litigation file, it is my understanding that my former colleague, Diane Dildy, also communicated with various custodians to coordinate and oversee their search and production of documents in their possession. It is my understanding that the following individuals searched for and provided American's counsel documents concerning Mr. Mawhinney: Jose Montes, Anthony Degrazia, Lynn Vaughn, and Jeannette Gibbs. I also engaged in further follow-up communications with custodians and other identified individuals, including Marianne Coplin, Anthony Degrazia, and Lynn Vaughn concerning further narrowed requests for responsive documents and e-mails.

6.     Finally, I provided contact information for various individuals, including Hollins Smith, Anthony Degrazia, Lynn Vaughn, Jeanette Gibbs, Ken Mactiernan, Aaron Klippel, Andrei Coval, and Ed Kempa to American's counsel so that they may speak directly with various custodians and further inquire about documents in their possession.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed this 2nd day of September, 2014, at Fort Worth, Texas.

*Cynthia Eller*
Cynthia Eller

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 25290615.1

2

DECLARATION OF CYNTHIA ELLER



XXX

| | |
|---|---|
| **Subject:** | Mawhinney - Large Attachments |
| **From:** | llawrence@morganlewis.com (llawrence@morganlewis.com) |
| **To:** | steven24rd@yahoo.com; judge@privatejudge.com; bfincher@privatejudge.com; |
| **Cc:** | crowd@adr.org; rhendricks@morganlewis.com; ctorres-gabig@morganlewis.com; |
| **Date:** | Friday, August 29, 2014 1:06 PM |

**You have received 4 secure files from llawrence@morganlewis.com.**
Use the secure links below to download.

Pursuant to my prior e-mail, here are the large attachments. '

**Secure File Downloads:**
Available until: **28 September 2014**

Click links to download:

> **Mawhinney - Production 1158-1164.pdf**
> 538.32 KB
>
> **Mawhinney Production - 1152-1157.pdf**
> 313.98 KB
>
> **TWU Plan Doc 1-1-09 with 7 amendments.pdf**
> 31,087.46 KB
>
> **TWU SPD November 2012 - FINAL.PDF**
> 4,312.42 KB

**\*\*\* Do not delete this email message prior to taking appropriate action. \*\*\***

You have received attachment link(s) within this email from Morgan, Lewis & Bockius LLP. **You must use the link(s) above to download the file(s): .**

Secured by Accellion

DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this
communication in error, please notify us immediately by
e-mail and delete the original message.

ENTERED

YYY

1   didn't label them as exhibits.

2           Did American label them or are they

3   somewhere --

4       MR. LAWRENCE:  As I understand it, all of the

5   documents that have been specifically used or shown

6   to a witness have either been pulled out and given a

7   new number or were already identified in American's

8   exhibit list.  So there should not -- as I recall

9   the testimony -- and, Mr. Mawhinney, you can correct

10  me if I'm wrong -- there has not been any exhibit

11  that's been shown to a witness that has not had

12  either its own respondent exhibit number or been

13  given a new number, such as 309, 310, 311, 312.

14      MR. HENDRICKS:  Does that answer your Honor's

15  question?

16      THE ARBITRATOR:  No.

17      MR. LAWRENCE:  I apologize.

18      THE ARBITRATOR:  So in terms of what was

19  included in the late production, what was it?

20      MR. LAWRENCE:  It was the pension document.

21      THE ARBITRATOR:  When you say "the pension

22  document," can you be specific?

23      MR. LAWRENCE:  The pension plan that was at

24  issue in connection with Mr. Mawhinney's claim for

25  the 1.33 years of service credit.

ARBITRATION- VOL. III

1    THE ARBITRATOR:  The plan document?

2    MR. LAWRENCE:  The plan document; correct.

3    MR. HENDRICKS:  Which I believe we've marked as

4    an amended exhibit.

5    MR. LAWRENCE:  Which is an exhibit, the pension

6    plan is.

7    THE ARBITRATOR:  It's in -- now included within

8    your exhibits.  It was in -- that's the reason in

9    the -- you produced the amended exhibit list --

10   MR. HENDRICKS:  Correct.  Correct.

11   THE ARBITRATOR:  -- was to add those additional

12   exhibits?

13   MR. LAWRENCE:  It was to add the pension plan

14   and a related document.

15   THE ARBITRATOR:  But if you compare the amended

16   exhibit list with the prior exhibit list, that does

17   not constitute all the documents that were in the

18   late production?

19   MR. LAWRENCE:  Correct.

20   THE ARBITRATOR:  It only evidences those two

21   documents that you wanted to add to exhibits?

22   MR. LAWRENCE:  Correct.

23   THE ARBITRATOR:  All right.  So with respect to

24   those, you're saying so far Mr. Mawhinney has not

25   referred to any of those or --

872

ENTERED

BARKLEY
Court Reporters

1    MR. LAWRENCE:  Correct.

2    THE ARBITRATOR:  -- they are in the 311, 312,

3  you know, the late numbering?

4    MR. HENDRICKS:  Correct.  Mr. Mawhinney, in

5  fact, has referred to it.  For example, there was

6  the April 29th statement from Mr. Smith that was a

7  late document.  Based upon the subpoena, we went out

8  to specifically say, "Do you have anything else?"

9  And he produced those documents to us.

10        And so those were -- some had already been

11  provided earlier, but there were some that we had

12  not had.  And so we made sure that Mr. Mawhinney had

13  those before the beginning of the proceeding.

14    MR. LAWRENCE:  There was a similar document used

15  with Mr. DeGrazia that was a specific email that he

16  had requested by date and subject matter in

17  connection with the arbitrator's discovery order.

18  That was produced, and that was also used in

19  connection with Mr. DeGrazia's examination and

20  marked as a specific exhibit.

21    THE ARBITRATOR:  My question is, those -- the

22  compilation of what was concluded in that late

23  production, do we have a numbering or an

24  identification of what was included in it?

25    MR. HENDRICKS:  I see.

873

1       MR. LAWRENCE:  I can give a Bates range.  And if

2   you would like, we can bring a whole set and mark it

3   as an exhibit, as well.

4       THE ARBITRATOR:  I don't need it so much marked

5   as an exhibit, but I would -- obviously, it would be

6   useful if -- to the extent either of you are going

7   to refer to any of those documents, that we have

8   them marked --

9       MR. HENDRICKS:  Okay.  So this is my

10  understanding --

11      THE ARBITRATOR:  -- in advance was my

12  preference.

13      MR. HENDRICKS:  Yeah.  I think there have been a

14  total -- what's the total number of documents?

15  Five?

16      MR. LAWRENCE:  Four or five.

17      MR. HENDRICKS:  We're talking about a total of

18  four or five documents here.  One was these

19  pension-related documents, which we have already

20  marked as an exhibit.  The others were the specific

21  email from Mr. DeGrazia, which has now been marked

22  as an exhibit.  The other was the witness statement

23  from -- prepared by Mr. Smith, which was marked as

24  an exhibit.

25          Is there any document that was produced in

874

1    this late production that has not been marked as an

2    exhibit?

3        MR. LAWRENCE:   There were documents that were

4    reproduced.   They were numbered incorrectly.   They

5    had duplicate Bates numbers.   And so that set was

6    renumbered to give them Bates numbers at the end,

7    but they had already been produced.

8        THE ARBITRATOR:   So tell me why the pension plan

9    document was not produced until last week.

10       MR. LAWRENCE:   It had never been requested.   And

11   it was our expectation that the parties would

12   informally be able to resolve that issue, and we did

13   not anticipate needing it as an exhibit.

14       THE ARBITRATOR:   But it had been requested for

15   quite some time.

16       MR. LAWRENCE:   The pension document?

17       THE ARBITRATOR:   Yes.   By Mr. Mawhinney.   Had it

18   not?

19       MR. LAWRENCE:   No.   That's not my -- I'll have

20   to go back and check the document.   That's not my

21   understanding.

22       THE ARBITRATOR:   With respect to determining, I

23   recall having some discussion about this on the

24   telephone.   Obviously, if we have a pension

25   determination issue, we have to look to the plan to

875

1    determine what the benefit is and the settlement

2    agreement to see what that means.

3        MR. HENDRICKS:   I thought with respect to that

4    specific document, there was some discussion at one

5    point as to that particular document being produced

6    at a later time with respect to damages issues.

7    However, when the issue of liability still -- it

8    became clear to us that Mr. Mawhinney didn't want to

9    discuss settlement of that, we felt it was necessary

10   to introduce it at that time.  So we provided it to

11   him as promptly as we realized we were not going to

12   be able to resolve that issue.

13       THE ARBITRATOR:   I don't consider that, you

14   know, the appropriate time to do it.   I recognize

15   that there was a time when we met in person in the

16   pre-hearing, and this -- we talked a little bit

17   about it.   And Mr. Mawhinney I asked to identify

18   what's the amount we're talking about with regard to

19   the pension issue with regard to the health benefits

20   and tried to help figure out what is it he's seeking

21   on some of those specifics.

22            And as we walked through that, it -- that

23   became clear.   And then the parties started some

24   discussion back and forth about whether they were

25   going to settle that.   But it doesn't mean that if

876

1    you're going to have a settlement discussion about

2    it, therefore, you don't have to provide the

3    document.

4         MR. LAWRENCE:  My recollection of the discussion

5    was that Mr. Mawhinney said that he did not have the

6    new Collective Bargaining Agreement --

7         THE ARBITRATOR:  That's true.

8         MR. LAWRENCE:  -- to settle the wage rate.

9         THE ARBITRATOR:  That's true.  That was also --

10        MR. LAWRENCE:  That was -- and that was produced

11   to him.  There was never any discussion about the

12   pension plan.  And as the Court may recall, we

13   initially argued that this claim is preempted by

14   ERISA.

15        THE ARBITRATOR:  Correct.

16        MR. LAWRENCE:  And the conclusion was there was

17   no need to look at the pension plan and, therefore,

18   the ERISA preemption doesn't apply here.  So it was

19   our understanding that that document was not at all

20   relevant to Mr. Mawhinney in his calculation of

21   damages because, again, from our perspective,

22   because the plan has specific limitations in it,

23   this -- from our perspective, at least, this issue

24   is preempted by ERISA.

25        THE ARBITRATOR:  Well, and you get to argue

1    that, but he gets to, obviously, argue the other

2    side of it that, under the settlement agreement, if

3    the plan prevents it, then is he owed the equivalent

4    of what he should have been provided if American was

5    not able to comply with what he believes the terms

6    of the settlement agreement were on the pension

7    benefit -- of restoring the pension benefit?

8            So you're right.  The underlying issue has

9    to be decided by me.  But, as you know, that doesn't

10   mean you withhold the documents because you don't

11   think it's necessary on the pension plan.  So --

12   right?

13           So, Mr. Mawhinney, you've already got the

14   documents, so you've been through it.  If you need

15   to refer to it, then I want you to come prepared to

16   have it as an exhibit with an exhibit number on it

17   so that we can try to move through things a little

18   more quickly.  In other words, I don't want to

19   have -- every time we have to stop because a

20   document has never been marked by either side or

21   that Mr. Mawhinney has it in 308 as a group exhibit

22   without any correlation to American's documents.

23           Mr. Mawhinney, that's your responsibility.

24   That's not American's.  Mr. Lawrence has been very

25   helpful throughout these days to try to help find a

878

THE ARBITRATION TRIBUNALS OF THE

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| ROBERT STEVEN MAWHINNEY )<br><br>Plaintiff )<br><br>vs. )<br><br>AMERICAN AIRLINES, INC., et seq., )<br>Defendant ) | **Case No.: 73-166-00371-11-DECR**<br><br>**SUBPOENA DUCES TECUM**<br><br>Judge:   Honorable Alice D. Sullivan (Ret.)<br>Action Filed:  Nov. 9, 2011<br>Hearing Date:  September 2, 2014 |

**FROM THE PEOPLE OF THE STATE OF CALIFORNIA**

To:    Henry Michael Maslon, PrimeFlight Aviation Services employee (2011), San Diego, CA.

3225 North Harbor Drive, San Diego, CA. 92101                    and/or

2045 Seca Street, El Cajon, CA. 92019

You are commanded to appear and attend the hearing in the matter of the arbitration between

Robert Steven Mawhinney and American Airlines, Inc., et seq., on September 9, 2014 at the hour

of 9:15 A.M., at 750 B Street, Suite 3300, San Diego, CA., then and there to testify as a witness

in said matter, on behalf of Robert Steven Mawhinney.

You are further instructed to bring the following papers, books, documents and records with you

to said hearing pertaining to your being a witness to, and your written statement pertaining to, the

incident of March 21, 2011 interactions between Robert Steven Mawhinney and Ray Ruiz.

You are advised that disobedience of this subpoena can subject you to consequences (including

punishment as a contempt of court) pursuant to the provisions of Code of Civil Procedure §

1282.6 and 1985 et seq.

DATED: August 5, 2014

_Alice D. Sullivan_                    Hon. Alice D. Sullivan (Ret.), Arbitrator

_[signature]_                    Requested by: Robert Steven Mawhinney, Plaintiff

8070 La Jolla Shores Drive #524, La Jolla, CA 92037,
(619) 985-3674, SteveN24RD@yahoo.com

THE ARBITRATION TRIBUNALS OF THE

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| ROBERT STEVEN MAWHINNEY )<br><br>Plaintiff )<br><br>vs. )<br><br>AMERICAN AIRLINES, INC., et seq., )<br><br>Defendant ) | **Case No.: 73-166-00371-11-DECR**<br><br>**APPLICATION FOR**<br>**SUBPOENA DUCES TECUM**<br><br>Judge:  Honorable Alice D. Sullivan (Ret.)<br>Action Filed:  Nov. 9, 2011<br>Hearing Date:  September 2, 2014 |

**FROM THE PEOPLE OF THE STATE OF CALIFORNIA**

Mr. Henry Maslon, 3225 North Harbor Drive, San Diego, CA 92101 and/or 2045 Seca Street (El Cajon, CA 92019), has in his possession or under his control the following statement, knowledge, and was witness to an incident: on March 21, 2011 a discussion between Robert Steven Mawhinney and Mr. Ray Ruiz.

The statement, knowledge, and as witness to an incident are material to the issue involved in the arbitration by reason of the following facts: Robert Steven Mawhinney's claims that the discussion was an attempt to resolve an alleged problem with an American Airlines Aircraft, and that the content of the discussion was not any different or offensive to Mr. Ray Ruiz than other discussions Mr. Ray Ruiz engaged in himself.

Good cause exists for the production of the described matters and things by reason of the following facts: verify the concerns, efforts, and dedication that Robert Steven Mawhinney undertook in the course of his duties; and, the close proximity to retaliatory actions implemented upon Robert Steven Mawhinney following the pursuit of said concerns, efforts, and dedication.

WHEREFORE, request is made that a Subpoena Duces Tecum issue.

Executed on August 5, 2014, at 8070 La Jolla Shores Drive #524, La Jolla, California.
I declare under penalty of perjury that the foregoing is true and correct.

DATED: August 5, 2014

_____

Requested by: Robert Steven Mawhinney, Plaintiff
(619) 985-3674, SteveN24RD@yahoo.com

AAA

**Subject:** AAA 731660037111DECR Subpoena's with new dates

| From: | Robert Mawhinney (steven24rd@yahoo.com) |
|---|---|
| To: | bfincher@privatejudge.com; crowd@adr.org; judge@privatejudge.com; llawrence@morganlewis.com; rhendricks@morganlewis.com; |
| Bcc: | rmawhinney@ymail.com; |
| Date: | Wednesday, August 20, 2014 9:54 PM |

Hello Bobbie Fincher,

Could you please reissue the subpoena's for Nicolai Smit and Henry Maslon, with the agreed upon dates of Sept. 4, 2014?
Do you still have the .doc files I sent you, or do I need to get those to you again?

Charles Jancsek is scheduled for 9:15 A.M. If you could please schedule Nicolai for 10:15 A.M., and Henry for 11:15 A.M.

Could you also issue the subpoena's for Anthony Degrazia and Ken Mactiernan with an open address line so that I could hand write the address in. If not then Mr. Hendricks is required to get the address in to you by Friday Aug. 22, 2014. Please issue them as soon as possible so that I have time to get them served.

Thank You,
Robert Steven Mawhinney

8/20/2014 9:56 PM



BBBE

**Subject:**  RE: 73-20-100-0371/73-166-371-11 DECR Mawhinney vs. American Airlines, Inc.

**From:**  Bobbie Fincher (bfincher@privatejudge.com)

**To:**  steven24rd@yahoo.com;

**Cc:**  llawrence@morganlewis.com; Crowd@adr.org; judge@privatejudge.com; rhendricks@morganlewis.com;

**Date:**  Monday, August 25, 2014 12:01 PM


Mr. Mawhinney,


Attached please find the updated subpoenas and applications for both Messrs. Smith and Maslon.


Please remember to submit copies of the executed documents for our records.


Thank you and best regards,


Bobbie

**Bobbie J. Fincher**
858.792.1330 Voice
858.461.6162 Fax

www.PrivateJudge.com



# THE ARBITRATION TRIBUNALS OF THE

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **ROBERT STEVEN MAWHINNEY**      ) | **Case No.: 73-166-00371-11-DECR** |
| Plaintiff      ) | |
| vs.      ) | **SUBPOENA DUCES TECUM** |
| **AMERICAN AIRLINES, INC.**, et seq.,      ) | Judge:   Honorable Alice D. Sullivan (Ret.) |
| Defendant      ) | Action Filed: Nov. 9, 2011 |
| _____      ) | Hearing Date:  September 3, 2014 |

**FROM THE PEOPLE OF THE STATE OF CALIFORNIA**

To:    Henry Michael Maslon, PrimeFlight Aviation Services employee (2011), San Diego, CA.

3225 North Harbor Drive, San Diego, CA. 92101           and/or

2045 Seca Street, El Cajon, CA. 92019

You are commanded to appear and attend the hearing in the matter of the arbitration between Robert Steven Mawhinney and American Airlines, Inc., et seq., on September 4, 2014 at the hour of 10:45 A.M., at 750 B Street, Suite 3300, San Diego, CA., then and there to testify as a witness in said matter, on behalf of Robert Steven Mawhinney.

You are further instructed to bring the following papers, books, documents and records with you to said hearing pertaining to your being a witness to, and your written statement pertaining to, the incident of March 21, 2011 interactions between Robert Steven Mawhinney and Ray Ruiz.

You are advised that disobedience of this subpoena can subject you to consequences (including punishment as a contempt of court) pursuant to the provisions of Code of Civil Procedure § 1282.6 and 1985 et seq.

DATED: August 25, 2014

*Alice D. Sullivan*          **Hon. Alice D. Sullivan (Ret.), Arbitrator**

_____     Requested by: Robert Steven Mawhinney, Plaintiff

8070 La Jolla Shores Drive #524, La Jolla, CA 92037,
(619) 985-3674,SteveN24RD@yahoo.com

# THE ARBITRATION TRIBUNALS OF THE

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| ROBERT STEVEN MAWHINNEY ) | **Case No.: 73-166-00371-11-DECR** |
| Plaintiff ) | **APPLICATION FOR** |
| vs. ) | **SUBPOENA DUCES TECUM** |
| AMERICAN AIRLINES, INC., et seq., ) | Judge:  Honorable Alice D. Sullivan (Ret.) |
| Defendant ) | Action Filed: Nov. 9, 2011 |
| | Hearing Date:  September 3, 2014 |

**FROM THE PEOPLE OF THE STATE OF CALIFORNIA**

Mr. Henry Maslon, 3225 North Harbor Drive, San Diego, CA 92101 and/or 2045 Seca Street (El Cajon, CA 92019), has in his possession or under his control the following statement, knowledge, and was witness to an incident: on March 21, 2011 a discussion between Robert Steven Mawhinney and Mr. Ray Ruiz.

The statement, knowledge, and as witness to an incident are material to the issue involved in the arbitration by reason of the following facts: Robert Steven Mawhinney's claims that the discussion was an attempt to resolve an alleged problem with an American Airlines Aircraft, and that the content of the discussion was not any different or offensive to Mr. Ray Ruiz than other discussions Mr. Ray Ruiz engaged in himself.

Good cause exists for the production of the described matters and things by reason of the following facts: verify the concerns, efforts, and dedication that Robert Steven Mawhinney undertook in the course of his duties; and, the close proximity to retaliatory actions implemented upon Robert Steven Mawhinney following the pursuit of said concerns, efforts, and dedication.

WHEREFORE, request is made that a Subpoena Duces Tecum issue.

Executed on August 25, 2014, at 8070 La Jolla Shores Drive #524, La Jolla, California.
I declare under penalty of perjury that the foregoing is true and correct.


DATED: August 25, 2014

_____   Requested by: Robert Steven Mawhinney, Plaintiff
(619) 985-3674, SteveN24RD@yahoo.com



1    cite them as exhibit numbers.  Once you say the

2    case, and this is the -- you can quote from the

3    case, I often go read the cases, if it's one I'm not

4    familiar with.  If I want to look at the proposition

5    you're citing it for, so it's just a different way

6    that they're treated.  It doesn't mean I don't read

7    and consider it, but it's different than being an

8    exhibit.  It's a legal authority.

9         All right.  Does that conclude the

10   objections?

11        MR. LAWRENCE:  Yes, your Honor.

12        THE ARBITRATOR:  All right.  Mr. Mawhinney, on

13   your side, any objections to any of the exhibits of

14   American?

15        MR. MAWHINNEY:  Your Honor, these witnesses that

16   did not make an appearance and I did not get to

17   cross -- it would be Exhibit X, Mr. Ruiz, who

18   American actually asked you for the subpoena for

19   Mr. Ruiz with the bogus address that I discovered

20   was the commuter terminal, and yet they chose not to

21   bring it to him.  I don't know if -- what weight you

22   would put on the information I have learned from

23   Mr. Smit, Nicolai Smit was here, when I escorted him

24   out, was that Mr. Ruiz was aware of the subpoena,

25   but I don't know that he was served.  They're saying

```
1   he was not served.

2       THE ARBITRATOR:   Yes.   And I understand you

3   tried to serve him.   Your server tried also, and he

4   did not --

5       MR. MAWHINNEY:   No.   I never had a -- they made

6   the request for the subpoena, and I was unable to

7   determine what Ray Ruiz, of 30 in San Diego,

8   actually submit to you.

9       THE ARBITRATOR:   Correct.   So neither side was

10  able to subpoena him, so Mr. Ruiz's statement --

11  let's go back a second.

12      MR. LAWRENCE:   Mr. Montes testified in his

13  declaration that he relied upon Mr. Ruiz's

14  statement.

15      THE ARBITRATOR:   That's all it's going to be

16  allowed for, not for the truth of the matter that

17  this is from Mr. Ruiz's testimony, because he was

18  not cross-examined, but only for the foundation of

19  the testimony of Mr. Montes.

20      MR. LAWRENCE:   Mr. Montes' reliance on

21  this informed --

22      THE ARBITRATOR:   Correct.

23      MR. MAWHINNEY:   And Z is Mr. Maslon.

24      THE ARBITRATOR:   That would be the same, because

25  Mr. Maslon did not appear.   He was not
```

1573

1    cross-examined, so his statement would be limited to

2    admission only for the limited purpose of showing

3    the extent to which management relied on it, if they

4    did, in the determinations of discipline of

5    Mr. Mawhinney or regarding his claims of

6    retaliation.

7        MR. MAWHINNEY:  With regard to Mr. Maslon, off

8    this where we're right now, there's an email I guess

9    that's been sent to you from my legal process server

10   that he served this and that he actually has a

11   picture of the house.

12       THE ARBITRATOR:  I saw, and I've read that.

13       MR. LAWRENCE:  We have not received a copy of

14   that email.

15       THE ARBITRATOR:  You did not receive -- you

16   weren't copied on that?

17       MR. LAWRENCE:  I don't believe so.

18       THE ARBITRATOR:  I saw that this morning

19   before --

20       MR. MAWHINNEY:  I only gave them yours -- email

21   address, so I guess I'll forward that to all of you.

22       THE ARBITRATOR:  No communication should be sent

23   to me that is not copied to them, and that's the

24   process we followed throughout the arbitration.

25       MR. MAWHINNEY:  Okay.  I didn't mean to ex parte

```
 1   or anything.  I was just making sure that you were

 2   given this from the process server.

 3       THE ARBITRATOR:  I received it this morning and

 4   read it this morning before I came to the

 5   arbitration, and I'll see if I can forward that, or

 6   if it was Bobbie was -- copying my assistant, she

 7   will forward it if she noticed you were not on

 8   there.  Give me just one minute.

 9       MR. MAWHINNEY:  Okay.

10       THE ARBITRATOR:  It was received at 6:39 a.m.

11   September 11, 2014.  It's from Michael Narey,

12   N-a-r-e-y, to Robert with a copy to me, and this is

13   regarding the service on Mr. Maslon.

14          So, Mr. Hendricks, give me your email.

15   RHendricks...

16       MR. HENDRICKS:  RHendricks@MorganLewis.com,

17   M-o-r-g-a-n-L-e-w-i-s.

18       THE ARBITRATOR:  I'll send it to you and then

19   you can send it to Mr. Lawrence, if you would.

20       MR. HENDRICKS:  Yes, your Honor.

21       THE ARBITRATOR:  Then I'll also ask Bobbie --

22   I'll send it on to her and have her forward it

23   including the case manager and do the full string

24   again so you get a second copy of it, but at least

25   for the moment you'll have it.
```

1    MR. MAWHINNEY:  As for the other subpoenaed

2  witnesses that I was promised but didn't show up,

3  what do we do about their statements?

4    THE ARBITRATOR:  I'm not aware of anyone else

5  that you subpoenaed --

6    MR. MAWHINNEY:  -- not I --

7    THE ARBITRATOR:  -- that you're referring to.

8    MR. MAWHINNEY:  They had subpoenaed them.  They

9  delivered them.  They said that they would be here

10  yesterday and yet didn't show.

11    THE ARBITRATOR:  You're talking about the two

12  witnesses that -- actually three, Vaughn --

13    MR. MAWHINNEY:  Gibbs.

14    THE ARBITRATOR:  -- Gibbs and Coval who American

15  elected not to call as witnesses but were originally

16  on their witness list; correct?

17    MR. MAWHINNEY:  And they also asked you for a

18  subpoena.

19    THE ARBITRATOR:  So they could have called them

20  and they declined to do so.  Now, what is your

21  question about their -- documents where we have a

22  number of emails with -- to and from Ms. Gibbs, Ms.

23  Vaughn and Mr. Montes and other individuals, so

24  those have already -- testimony's already been given

25  as to those, so I'm not intending to strike those

1576

1    exhibits.  You want them in evidence; correct?

2         MR. MAWHINNEY:  Yes, I do.

3         THE ARBITRATOR:  All right.

4              You want them in evidence?

5         MR. LAWRENCE:  Right.

6         THE ARBITRATOR:  The correspondence, including

7    those witnesses, even though they did not testify.

8         MR. LAWRENCE:  As we understand it, these

9    witness were not on Mr. Mawhinney's witness list.

10   He never asked for them to be subpoenaed.  They were

11   witnesses that were identified by American.

12        THE ARBITRATOR:  So going back to my question --

13        MR. HENDRICKS:  That's correct.

14        THE ARBITRATOR:  These are exhibits you want

15   admitted as well.  All right.  There's no objection.

16   They will be admitted.

17        MR. MAWHINNEY:  And then so that's the

18   corporate.  How about Mr. Coval?

19        THE ARBITRATOR:  As to Mr. Coval, the same.  If

20   both sides want those emails in evidence, they would

21   be received.

22        MR. MAWHINNEY:  Mr. Coval was actually a 29(f)

23   investigation and about the August 8th incident as a

24   witness.

25        THE ARBITRATOR:  Do you want that admitted?

1577

ENTERED

BARKLEY
Court Reporters

ARBITRATION - VI

1    MR. HENDRICKS:  Those documents are, again,

2    documents relied upon by Mr. Montes in making his

3    decisions.

4    THE ARBITRATOR:  I think Mr. Mawhinney also

5    wanted those documents in evidence.

6    MR. MAWHINNEY:  I was hoping to actually

7    cross-examine him, and so I don't know how to

8    handle --

9    THE ARBITRATOR:  Is there something in there

10   that you don't want admitted?

11   MR. MAWHINNEY:  Yeah.  I just wasn't able to

12   cross and verify any of this.

13   THE ARBITRATOR:  All right.  It will be limited,

14   again, not received in evidence for the truth of the

15   matter from Mr. Coval but only that Mr. Montes

16   relied on it or to the extent management at American

17   relied on it in their decision-making.

18   MR. MAWHINNEY:  There was a lot of others that

19   weren't even subpoenaed or known to have been

20   involved prior to the discovery being fulfilled.

21   THE ARBITRATOR:  That's why you do discovery.

22   MR. MAWHINNEY:  Yeah.  But then I had no way of

23   knowing their involvement as -- or call them as

24   witness.

25   THE ARBITRATOR:  That's pretty typical that

1578

ARBITRATION - VI

1    sometimes you make a personnel complaint about

2    someone and management does not reveal the private

3    admonishment of another employee, for example, or

4    doesn't often get back to you, so that's not

5    unusual.  You don't know until you see the discovery

6    what happened.

7        MR. MAWHINNEY:  Yes.

8        MR. HENDRICKS:  For the record, your Honor, I

9    did just receive your email.

10       THE ARBITRATOR:  All right.  Thank you.

11       MR. MAWHINNEY:  Is there anything after EEEE?

12   Did you add any more after EEEE?

13       MR. LAWRENCE:  We've added exhibits during the

14   arbitration.

15       MR. MAWHINNEY:  There was FFFF or G?

16       MR. LAWRENCE:  I imagine if you had objections

17   to those exhibits, you would have raised them at the

18   time they were introduced.

19       MR. MAWHINNEY:  All right.  That's fine.

20       THE ARBITRATOR:  All right.  That concludes the

21   exhibits.

22           All right.  Now let's talk about briefing.

23   Today is September 11th, and let's go off the record

24   and we can talk about this for a few minutes with

25   your schedules.

```
 1              (A brief recess was taken.)
 2          THE ARBITRATOR:  Having discussed the briefing
 3     schedule, we've agreed on the opening simultaneous
 4     briefs to be filed on October 13th, and those will
 5     be limited to 20 pages.  And October 24th for the
 6     reply briefs, and those will be limited to 10 pages,
 7     and after discussing it, both parties are agreeable
 8     to that; correct, Mr. Mawhinney?
 9          MR. MAWHINNEY:  Yes.  How will they be
10     delivered?  Are they mailed on the 24th and then we
11     receive it whenever it gets there?
12          THE ARBITRATOR:  Yes.  Let me just finish
13     because I want to get an acknowledgment on the
14     record we agreed --
15          MR. HENDRICKS:  We agreed.
16          THE ARBITRATOR:  -- to that schedule.
17          MR. HENDRICKS:  Yes.
18          THE ARBITRATOR:  With regard how to submit them,
19     you can submit them the same way you have submitted
20     all of the evidence, so it has to be sent by these
21     dates.  So you can send it by email as an
22     attachment.  You can send it by hard copy.  If you
23     send it by hard copy, then I would be looking for it
24     to be delivered on October 13th.  If you send it by
25     email and hard copy, as long as the email gets to me
```

1580

1    on October 13th with the attachment, that complies

2    with the deadline.

3        MR. LAWRENCE:  To the extent they're sent by

4    mail, FedEx, it must be received by that deadline.

5        THE ARBITRATOR:  Correct.  If that's the only

6    way in which it's delivered.  But if you are doing

7    both, and sometimes people do send the hard copy and

8    electronic copy, as long as electronic copy is

9    received on the date it's due, that's sufficient.

10   But of course, again, everyone needs to be copied on

11   this.  That's on our email string.

12          Anything else, Mr. Mawhinney?

13       THE WITNESS:  Just the Maslon situation was --

14   now, you've received the email, and I think you

15   forwarded it because I didn't include it, but what

16   can you do to help me with finding out why

17   Mr. Maslon didn't show?

18       THE ARBITRATOR:  So if you have complied with

19   all the requirements, have you contacted Mr. Maslon

20   to find out why he didn't appear?

21       MR. MAWHINNEY:  I only had his address.  I don't

22   think I have his phone number.

23       THE ARBITRATOR:  All right.  And you don't have

24   his email?

25       MR. MAWHINNEY:  No.

1  THE ARBITRATOR:  We have his email at work.

2  Does he still work there?

3  MR. HENDRICKS:  I don't know.  Maslon worked for

4  Prime Flight.

5  THE ARBITRATOR:  Have you tried emailing him at

6  Prime Flight with the email address that's shown

7  here?

8  MR. MAWHINNEY:  I don't think I ever saw one.

9  Where would it be?

10  THE ARBITRATOR:  Maybe I'm wrong.  Is he not on

11  any of the email chain?

12  MR. MAWHINNEY:  I don't know that I saw any

13  Prime Flight email.

14  MR. LAWRENCE:  Your Honor, we have to review the

15  documents just a little bit closer.  It's unclear to

16  me whether or not there actually was service, at

17  least the document we're looking at.

18  THE ARBITRATOR:  There is a document signed by

19  the server.  There are any number of documents

20  there.  But it is in there showing service and a

21  conversation.  "He's a nice person."  There's some

22  comments noted by the --

23  MR. LAWRENCE:  I see there was a conversation

24  with his brother and wife, but I have not gone

25  through all the documents.

1582

ARBITRATION - VI

1    THE ARBITRATOR:  That's the first document.  And

2  as I say, I think it might be even the third

3  document along.  So we can go off the record and

4  take a minute for you to look at those.

5              (A brief recess was taken.)

6    THE ARBITRATOR:  With respect to the subpoena of

7  Mr. Maslon, we've reviewed the documentation from

8  the process server, and there is a certification

9  that the subpoena was served on Henri Maslon.  It

10  does not appear that it met the legal requirements.

11  The subpoena and the date of service, Mr. Mawhinney

12  has indicated the fees were not paid for the witness

13  or advanced, and we've discussed the effect of

14  Mr. Maslon's appearance or nonappearance, so

15  Mr. Mawhinney can seek enforcement of the subpoena

16  if he would like to do so.

17          What else?  Anything else before we

18  adjourn?

19    MR. HENDRICKS:  I don't believe so, your Honor.

20    THE ARBITRATOR:  All right.  Then the parties

21  can, as we've discussed also, address the issues

22  about Mr. Maslon and Mr. Mawhinney's concern that

23  Mr. Maslon did not come out that day, did not give

24  him any information about what was wrong with the

25  plane or why he reported it or he did not come

1583

DDDD

1    arbitration.  So unless there's some additional

2    showing, they won't be admitted.

3         But other than that, these binders of

4    documents, it's not necessary for you at least --

5    you know, it's a question of efficiency.  And

6    sometimes it's more efficient to just move the

7    documents into evidence and look at the -- you know,

8    read the chain of emails than it is to have the

9    witnesses read them one at a time here with

10   everybody present.  So that's fine.

11        MR. MAWHINNEY:  And, your Honor, I feel

12   disadvantaged to not know who to prepare for

13   tomorrow, being either Jeanette Gibbs or Lynn

14   Vaughn.

15        THE ARBITRATOR:  All right.  Well, what is it

16   you need to know in terms of the preparation?  You

17   have questions prepared for both of them?

18        MR. MAWHINNEY:  Well, I will be preparing for

19   them tonight.  I don't know which one to prepare

20   for.

21        THE ARBITRATOR:  Why don't you prepare for one

22   of them, whichever one you think is -- if we don't

23   know which one.  And if that is not the witness

24   you're prepared for and you need time to prepare

25   your examination, then we'll take it up on Thursday.

1    We'll have the witness testify on Thursday instead

2    of Wednesday when American has made their decision

3    about whether they're going to call a person and, if

4    so, who it is.  Again, no surprises.

5        MR. MAWHINNEY:  Also, I had made a -- I had

6    delivered a subpoena to Mr. Maslon, who did not show

7    up.  And I have my process server investigating to

8    see if pictures were taken, and I gave him your

9    email address.  So if he comes up with anything more

10   than what you had requested of the subpoenas he

11   delivered as well as the process that he had done

12   it -- he may have pictures.  I'm going to remind him

13   again.  And so you may be receiving an email

14   regarding that.

15          But, really, these witnesses that did not

16   show up, is there written statements that hold water

17   if I couldn't -- could not question them?

18       THE ARBITRATOR:  If there's a statement from

19   Mr. Maslon that you wanted to have admitted without

20   Mr. Maslon present, then go over that with the other

21   side, let them know which statement it is you're

22   referring to.

23      MR. MAWHINNEY:  No.  I mean, they're in

24   evidence.  And I want them removed from evidence

25   because I wasn't given the opportunity to

                          1185



**Gibbs, Jeanette**

| | |
|---|---|
| From: | Montes, Jose |
| Sent: | Thursday, August 18, 2011 3:20 AM |
| To: | Gibbs, Jeanette |
| Cc: | Degrazia, Anthony |
| Subject: | RE: Written Statement |

Jeanette,

This is what I have so far. To the best of my recollection all issues that have been reported to me are listed below. I will continue to go over my notes to see if there is anything else. Any questions, let me know...

Thanks...

- October 26, 2010 – Mawhinney sent me an email regarding the VC bid, and the fact that it was 10 days behind the contract. He was requesting that I oversee the Bid instead of the TWU. **Corrective Action** - Discussion was held with Mawhinney. Advised him that part of the problem why the Bid was late was due to my recent arrival to SAN as the manager, and as part of the new transition, the Bid went out late.

- November 6 2010 – Mawhinney sent me an email regarding an aircraft that was not released due to a missing signature. **Corrective Action** - 29F's were held with Mawhinney, Mactiernan, and Klippel. Mawhinney received 1st step for documenting in the aircraft logbook that Mactiernan went home & for being at a lost as to how to release the aircraft. Mactiernan would receive CR-1 regarding proper paperwork and completion. Klippel would receive a CR-1 for discussion with Mawhinney which led to him using an inappropriate word.

- November 6 2010 – Mawhinney sent me an email regarding personal property that had been tampered with, however no one was named or suspected. **Corrective Action** – Discussion held with Mawhinney, along with posting a local memo on the manager bulletin board regarding company rules regarding respecting the property of others

- Early December 2010 Timeframe – Mawhinney would come in my office and give me a piece of paper he encountered that had "Burns" taped to a wheelchair in the Jetbridge, and suggested someone was playing games, making fun of Burns' age, etc... **Corrective Action** - Would investigate with Tina Moman. Found out that it is local policy for customer service to put the last names of wheel chaired passengers on the wheel chair itself. Confirmed that there was a wheelchair passenger named Burns arriving to that Jetbridge.

- December 4, 2010 – Mawhinney sent me an email regarding being falsely accused of pushing Klippel while at a jet-bridge. **Corrective Action** – Held discussion with Klippel, he felt that he was pushed by Mawhinney while walking by him at jet-bridge, however was not interested in filing compliant against Mawhinney. Held discussion with Mawhinney and advised him that at this point no complaints were being filed against him regarding him pushing anyone.

- December 13, 2010 – Mawhinney sent me an email regarding phone call he received from the cleaners in reference to emergency flashlight seals that were missing. Stated he notified Mactiernan, who in turn would notify Rich McNealy to address the issue. In his email, Mawhinney indicated that he wasn't sure if Mactiernan had called me or Rich McNealy. **Corrective Action** – Held discussion with Mawhinney, would notify him that I hadn't received any phone calls from Mactiernan that evening.

1

AA/Mawhinney001133

ENTERED
359

- January 30, 2011 – Mawhinney sent me an email regarding Mactiernan and his involvement with an accountability sheet. Mawhinney suggested that Mactiernan not try to help him in reference to the afternoon crew chief setting up workload for nights, as Mawhinney found an issue with an accountability sheet. Also suggested that Mactiernan had been distracted with organizing his own Union at AA. **Corrective Action** – Held discussion with Mactiernan to ensure he understands procedures for accountability sheet.

- 1st Quarter of 2011 – Mawhinney would come in my office to advise me he thinks employees from work are crank calling his parent's house. **Corrective Action** - I would ask Steve if he had any proof. He stated no. I advised him to see if he could research his parent's phone records to see what phone numbers were calling. He said he would look into it. Never received any follow-up or substantiating information from Steve regarding matter

- 1st Quarter of 2011 – Mawhinney would call me to let me know that Mactiernan was purposely playing the radio in the break room loud enough so that he could not hear the television. **Corrective Action** – Would call Mactiernan and ask that he lower or shut off radio, which he did, then would call Mawhinney back to confirm if Mactiernan did so. Would not hear anymore issues regarding TV/Radio volume

- 1st Quarter of 2011 – Clingman would come in my office with allegation that Mawhinney is giving him a lot more assignments than Burns gets. Would also claim Burns sleeps on the job. **Corrective Action** – After reviewing previous 30 days in crew book, could not substantiate Clingman's claim that Mawhinney is overloading him with work in comparison to Burns. With regards to claims of Burns sleeping, at no point during tours of duty on night shift did I witness Burns or anyone else sleeping.

- Early March 2011 Timeframe – Received call from Mawhinney regarding incident involving Mawhinney, Clingman, and Burns. Engine wash assigned to Clingman and Burns. Clingman had decided to switch up "normal routine", which was him not taking on the harder part of the engine wash, which led to argument between Clingman and Burns. Mawhinney would later show up at the wash rack and an argument would occur between him and Clingman. **Corrective Action** - 29F Investigation held. Would conclude that from start to finish everyone involved had been agitated due to the "switch up" that Clingman no longer wanted to do the "hard part" of the engine wash which he felt he always did when working with Burns. Became he said/she said. Would bring all parties involved for verbal counseling regarding professional behavior at work. (Note) - Through 29F, it was made clear that Clingman was no longer friends with Mawhinney and Burns and vice versa

- Early March 2011 Timeframe – Received complaint from Steve regarding Clingman not cooperating when given an assignment. **Corrective Action** - 29F Investigation held. Determined Clingman used poor judgment to voice his grievances with Mawhinney after given an assignment. Clingman claimed Mawhinney was picking on him for all the early morning gate calls. CR-1 issued to Clingman for poor judgment to air grievances after given an assignment. Would notify Phil to document and bring to my attention when he felt he was getting picked on by Mawhinney.

- March 11, 2011 – Received email from Jeanette Gibbs in reference to an email Mawhinney had sent her claiming he had been informed by a fellow co-worker that Aaron Klippel was "out to get him" and he needed "watch his back". Would bring in Mawhinney to ask him more information about this claim. He would not provide the source of who told him that Klippel was "out to get him". **Corrective Action** – Brought in Klippel for statement. Klippel would deny any claim that he has threatened Steve or anyone else. Letter would be sent out to Mawhinney's address on file regarding investigation, prepared by Jeanette Gibbs.

- March 21, 2011 – Received complaint from Prime Flight (Vendor) Overnight Cleaners regarding incident involving Mawhinney. Supervisor for Prime Flight would approach Steve regarding potential maintenance issue that required attention. Mawhinney would voice his displeasures about being notified of the issue, used

2

AA/Mawhinney001134

profanity, and overall unprofessional behavior.   **Corrective Action** - 29F investigation held. A total of 3 Prime Flights employees provided statements regarding incident. Mawhinney issued 2nd step advisory.

- March 25, 2011 – Received email/call from Mawhinney regarding Clingman. Would complain that Clingman handed him the logbook for review, then Clingman noted another discrepancy on the aircraft. Mawhinney in his email would voice overall displeasure with Clingman. **Corrective Action** – Would bring in both Clingman and Mawhinney together to try to work out whatever issues they had between them. Overall I thought the meeting was productive, and was hopeful that the two would put their personal differences aside and move forward to maintain a professional work environment.

- Mid to Late April – Clingman would bring allegations forward regarding Mawhinney and Burns performing background checks on fellow employees, including retrieval of public records. **Corrective Action** – 29F investigation held. Both Mawhinney and Burns admitted to obtaining public records on fellow co-workers, however denied claim of conducting background checks at work. Clingman admitted to knowing about public records retrieval back when they were "friends". All parties involved were brought in for verbal counseling regarding retrieval of public records of fellow co-workers is within their right, however discussing those matter at the workplace is inappropriate, along with performing background checks on fellow employees at the workplace would also be considered inappropriate.

- April 22, 2011 – Would receive phone call from Mawhinney regarding his inability to locate Clingman, didn't have his cell. **Corrective Action -** Provided Clingman' s Cell to Mawhinney, and would remind Clingman that he needs to be available to his crew chief by cell if he is not in the immediate work area.

- April 29, 2011 – Mawhinney would walk in my office regarding a missed confirmation check by Clingman. I would disagree with Mawhinney with regards to who is able to sign for confirmation checks. After asking for Mawhinney to come to my office to go over confirmation check discrepancy, Mawhinney would then claim a hostile work environment and called the airport police. **Corrective Action** – Would post Local Memo on Manager Bulletin Board giving further explanation as to who can sign for a confirmation check. Would also hold discussion with Mawhinney and Clingman regarding proper procedure on Confirmation Check's. With regards to claim of hostile work environment, Jeanette Gibbs would investigate the matter.

- June 26, 2011 – Would be notified by Krznaric that Mawhinney and Clingman had an altercation which led to shouting/yelling that morning regarding Clingman claiming he asked Mawhinney for help, which he felt he didn't receive. Mawhinney would claim he did offer help. **Corrective Action** – 29F investigation held. Determined that Clingman used poor judgment with regards to what he was asking assistance for and his willingness to engage in a shouting match with Mawhinney, and determined that Mawhinney used poor judgment in continuing to engage in shouting match with Clingman. Would recommend 1st step advisory for Clingman and CR-1 for Mawhinney.

- August 9, 2011 – Would receive call from Mawhinney regarding Ken Mactiernan not turning in his logbook. **Corrective Action** – 29F investigation launched. Currently under investigation

- August 15, 2011 – Received email from Mawhinney regarding an aircraft that required an RII inspection which had not been done. Mawhinney stated he performed inspection. After talking with Mawhinney that morning, he had performed the RII inspection and was ok with the release of the aircraft. **Corrective Action** – Held crew meeting the next night to remind everyone regarding RII items, and being able to properly identify which jobs were RII before starting the task. Brief the crew to consult with their crew chief and GPM if they have any questions regarding the RII items.

Jose Montes

3

AA/Mawhinney001135

ENTERED
3 6 1

FFFF

Jose Montes,

At your request I am providing You with what transpired when I arrived at work on the evening 1-17-2011.

I clocked in at 21:10 (≈) and turned on the TV while I ate my first meal of the day. Mr. Mactiernan was also in the area. The radio was on at an acceptable level. The TV could be heard as well as the radio. Mr. Mactiernin went to turn up the radio volume to drown out the TV. I asked Mr. Mactiernan why he did that. Mr. Mactiernan's response was "that the facts are You are an Asshole" (referring to Me). I turned the radio off. Mr. Mactiernan turned the radio on.
I told Mr. Mactiernan that He was repeating the same problem that occurred before 2 prior Supervisor's. (Glen Hansen, and Mel Rodgers) I immediately called You to ask for Your assistance to calm the situation and rectify the problem.
I consider Mr. Mactiernan hostile, and disrupt with using derogatory title toward Me

RS Mawhinney
Ref.# 1 : - 1 8 2

ENTERED
3 6 2

GGGG

## Discussion Record

| 00009335 | R | NORRIS | SAN | 6/30/1966 | 2010 | 838828 |
|----------|---|--------|-----|-----------|------|--------|
| Employee No | Initial | Lastname | Sta.Code | Co. Seniority Date | Year | Discussion Nbr. |

| Date of Incident or Action | Subject or Incident Discussed | Details/Action Taken/Commendation/Other Remarks Briefly Explain What Was Discussed/Commitments Made Include Any Significant Date/Time/Place. Supervisor"s Signature/Date Following Each Entry |
|---|---|---|
| 7/22/2010 | Workplace Enviroment | I met with Bob on the 22nd July, to discuss the AA work place environment policy, and the use of shop talk while on duty with AA or on AA premises. Bob has committed to avoiding the use of profanity within the work environment. Bob decline union representation for this meeting.<br><br>BRIAN KIRKPATRICK<br>00605247 / SAN<br>7/22/2010 |

AA/Mawhinney001082

ENTERED
363

HHHH

## Discussion Record

| 00108965 | A | KLIPPEL | SAN | 2/6/1986 | 2010 | 862890 |
|---|---|---|---|---|---|---|
| Employee No | Initial | Lastname | Ste.Code | Co. Seniority Date | Year | Discussion Nbr. |

| Date of Incident or Action | Subject or Incident Discussed | Details/Action Taken/Commendation/Other Remarks Briefly Explain What Was Discussed/Commitments Made Include Any Significant Date/Time/Place. Supervisor"s Signature/Date Following Each Entry |
|---|---|---|
| 11/16/2010 | Rule 32 | The purpose of this discussion with Mr. Klippel is to remind him of AA's Work Environment Policy and rule of conduct #32 which states:<br><br>"Behavior that violates the Company's Work Environment Policy, even if intended as a joke, is absolutely prohibited and will be grounds for severe corrective action, up to and including termination of employment. This includes, but is not limited to, threatening, intimidating, interfering with, or abusive, demeaning, or violent behavior toward, another employee, contractor, customer, or vendor, while either on or off duty. Behavior that is also hate-related will result in immediate termination of employment, regardless of length of service and prior employment record."<br><br>On November 5th 2010, Mr. Klippel was engaged in a conversation with a crew chief. According to Mr. Klippel, another employee entered the room at which time Mr. Klippel asked the employee to leave because the conversation did not pertain to him. Mr. Klippel stated he asked the employee a 2nd time to leave the office with no luck. Mr. Klippel then stated on the 3rd time he used profanity when asking the employee to leave the room. Mr. Klippel subsequently apologized for using profanity however it does not excuse him for violating rule 32. I advised Aaron that any future instances of unsatisfactory performance may result in corrective action up to and including termination of employment. Aaron was in agreement with the conversation, however noted he felt he was being provoked. I expressed to Aaron that he is to notify me when he is feeling provoked, but being provoked is not an excuse to use profanity.<br><br>JOSE MONTES<br>00598733 / SAN<br>11/16/2010 |

AA/Mawhinney001083

ENTERED
3 6 4

Human Resources, American Airlines                                        Aug. 25, 2009

I am filing a complaint on Frank Krznaric for his intimidation and degradation of me.

On the morning of Aug. 25, 2009 at 7:40 AM, during a meeting with the Manager (Mr. Brian Kirkpatrick) and the AMT Crew Chief's (Myself, Mr. Robert Norris, Mr. Frank Krznaric) Mr. Krznaric burst out that I "was a Fuckin Liar".

The Manager (Kirkpatrick) immediately ordered Mr. Krznaric to leave the meeting.

I take offense to this attack and I am notifying American Airlines that this is unacceptable, and that I should not have to put up with Mr. Krznaric's intimidating behavior.

Sincerely,

Robert Steven Mawhinney

AMT Crew Chief, SAN

RSMawhinney
Ref. # 3 5 7
365

JJJJ

Hello Anthony,

 ave made numerous attempts with Brian to rectify issues at this station, however, He has taken sides.
 is now time to involve Corporate Security, and others.
I do not appreciate the latest posted directive that insinuates that my crew is lounging and reclining. This is example of the words that Brian chooses to listen, and who he chooses to to.
This Station has become a hostile environment and needs outside intervention.
When Mr. Costanza is allowed to call Mr. Garoian an "ASSHOLE" and get away with it You are my first call.

Robert Steven Mawhinney
CC AMT SAN



KKKK

1    would verify what I'm saying here?

2         A.    Not regarding this, no.

3         Q.    Okay.  Did you document anything with

4    Mr. Costanza regarding the use of profanity?

5         THE ARBITRATOR:  Did he --

6         MR. MAWHINNEY:  Document anything, the CR1s.

7         THE ARBITRATOR:  Are you asking, did he issue a

8    CR1?

9         MR. MAWHINNEY:  Yes.

10        THE WITNESS:  I personally did not, but I did

11   have the manager -- I mentioned this to the manager

12   and asked him to handle it.

13        Q.    BY MR. MAWHINNEY:  That would have been

14   Brian Kirkpatrick, I believe?

15        A.    If it's that time frame, then it would be

16   Brian, yes.

17        Q.    Okay.

18        MR. MAWHINNEY:  There was a recent discovery

19   request made that was complied with, and it was AA

20   -1168 -- or -58.  Excuse me.  Do you have that in

21   exhibit?

22        MR. LAWRENCE:  What is the document,

23   Mr. Mawhinney?

24        MR. MAWHINNEY:  AA/Mawhinney -1158, I believe.

25        MR. LAWRENCE:  Can you describe the substance of

                           730

ARBITRATION- VOL. III

LLLL

## NON-MANAGEMENT EMPLOYEE GRIEVANCES

Non-Management employees may file a grievance if they feel the company's action - whether it be corrective action, discharge or the misapplication of company policy - has been unfair.

- Issues such as (but not limited to) policy changes, promotions, job selections, and performance evaluations are not eligible for this grievance procedure.

- All grievance steps or appeals must be submitted in writing via certified mail, return receipt requested. Be sure to keep a copy of everything for your records.

- All grievance correspondence should include your name, employee number, job classification, location, and your home address.

- If you do not meet the specified time frame(s) outlined below, your grievance may be denied.

### Procedures for Non-Discharge Issues

- Submit a written grievance to your immediate manager or Customer Service Manager (CSM) within 7 calendar days of the action or event being grieved (or your first knowledge of the issue). A sample letter format (PDF) is provided, for use in all steps of the grievance process - be sure to provide all the information listed on the sample letter.

- Your manager will respond to your grievance in writing within 7 calendar days, unless extenuating circumstances prevent him or her from doing so.

- If the decision of your manager is not satisfactory to you, you may appeal the grievance in writing to your Department Executive in Charge within 14 calendar days of when you receive his or her written decision. You may request to meet with the Department Executive in Charge or you may ask him or her to review your grievance without a meeting. You will be advised of the date, time, and place of the meeting if you have requested to meet with the Department Executive in Charge. Be sure to advise the Department Executive in Charge if you wish to have a peer witness present with you at your meeting.

- After the review process has been completed, the Department Executive in Charge will respond to your grievance in writing within 14 calendar days, whenever possible, of receipt of your appeal.

- If the decision of the Department Executive in Charge is not satisfactory to you, you may request a hearing before a company-appointed Hearing Officer. Your written request must be submitted to the Department Executive in Charge within 14 calendar days of receiving his or her decision (via certified mail, return receipt requested).
  You may also request a representative be assigned to assist in presenting your case or you may retain outside counsel.

- Your Department Executive in Charge will forward your request to the Vice President of Employee Policy & Relations (EPR) The VP of EPR will advise you and all concerned parties in writing of the date, time and place of the hearing and the name of the company representative who will help you prepare and present your case (if you request such representation).

- The Hearing Officer will make a decision promptly, but no later than 21 calendar days after the hearing. The decision of the Hearing Officer is final and binding on both you and the company.

### Alternative Dispute Resolution

Alternative Dispute Resolution, or ADR, is a process available to you in cases of disciplinary action. The goal of ADR is to find the underlying interests of both you and the Company and to determine a mutually agreeable solution.

Alternative Dispute Resolution is available any time after your hearing is granted. However, the use of ADR prior to filing for a hearing is strongly encouraged.

A trained facilitator will lead the meeting which requires an honest and open dialogue about your situation. You, your representative, your CSM or supervisor, and the Company representative participate in a discussion about the disciplinary issue at hand, and with the facilitator's assistance, attempt to agree upon a course of action which will resolve your grievance.



MMMM

## Track & Confirm

Search Results

Label/Receipt Number: 7010 0780 0001 2999 8702
Expected Delivery Date: November 26, 2010
Class: First-Class Mail®
Service(s): Certified Mail™
        Restricted Delivery
        Return Receipt
Status: Delivered

```
Track & Confirm
Enter Label/Receipt Number.
|
                              Go >
```

Your item was delivered at 12:50 pm on January 03, 2011 in
LA JOLLA, CA 92037.

Information on this item has been restored from offline files
and will be available online for 30 days from 05/13/2011.

Detailed Results:
• Delivered, January 03, 2011, 12:50 pm, LA JOLLA, CA 92037
• Notice Left, November 29, 2010, 2:39 pm, SAN DIEGO, CA 92101
• Notice Left, November 26, 2010, 5:28 pm, SAN DIEGO, CA 92101
• Acceptance, November 24, 2010, 4:24 pm, LA JOLLA, CA 92037

**RSMawhinney**
Ref. # ▮ · ·1 9 7



CERTIFIED MAIL

U.S. POSTAGE
PAID
LA JOLLA CA
NOV 24 '10
AMOUNT
$10.04
00095385-14

7010 0780 0001 2999 8702

1000    92010

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

American Airlines
Attn: Jose Montes
3707 N Harbor Dr.
Suite 103
S.D., CA. 92010

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

7010 0780 0001 2999 8702

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

NIXIE    921    DE 1    00 12/09/10
RETURN TO SENDER
UNCLAIMED
UNABLE TO FORWARD
BC: 92037200918    *0904-09298-24-42

American Airlines Attn: Jose Montes
3707 N. Harbor Dr., Suite 103
S.D., CA

RESTRICTED DELIVERY

NNNN

1    A.    No.   I don't recall seeing this.

2    Q.    Second page would show that it was

3  addressed to you.

4    MR. LAWRENCE:   So is there a question?   Are you

5  asking if he's seen this before?

6    MR. MAWHINNEY:   Correct.   Well, that this is --

7  this is the -- I'm asking, did the United States

8  Postal Service try to deliver this letter to

9  Mr. Montes?

10    MR. LAWRENCE:   Lacks foundation.

11    THE ARBITRATOR:   He doesn't -- yeah.   He doesn't

12  necessarily know whether they tried.

13    MR. MAWHINNEY:   Oh.   Well, they --

14    THE ARBITRATOR:   He's testified that he was not

15  notified by them that they were trying to deliver

16  this to him.

17    MR. MAWHINNEY:   Okay.   Well, now, on this

18  receipt it says that they left two notices for

19  Mr. Montes.

20    THE ARBITRATOR:   And so is there a question for

21  Mr. Montes?

22    Q.    BY MR. MAWHINNEY:   Did you ever see the

23  notice for this letter?

24    A.    That doesn't ring a bell.

25    Q.    Okay.   Have you ever read the letter?

OOOO

FT 810

** CRITICAL **

FLT     810 SAN -ORD      1 30APR                30/1531Z
01 3CY  GKCE MKE    IND    CAPT THOMAS RH C3
GRN ORD   60 D  T      **ACARS**  **PRINTER**
PAYLOAD   T/O WGT   FUEL DB    RR  32    GATES 30  /H6
A 33700  P155800   P 276/ 276  FD11 7111 L.GOULD
A 33000  A155400   A 28000    LO13 7313 JEANETTE RUSSELL
PERF      SKED PLAN ACTL PL.  AC  PLAN. ACTL. DISP DELAYS
 --4   SAN   0625 0625 0621-        276  280 FD11
       SAN        0646 0641-        276
       ORD        1154             84       FD11
 -21   ORD   1225 1204             82
FLIGHT FORECAST


ON-TIME ANALYSIS----
SKDBLK - TXO  25---AIR  3.21---TXI  10---AIRQ  4---TOTAL  4.00
FLIPLN - TXO  25---AIR  3.12---TXI  10---AIRQ  4---TOTAL  3.51

ACTUAL - TXO  20---AIR  .00---TXI  0---------------TOTAL  .20

MOT DATA
PREOFF - TXO  25---AIR  3.16---TXI  10---------------TOTAL  3.51
CA RH THOMAS                          - MOT -  1744/3OL
FO SW CLARKE                          - MOT -  1744/3OL
END

ORD. TURN H6 (713) 6864248

RSMawhinney
Ref. # 10 . . 8 3 1
ENTERED
NO 3 7 2



Case 3:15-cv-04259-MMA-BLM Document 1-4 Filed 05/06/16 PageID.1512 Page 222 of 249

MISSING
THE
GREEN SHEET

AGENT.
JAN

Case 3:15-cv-00259-MMA-BLM  Document 1-4  Filed 02/09/15  PageID.1513  Page 214 of 249

American Airlines AIRCRAFT MAINTENANCE LOGBOOK

NOSE NUMBER 3G
11 39828

| FLT | DATE | MECHANICAL DESCRIPTION | ACTION TAKEN |
|-----|------|------------------------|--------------|
| 27 | 4/29 | No TIX N18282Q | Accomplished routine service Cbd 0209. |
| FLT | DATE | | Accomplished 2945-2 chk. |
| FLT | DATE | | Replaced KA23 transducer P/N Reinstalled 77BA (C4:4-163B etc. Clean MK shot |

RH/C

RH/C

RH/C

AIRCRAFT RELEASE

ENGINE OIL ADDED (PTS)

RSMawhinney
TOTAL  P. 01

Ref. #

P. 823
M3 74

PPPP

(f)    **Acting Crew Chief**

In the absence of a regularly assigned Crew Chief or while in the process of filling an existing or newly created Crew Chief position, an Acting Crew Chief may be appointed to fill the vacancy from within the work unit/shop/dock for a period not to exceed sixty (60) calendar days.

In the event a Crew Chief is not available, the appointment will be proffered to the senior pre-qualified employee regularly assigned to that work unit/shop/dock.

The Company may provide lists in each of its work **unit/shop/dock** at each station on which employees regularly assigned to that work **unit/shop/dock** may **volunteer** to be considered for the filling of **Acting** Crew Chief vacancies under this paragraph.  The Company will periodically administer qualifying tests for the positions involved to the employees who have signed these lists and will maintain lists comprised of those employees who indicate a desire for pre-qualification and successfully complete the test. Employees who have successfully passed these qualifying tests will, if they are regularly assigned to that work **unit/shop/dock**, be assigned in order of their Occupational Seniority to fill acting vacancies. Additionally, an employee who has **expressed a desire but** has not been provided an opportunity to take the qualifications test since the date he transferred into the work **unit/shop/dock** will be considered to fill acting vacancies in accordance with his seniority, until he is provided an opportunity to test.  An employee who refuses acting assignments three (3) times within a calendar year, will be removed from the pre-qualified list for a period of six (6) months.

> (1)    In the event there are no **pre-qualified** employees **or volunteers,** the most senior employee regularly assigned to that work **unit/shop/dock** will be **required** to fill the **Acting Crew Chief** vacancy.

> (2)    Employees selected to fill **Acting Crew Chief** vacancies will be entitled during the period so assigned to compensation at a rate not less than that at which the job is rated.  An employee assigned to **an Acting Crew Chief vacancy** in a lower classification will not have his compensation reduced to that of the lower classification.

(g)    **Intentionally left blank**

(h)    **Intentionally left blank**

(i)    **Intentionally left blank**

(j)    **Intentionally left blank**

(k)    **Transfer Waivers**

We have agreed that where a six or twelve month wait is required, this requirement may be waived upon mutual agreement between Employee Relations and the International TWU prior to hiring new employees. The Union must receive a written request from an employee who desires this exception.

(l)    **Basic Classification Transfers**

An employee may request a transfer from one station to another to fill a regular full-time or part-time vacancy, provided that the employee's qualifications are sufficient for the conduct of the work to which he is to be assigned.  All transfers for Title II vacancies at all stations will be filled within the appropriate craft classification.

After the provisions of Article 46 (One Station Agreement) or the **Maintenance Base** Transfer Process, if applicable, have been exhausted, the employee will be permitted to transfer before a new employee is hired at that station, provided:





87



Jose Montes

May 24, 2011

Statement of Confidentiality

Peer witness: No.

Allegations of hostile work environment and covering up.

1. The 291's, describe the tone of that conversation with Mawhinney. Little bit defensive, why am I in a 29(F) again. I explained why. People running background checks at work. At that point I asked questions and he answered them. Other than that, there was no real issues.

2. How did that conversation end? (high note, low note). Don't recall it being one or the other. Thanks for coming in and answering the questions. I can't remember if I asked him for a statement or not. I think he wrote a statement.

3. Let's go to when Steve brought you the 737 chip detector work card. Walk me through that chain of events, conversation and all. Came in my office and said Phil turned this end and said there is no confirmation check. I told Steve have you addressed the issue with Phil. He said no. I said why don't you go ahead do that. Anticipating that those two would get into an argument, I went into the cc office in about 2 minutes later. When I came in there seemed like a precursor to argument. At that point, I came in and said what's going on. Steve explained that we not copeite need confir check. Phil said don't know why this is an issue. Never been issue before as far as turning the work card and cc taking care of it. Never been an issue prior. At that point I asked steve have you ever done this work card before. Steve said he han'd seen this work card or not scheduled in SAN. At that point I requested assistance of ed kempa. Asked him if he saw this card in SAN and how we perform the conf check. That was in presence of SM and PC. He said he hadn't seen that work card either, I don't think I have done that before. So at that point I said OK thanks Ed. And ef left. I started looking at work card. Became clear to me that it required conf check and PC performed work wo con chk. Told pc we need to get conf cd done so get sm or another mechanic assist you and PC said OK. I remember PC making the comment I don't want to Steve to go or I don't' want steve to do it. But knowing what I knew as far as my experience with conf check, I didn't think cc was required, as long as that mechanic is fleet qualified he can perform the check.

4. And that knowledge is based on what experience? Experience from my time at AE as a mechanic, cc, supervisor and maintenance manager.

5. Why were you anticipating an argument? Past history between phil and steve. Last couple of months seems to have inability to get along. Appeared to have been friends a while back and there was some event that happened that I don't know what happened last now they no longer care for each other and they seem to be consumed with getting each other in trou le.

6. Precusor to argument? I remember phil saying why are we doing this. Why is this an issue now. Steve said something like are we playing those games again or something along those lines.

7. Describe tone and demeanor. With Phil it was kind of defensive tone of voice and would say the same with Steve.

8. And your tone and demeanor. Normal, kind like I am now.

9. After PC said OK, about getting mechanic or Steve to do conf check? He left the office. I left too cause I thought everything was resolved. I went to the records package here to see if that card had been assigned to SAN the month prior. I didn't find that particular wc assigned the last month. While I was doing that Ed Kempa walked in and said I'm going to go ahead and do the chip detector conf check.

10. Backing up, did you and Steve speak before you left the cc office? I remember letting him know good catch.

11. Did he say anything at that point? No. He didn't mention anything to me about a cc having to sign it.

12. How was Steve acting after Phil left and when you said good catch? Body language was kind of defensive.

13. You just got that vibe from him? Yeah.

14. Sitting standing? He was sitting. If anything I thought he felt that I was supporting him because I said we got to fix this. At that point, I felt that there was an issue, it got brought up and we resolved it relatively quickly. Not long drawn out process.

15. Excuse my ignorance but I don't know if all work cards look the same, so did the work cards in AE have this column that says is/cc? Yeah.

16. When you were in AE, under what circumstances would a mechanic instead of a cc do the conf check? It was usually you would have a CC in the block.

17. When would you have a mech do it instead of CC? If needed RII, it would say that and you would have to be inspector or designee to do that. And if the block didn't have RII, a mechanic could do it.

18. If there was a mechanic and a crew chief on duty, when you were in AE, who would sign the conf check block? A mechanic. It was easier to ask second mechanic working with you to do confirmation check for you.

19. Why did you give Phil the option to have another mechanic instead of Steve to do the conf check? Why did you leave it up to Phil? I didn't think there was a need to have cc to do it. What played into it also was I knew that s and P don't get along. But that was not determining factor.

20. When you were in the crew chief office with Phil and Steve, did you ask Phil if he notified steve to come out and witness the chip detectors? No, I assumed that he didn't.

21. Did you ask Steve if he had ever signed for work that he had been present for? I remember asking. He mentioned I'm not going to sign for work that I haven't done. I said no one is asking you to do that.

22. So he made that statement, kind out of blue? I think when I was asking what was going on. He was saying this wasn't done and I'm not going to sign work that I haven't done. I said slow down no one is asking you to sign for work that wasn't done.

23. Did you ask Ed who would sign for the back check, the second signature? Yeah, I think I asked who typically. He said I don't know. Havne't seent this work card before.

AA/Mawhinney001105



24. Did Ed answer that the cc or inspector would sign while he was doing the task? No.
25. Did you tell Phil you would find another mechanic to help him when he said he didn't want Steve? No, I remember saying if you can't find no one to do confirmation check, I'll get a mechanic for you. Let me know.
26. What did Ed and Phil do when they went back to the plane? I went back to my office. Shortly there after Ed said he'd come back and take care of it. I remember going out of the back office. I saw Ed and Phil out on the aircraft.
27. What were they doing? They were near the engine. About 10-15 minutes after Ed came to my office.
28. Do you know what work they did? I'm assuming they did the rest of the confirmation checks.
29. How long did that take for them to redo? I saw them at the AC and I could see Ed walking back.
30. Did the card say to run engines? I don't know. I recall engines being ran cause I think that's one of the reasons why I went out. I'm not sure if work card calls for engine ran or not.
31. How many mechanics are need to run an engine? Min. 2 in the cockpit. Potentially 3 if you need fire guard.
32. Under what circumstances would you need 3? I'm not sure if 2 or 3, I think 3. GPM would require fire guard.
33. Were there 3 that night? As far as I could see, I only saw E and P.
34. After Ed told that the conf check was complete, you went back to your office. Then you went to the maintenance office to ask Steve if everything was OK with the work card. Why did you do that - go to the maintenance office and ask Steve if everything was OK with the work card? Just kind of final check making sure everything ok.
35. Where was Steve when you went in the maintenance office? In the cc office.
36. Walk me through that conversation with Steve. I kind of ask him everything OK. He indicated he wasn't sure if Ed could sign that or was authorized, something along those lines. He mentioned something RIL. I told him I don't think you need RIL. I think I told him let's pull the GPM.
37. So he wasn't looking at the GPM when you came in? I don't recall. He might of.
38. So what happened next? He's looking at the GPM, we pulled up conf check chapter. The first statement says any mechanic, CC who has is equipment qualified may do a conf check. I said OK. Done deal, no need to keep digging. Steve felt need to keep looking into it. I said I think it's pretty clear, everything we need is in this statement. At that point I went to the computer outside the cc office and I started looking into it myself.
39. How long were you in the office with Steve that time? 2-3 minutes.
40. Describe his tone and demeanor? Little defensive.
41. And yours? I was giving him my opinion. I was little bit stern, steve, I think what we're looking for is here.
42. And were you need to him? Yes, I was pointing out at the monitor.
43. Were you blocking the mouse? No.
44. Could he have gotten to the mouse? No.
45. Did he make any statement about having to go to 16.02? Yeah, I think he made a reference to that.

46. What did you say when he said that? I think I indicated OK but I think the answer we're looking for is OK.
47. Did he mention 16.02 more than once? I don't recall. I don't recall him mentioning it multiple times.
48. Distance between you and him when you were looking at the computer together? About two feet.
49. Closest your hand got to him? About a foot.
50. So what made you go out and use the other computer? Keep researching myself. He was on the computer.
51. Why bother researching? To look at any potential concerns he may have because ultimately the answer would be there. I also got on to print out the page.
52. Do you remember what sections you looked at, this one? Yes and 16.02
53. Any other sections? I don't think so.
54. So what happens while you're sitting out there? I could hear steve on phone and I can hear him say am I speak to MOD please, my manager's not supporting me or deliberately bypassing me, something along those lines. That caught my attention. Once steve hung up the phone, I asked him who were you talking to? He said the MOD. He made mention that I was deliberately bypassing him. He was upset at that point. He felt that I was not supporting him, not listening to him. He had a concern that Ed was not able to sign that. At that point he had to bring something to my attention that says ed can't sign that. At that point, I told Steve, I reiterated my stance, GPM relatively clear of what conf is. I'm at the doorway and he's at the computer. He's almost like zoning me out. He has back towards me. At this point rather than keep going back and forth with him verbal standpoint, I asked him to come to my office. And he said something like I'm not going or something like that. At that point I gave him verbal directive. At that point he stood up.
55. How long were you in the office with him? Less than a minute. Minute two minutes maybe.
56. Describe his tone and demeanor at that time? A bit more defensive. I didn't get a good grasp cause he has his back towards me. When I asked him who did you talk to , he was looking at the computer. He was a bit more defensive than first go around.
57. And your tone and demeanor? Same, stern.
58. What was going through your mind when you heard him calling the MOD? I felt it was unnecessary. If he had concerns, he could have just told me, hey Jose, I want to look at the GPM and we can talk about this later. But he didn't offer that opportunity to me.
59. Were you upset when you asked him who he called? No I was just stern. At no point during our conversations did he indicate that he wanted to sign that. He just indicated that ed wasn't qualified to sign that.
60. Why didn't you go in the cc when he was on the phone with the MOD to clarify what he was saying? I wasn't going to stop him from calling the MOD.
61. Why not join the conversation? I didn't think it would be very professional for me to some how jump in that conversation. You would have two people trying to convince guy on the phone why one ws right over the other.
62. If you knew he was calling the MOD, why did you ask who did you call? Just to confirm.

AA/Mawhinney001106



63. Why did you think it was necessary to confirm that conversation when you heard it from outside?  Cause you can't always assume everything.

64. What were you expecting him to say?  I was expecting him to say yes.

65. Did he tell you what the MOD told him?  He said something about them trying to get a hold of QA manager.

66. Anything else he said about that conversation?  No other than me bypassing him, not letting him do his job or not supporting him, something along those lines.

67. What did you say in response to that?  I reiterated my stance about the GPM, what I felt it was stating. After I said it once or twice he started kind of ignoring me.

68. If he's ignoring you, why bother continue with the conversation?  Because we were at an impasse. He said Ed was not qualified yet Ed already signed the work so we needed to find an answer.

69. What were you going to discuss in the office?  I had a copy of the GPM, the highlighted section. I sat down and read the GPM to him.

70. What else happened?  While I was reading the GPM, I could see him shaking. He had cell phone in his hand. Not sure if he was trying to record conversation or what he was doing. He stood up. He said he was calling the cops. This is a hostile work environment.

71. After you give him directive what did he say?  I think he just stood up and followed me.

72. And you come in the office?  Yes. I sat down on my desk and he sat down.

73. What was first?  I said look steve GPM too clear. What part do you not understand. This first paragraph says and I didn't finish highlighted language when I saw him with his hand shaking with the cell phone in his hand.

74. He stood up?  Yeah and I said what are you doing.

75. Conversation when you asked who he was calling, how long?  Minute two minutes if that.

76. How long in the office before he called the police?  Within a minute.

77. Were you yelling when you were in the office?  No. Stem.

78. What do you mean Stem?  Demonstrates. I was making my point across. Not yelling, no where near yelling.

79. You asked him who he called but did you ask him why he was calling the MOD?  I think he answered it in his response. I called the MOD because.

80. And did you push him by asking why he called?  No. After that I said what do you not understand the GPM is clear.

81. What was his tone and demeanor like in your office?  The fact that he was shaking while he was calling the cops. I guess he was in a fragile state. I had never seen him like that. Obviously, nervous.

82. Did you hear him call the police?  Yeah.

83. What did you hear him say?  This is mech w/ AA calling cause I'm in a hostile work environment. I was in shock so I don't remember what he said. At that point I felt super awkward. Never had anyone call cops on me and for him to call the cops in my presence. Asking myself what hostility are you talking about.

84. What happened after that?  At that point, he was still on the phone. Took me a minute to gather myself, I was in shock.  I got up.  I figure I get to call Anthony.  I walk out.  He's still in the

office and I walk right next to him to get out of the office.  Shortly after I walked out, he walked out.

85. Then?  I told Anthony what was going on. Anthony told me that the MOD had called him in reference to Steve's call to MOD so when I called Anthony, Anthony was on the phone with the MOD. I told Anthony that difference of opinion, mechanic qualified, s said not qualified, called him to office, gave directive, showed him GPM then he called the cops. I told him I'd call him back.

86. So the cops come?  They essentially asked me what was going on. I explained to them that there was difference of opinion regarding work policy, at no pt did I think it became hostile, no violence involved.  At that pt they kind of stated what's the next step, let him go home, stay on the clock, said I don't know, we'll contact my boss. They said OK, we'll hang out til there's resolution, they're preservers of peace. They left office.  I called Anthony and AD got a hold of Paula King.  We agreed that we would leave him on duty from the Company stand pt I felt I didn't act out of line or violated procedures. That was it. At that pt, I briefed the cops of our plans. During that conv w/ Anthony and Paula, we outlined what we would do. Wanted to bring SM in to give summary of what happened, remind steve that we would have differences of opinion, but at no pt did I think did it have to get this far as far as calling the cops. I explained to cops what I wanted to do. I asked them to be in the office when I explained things to Steve. Steve and the cops came in. I explained to Steve that we will have diff or opinions re work policies but at no pt did I think it was hostile, that's no who I am, that's not who we're about. I told him I didn't think it was necessary for him to call the police. He mentioned something like it got pretty heated. I think that was pretty much it. I asked him to finish remainder of shift. Then he left, the cops said they won't file police report. They said evident employee related issue and we expect your company to follow your procedures. I told them yeah.

87. Do you agree with Steve's comment that things got pretty heated?  Heated in the sense that we had a difference of opinion. It was back and forth of difference of opinion. I don't think it was heated in that it became a yelling match or personal attacks. I guess when you have to give directive to someone that's kind of testy moment. I get at that point it became a little testy when I had to give him a directive. It wasn't anticipating him refusing to come to my office.

88. What happened after that?  Police left, got hold of Anthony and explained what happened. At that pt I wanted to go to the bottom of what our differences of opinions was. I got a hold of Pete Schafer and explained the situation to him. I scanned docs to him.

89. Who told you to call Pete or did he call here?  I think when I was on the phone with Anthony I asked do you think I can get a hold of Pete Schaffer and I asked AD for pn number.

90. What did Pete say?  Pete essentially looked everything over and said we were OK with mechanic signing for it, but the one block that says to inspect that required re-signature.  In 1602, it says mechanics can inspect. It was never to me. I learned something I didn't know.  At that point, I explained to pete that I had mechanic that's fleet qualified.  Not sure who suggested it, but decided that upgrade mechanic to cc would be suitable for regulatory standpoint.



91. Then? I talked to Anthony about my discussion with Pete. 2 of 3 any mechanic could sign, but 1 required cc, but OK to upgrade the mechanic to cc. AD was OK with that. Me and ad talked more and decided that I should explain everything that's going on with Steve.

92. When decision was made to upgrade Ed, was the plane already off? I couldn't tell.

93. When the cops were here was the plane on the ground? Yeah.

94. So you tell Steve? Yeah, I brought Steve back in the office. Told him got off phone w/ PS. You were kind of right. I was kind of right, but we were both kind of wrong. Can learn from this issue and move on and we're ok with AC safety standpoint, cause upgraded Ed. PS is OK w/ that. I said I hope we can move on from this, letting him know him calling the cops no hard feelings, let's move on.

95. What did he say in response? OK.

96. What was his tone and demeanor? Kind of quiet.

97. Did Steve at any time tell you to calm down? No.

98. Did he say anything to you before he called the police? No.

99. When you were in the office, nobody else was here? No.

100. The fact that the check was not done in the order listed, does that fact have to be report to anyone? It never dawned on me about the sequence. It dawned on me when I looked at the work card. Nothing drew my attention as to that we couldn't go back and do the confirmation check again. We had to rectify the issue.

101. Did we have obligation to report the error to anybody? I don't think so. From procedural standpoint, we caught missing signature and we corrected that but I don't think we needed to report that to anyone. The fact that it was done out of sequence, we couldn't go back and fix that so how do we make it right.

102. And as far as you know we don't have to report those kind of errors? No. If someone continually forgets to do confirmation check, that manager has to address that. Also, that following week I spoke to rick browning of the FAA, he's kind of the FAA Inspector assigned to SAN, he oversees a lot of the west coast operation. I get his opinion of what had happened that we had done a work card, noticed conf missing, assigned mech to do conf. come to find out it required cc so we upgrade mech to A1 cc. I asked mech or you think about that and he said no issues as far as safety of the AC.

103. Is that in writing? No that was phone conversation.

104. What made you call him? Just to get his opinion. I've known him for a while now. I value his opinion.

105. Is there a problem with the fact that the work package was signed after the plane was in the air? I don't know. I don't think so. It wasn't an airworthiness release. This particular check is called an OS09, an overnight check. It doesn't require an airworthiness release. Anything PS check and up requires airworthiness release.

106. Was MAPS accountability sheet supposed to be updated before ac was airborne? Probably, yes. It's more of an administrative function to show that work was accomplished.

107. AMS message – does that have to be sent before ac is airborne? I'm not sure what an AMS message is. (reads workcard) I would think so. But do I think it's a safety of flight issue, no.

108. Does the fact that those things were not accomplished before the ac was airborne, does that have to be reported? I guess depending on the severity. When I went next door, I wasn't aware that the AMS message, the work card, all of that, that they were not done. I thought Steve took care of that. I wasn't aware that he hadn't until I went next door. When I noticed that the package had not been signed I asked the day shift cc to review the pack. In doing, that he took care of the accountability sheet and the outside pack.

109. Did you mention something about him not having to go out if he's busy? In the future, if he's busy, we can have another mechanic who is fleet qualified to perform that back check.

110. When did that come up? When I brought him to say that I spoke to Pete Schaefer.

111. At any time during that morning, did he ask you why you didn't have him do the check or why you didn't tell PC that he would do the check? No. At no point did he say he felt he should have done the check. It was just Ed is no qualified.

112. Did he ever mention employees sleeping on the job? Yeah, he mentioned it a couple of times. I'm not sure who he was referring to. He said the afternoon hides after they're done. When I first got here I think he mentioned tito deguzman was sleeping. I'm trying to think who else. That's all I can think of right now. I have no reason to believe that was going on. I've been on nights and afternoons and I didn't see signs of that going on.

113. Did he say where they were sleeping? No.

114. So what were you looking for with regard to sleeping? I did my fair share in afternoons and nights, there was no evidence for me to believe that was going on.

115. Did he mention Menely sleeping? No.

116. Did he mention an employee going to their car during their shift? No.

117. Are you aware of an email that Phil supposedly wrote about not working on planes? I remember Burns showing me an email in reference to, when I brought him for 29(f) about back ground check. He showed me email from Phil in regards to his lawsuit. Phil sent Burns an email how Mawhinney is riding him and he's getting tired of it. I think in the email it said something about Frank trying to get Phil or treating him bad or something along those lines. Two separate emails, one regarding his lawsuit and bad mouthing frzmarc and other people; and there was another email about how Mawhinney is riding him how he is getting all the hard tasks at work.

118. Are you aware of any email where Phil said he "should stop fixing planes?" No. It might have been in the email that I read. I took that email with grain of salt cause it wasn't pertaining to my 29(f) with Burns. It wasn't what I was investigating so I didn't care for it. It was all history, dated way before I got here.

119. Why did Burns share that with you? I don't know. I guess to demonstrate Clingman's statement of mind. Burns is aware that Clingman was the one bringing up the back ground check issue.

120. From what you gathered from the emails, what is Clingman's statement of mind? I think he's was trying to demonstrate that pc is erotic. One day he's saying one thing and one day he's saying another.

121. When you were investigating the Klippel threat, did you ask Mawhinney when he refused to name his source, do you want to end up in the hospital? No.

122. Did you say anything to that effect? No.



123. You have your notes from that meeting? No.

124. Anything else about anything we talked about? I'm just a little concerned with Steve going forward. There seems an inability to try to get along with his co-workers. He seems to be reaching an all time high since I've been here. Right now he has an issue with PC. Every day there is something new between both of them, seems like.

125. Is PC taking planes out of service? From what I can see, they have been valid reasons. If planes broke, it's broke, you got to fix it. PC would come 2 am and say plane out of service because it needs this, SM takes it personal why taking it out of service during my shift or why you telling me at 2 am and not early. It seems he's taking it personally. I can tell it bothers him. I think that is where the recent clashes have been.

126. Other than Phil, who is Steve not getting along with? He doesn't want to have conversation / relationship with Frank Krznaric even on a working standpoint. Other than Burns, it doesn't seem like he's attempting to reach out.

127. Are others attempting to reach out to him? I think so. There might be one or two people, that he's OK with. But for the most part, he's not attempting to making any positive relationship with others, other than Burns.

128. Are there people trying to making positive relationship with him? I think not everyone is interested in doing that either.

129. Anything else? Yeah. I just would like to say from manager standpoint that it's bit frustrating on how to handle personalities which seem to trigger events. I can't been here 24/7 to police those personalities, which is frustrating part. When some people are together, it is almost toxic.

130. Who is toxic together? Clingman, mawhinheney. Clingman, Burns. Anyone that disagrees with Mawhinney.

131. Why do you say that? If someone says I want to do this and Steve says no, it gets things going, Steve says I'm the cz you need to listen to me. I think he's personality is abrasive in nature and robs the people off the wrong way.

132. Anything else? That's it.

133. Do you think it was necessary to give Mawhinney a directive? Yes.

134. Why? Why didn't you just drop the issue? If I ask you to do something and I let it go when you don't, I'm setting a bad precedent.

135. What did you ask him to do? Come to my office.

136. Why didn't you ask Steve to disagree? We were in an impasse. We needed to find out who was right. Ed already signed it.

137. How were you going to find out who was right? I wanted him to come to the office and we would read the GPM.

138. Why didn't you call the MOD yourself? I don't know. I thought we could work it through the GPM ourselves.

139. Anything else? No.





1       A.    Two harbor police.

2       Q.    Okay.  And did you ask why the harbor

3  police had been called?

4       A.    Well, I didn't know.  I was trying to

5  figure out what was going on.  No one was talking to

6  me.

7       Q.    No one told you why you were being escorted

8  off the facility?

9       A.    No.  No.  No one said a word.

10      Q.    Okay.  So after your termination, are you

11 aware that your locker was searched to return your

12 belongings to you?

13      A.    No.

14      Q.    Okay.  Are you aware that it was found in

15 your locker that you had taken cabin items, such as

16 liquor bottles and other items from the plane, in

17 your locker -- and placed them in your locker?

18      A.    I strongly object to that.  It's -- that's

19 ridiculous.

20      Q.    You understand that if you were to have

21 done that, if you had taken items off of a plane and

22 placed them in your locker for your personal use,

23 that would be a basis for your termination; correct?

24      A.    But I didn't.

25      Q.    But that's not my question.



SSSS

### MINUTES OF THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

CASE NAME: <u>Jancsek v. American Airlines</u>          04cv1203-IEG (BLM)

HON. BARBARA L. MAJOR          <u>CT. DEP. MICHELLE BEHNING</u>

TAPE  #:  1:  0  -

Settlement Conference held.  Case settled.

                    IT IS SO ORDERED

DATED: August 30, 2005          *Barbara Major*
                    BARBARA L. MAJOR
                    United States Magistrate Judge

COPY TO:

HONORABLE IRMA E. GONZALEZ
U.S. DISTRICT JUDGE

ALL COUNSEL OF RECORD

55 MH



FILED

05 SEP -7 PH 3: 23

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES JANCSEK,<br><br>                    Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES; and DOES 1-100;<br>Inclusive,<br><br>                    Defendants | Case No.  04-CV1203-IEG(BLM)<br><br>**STIPULATION OF DISMISSAL; AND<br>ORDER THEREON** |

IT IS HEREBY STIPULATED by and between the parties to this action through their

designated counsel that the above-captioned action be and hereby is dismissed with prejudice

pursuant to FRCP 41(a)(1).  No party is a prevailing party.  The court shall retain jurisdiction to

enforce the terms of the settlement agreement.

///

///

///

///

04-cv1203-IEG (BLM)

ENTERED ON 9/8/05

1

2

DATED: 8-36-05 2005                    GRADY AND ASSOCIATES

3

4

5                                      DENNIS M. GRADY, Esq.,
                                       Attorneys for Plaintiff
6                                      CHARLES JANCSEK

7                                      Littler Mendelson
                                       A Professional Corporation
8

9    DATED: 8·20— , 2005

10                                     Kenneth R. O'Brien, Esq.,
                                       Attorneys for Defendant
11                                     AMERICAN AIRLINES

12
                                       **Order.**
13

14
     IT IS SO ORDERED.
15

16

17
     DATED: 9/6 , 2005
18
                                       Barbara L. Major
19                                     United States Magistrate Judge

20

21

22

23

24

25

26

27

28

                              2                          04-cv1203-IEG (BLM)



TTTT

```
 1    at the time of the settlement?

 2        MR. HENDRICKS:  Exactly.  If you look at Exhibit

 3    40, page 2 of that exhibit, Section 5,

 4    "Consideration" --

 5        THE ARBITRATOR:  Give me just a minute to go

 6    back to that.  All right.  Paragraph 5?

 7        MR. HENDRICKS:  It's paragraph 5, subsection

 8    A(i).  You will see that it says, one, the claims

 9    are -- "The Parties recognize for purposes of

10    entering into this Agreement and settling all claims

11    between them, that Mawhinney's claim in the Lawsuit

12    for Wrongful Termination in Violation of Public

13    Policy is preempted by 42 U.S.C. § 42121 ('AIR 21'),

14    and that the claims remaining in the Lawsuit for

15    Defamation, Intentional Infliction of Emotional

16    Distress, and Public Disclosure of Private Facts

17    seek only damages for emotional distress and similar

18    tort-type damages, and not for lost wages.

19            In view of that recognition, the Parties

20    agree that the amount being paid Plaintiff does not

21    constitute wages and American Airlines would not" --

22    "will not withhold any sums from this amount and

23    will not issue a W-2 Form.  American Airlines will

24    issue a Form 1099 as required by the Internal

25    Revenue Service and comply with all reporting
```

86

ARBITRATION - VOLUME I

1    requirements."

2            That's the exact reason why, although, with

3    respect to vacation and sick leave, which is

4    contained on page 3 of the agreement, paragraph B,

5    where there is a specific specification of the

6    amounts of credit, there is no specification for

7    work credit, service credit.  There could not be.

8    Our position is there could not be as a matter of

9    law because without wages funding that, you cannot

10   get that sort of benefit out of a qualified ERISA

11   plan.  You would -- the plan itself would prevent

12   that from taking place.

13           So, you know, the reality of it is, is that

14   this is something Mr. Mawhinney negotiated at the

15   time.  He got the benefit of not having any of the

16   settlement deducted as wages, and now he's trying,

17   quite frankly, to double dip after the fact by -- by

18   now seeking that very benefit.  This is an

19   integrated agreement.  He did have the benefit of

20   counsel.  If there -- if he felt that that was

21   unclear in some sort of fashion, as he pointed out,

22   there was negotiation, and -- and, you know, this

23   represents the entire agreement.

24           And our further position is, quite frankly,

25   it is now a legal impossibility.  We have looked

87

1  into this very carefully.  It is a legal

2  impossibility for us to just -- given that he

3  negotiated not to have wages deducted, to suddenly

4  give him years of credit, it would basically destroy

5  the plan, and that's something that would be a non

6  sequitur.  You can't interpret the agreement as

7  requiring a result that would destroy the very,

8  quote-unquote, benefit that he's purporting to seek,

9  and that is years of credit.

10  THE ARBITRATOR:  All right.  So there may be

11  some monetary payment that represents that, but you

12  can't, essentially, go back and put it into the plan

13  itself.

14  MR. HENDRICKS:  Well, I think you're correct in

15  that.  Having said that, though, I believe that this

16  represents a negotiated settlement, and he's gotten

17  the benefit of his bargain.  It might have been the

18  case at one point it was contemplated that he would

19  get wages and service credit and all the rest.  But

20  through negotiation, he decided he wanted the

21  benefit of that cash without having those

22  deductions.  He's received the benefit of that at

23  this point in time.

24  THE ARBITRATOR:  So if he had, under the

25  settlement agreement, opted instead of to take wages

88

1  and have them be taxable --

2      MR. HENDRICKS:  Yeah.

3      THE ARBITRATOR:  -- then he would have been

4  entitled to, essentially, service credits for the

5  wages that that period covered?

6      MR. HENDRICKS:  Correct.  Correct.

7      THE WITNESS:  That's not --

8      THE ARBITRATOR:  But if you opt not to take them

9  as wages, then you don't get the service credits

10  that would accompany them?

11      MR. HENDRICKS:  Correct.  Because you --

12  basically, you're getting -- you would be getting,

13  quote-unquote, service credit without having

14  contributed the corresponding wages to the plan.

15  And that's something that he bargained for and

16  accepted and has received the benefit of that.

17      THE WITNESS:  Not so, your Honor.  That -- all

18  that -- all of that money that was restored to me

19  was taxable.  I did not double dip.  He's giving --

20      THE ARBITRATOR:  One -- let's go back one step

21  at a time.  Mr. Mawhinney, you said, "All that money

22  was restored to me."  What money are you referring

23  to?

24      THE WITNESS:  The settlement agreement for being

25  made whole.  As you can see, I was made whole in

89

```
 1   regards to sick time for time lost during the time
 2   that I was withheld from service.
 3       THE ARBITRATOR:  Correct.
 4       THE WITNESS:  Vacation was restored.  The
 5   accrual of the pension was to be restored to
 6   reflect, and, yet, they did not do that.  That's the
 7   breach of contract.
 8       THE ARBITRATOR:  But with regard to the $2,514
 9   that was -- as I understand it correctly, was in
10   your account as of the time of the termination,
11   you're saying that $2,514 should have gone back in
12   when I was returned to work?
13       THE WITNESS:  Well, that $2,514 is not part of
14   the pension plan.
15       THE ARBITRATOR:  It's the pre-retirement
16   medical?
17       THE WITNESS:  Right.
18       THE ARBITRATOR:  All right.  So that $2,514 did
19   not go back in.  So that's one breach --
20       THE WITNESS:  That was one, yeah.
21       THE ARBITRATOR:  -- that you're claiming of the
22   settlement agreement?
23       THE WITNESS:  Now we're on a -- on to a
24   different subject of the pension plan.
25       THE ARBITRATOR:  Correct.  I'm going through all
```

90

ARBITRATION - VOLUME I

2          And the vacation and the sick leave you say

3     they calculated correctly, but they did not

4     calculate correctly the pension?

5          THE WITNESS:  Correct.

6          THE ARBITRATOR:  So, Mr. Hendricks or

7     Mr. Lawrence, can you explain American's position

8     with regard to why is it he got the credit for

9     vacation and sick leave for that period he was off

10    work when no wages were paid but didn't get a

11    pension credit?

12         MR. HENDRICKS:  It's an issue of ERISA.  I mean,

13    that's basically what you're dealing with.  You're

14    dealing with an issue of ERISA.  And the ERISA laws

15    in the plan under those circumstances would preclude

16    it.

17         MR. LAWRENCE:  If the arbitrator looks at the

18    settlement agreement itself, it specifically states

19    the amounts that are to be returned to

20    Mr. Mawhinney.  It specifically states the amount of

21    vacation.  It specifically states the amount of sick

22    leave.  It does not state any amount for a pension

23    credit.  That's because under ERISA and the plan,

24    having not received any economic wages, there is no

25    service years of credit that can be provided without

91

1   violating ERISA and violating the terms of the plan.

2       THE ARBITRATOR:  All right.  So that explains

3   the differences between the parties with regard to

4   the pension --

5       THE WITNESS:  Well --

6       THE ARBITRATOR:  -- the language or the

7   interpretation of the agreement.

8           So go ahead, Mr. Mawhinney.

9       THE WITNESS:  Yeah.  I don't -- I don't think

10  that that fully is being explained to your Honor,

11  that --

12      THE ARBITRATOR:  It's not intended to be a full

13  explanation.  It was just in response to my

14  question.  So you are entitled to put on more

15  evidence, as is American on this issue.

16      THE WITNESS:  Yeah.  And I have put the evidence

17  there that the -- as Mr. Hendricks referred to the

18  order, that was the Department of Labor order.  That

19  order had to come out after the settlement

20  agreement.  When I was taken before the TWU in a

21  kangaroo trial, that order is where the language is

22  and where --

23      THE ARBITRATOR:  In what year are you talking

24  about?

25      THE WITNESS:  2002.  The TWU kangaroo trial was

1    2003.  My legal representative had to bring in the

2    2002 DOL order.  This DOL order included the

3    reference to my pension accruing since March 2nd of

4    2001.  The settlement agreement itself only provides

5    the date of -- that I entered the plan.

6        THE ARBITRATOR:  And do you have the exhibit

7    number of the DOL order that you are referring to?

8        THE WITNESS:  Yes.  And I have further evidence

9    of the negotiations between legal counsels, that

10   they were in agreement that this was going to be in

11   the settlement agreement.

12       THE ARBITRATOR:  Mr. Hendricks indicated that

13   was discussed at some point and the --

14       THE WITNESS:  Yes.

15       THE ARBITRATOR:  -- parties did negotiate it,

16   and instead you opted to take it as a nontaxable

17   settlement.

18       THE WITNESS:  No.  No.  I --

19       THE ARBITRATOR:  So there may be some -- those

20   negotiations and the documents would be in evidence.

21       THE WITNESS:  That would be a misrepresentation

22   that they were not taxable.

23       THE ARBITRATOR:  Well, you will have to present

24   some evidence of that.

25       THE WITNESS:  That I paid taxes for those?

93

1      THE ARBITRATOR:  That -- no.  The issue is that

2  you didn't take it as wages.  Had you taken it as

3  wages, it would have been taxable, so you weren't

4  required to pay --

5      THE WITNESS:  No.  That's in the agreement that

6  it was not going to be defined as taxes.  It was

7  going to be issued as a 1099-R, taxable.  I wasn't

8  double dipping, as he would like you to belive.

9      THE ARBITRATOR:  He hasn't said that.

10     THE WITNESS:  He did say that.

11     MR. HENDRICKS:  The issue is there were no

12  payroll taxes.  There were not the normal

13  withholdings and deductions associated with wages.

14  That's the point that's being made here.

15     THE ARBITRATOR:  You understand what he's

16  saying, Mr. Mawhinney?  If it had been paid as

17  wages, then American would have been withholding

18  from the amount that was actually paid to you.  They

19  would have been required to do withholding from the

20  amounts that were wages --

21     THE WITNESS:  Okay.

22     THE ARBITRATOR:  -- in addition to whatever

23  taxes you paid.  And that was not done --

24     THE WITNESS:  Right.

25     THE ARBITRATOR:  -- because the election was

94

UUUU

1    THE ARBITRATOR:   -- is to which account?

2    THE WITNESS:   Pre-retirement medical insurance.

3    THE ARBITRATOR:   To the same one?

4    THE WITNESS:   Yes.

5    THE ARBITRATOR:   All right.   And you're saying

6    it's not in the amount that they refunded to me?

7    THE WITNESS:   Correct.   That would have been the

8    first of those two checks.

9    THE ARBITRATOR:   And so the amount they refunded

10   to you -- let me go back and look at that amount --

11   was about $1,805?

12   THE WITNESS:   Correct.   Yes.

13   THE ARBITRATOR:   And what is that?

14   THE WITNESS:   That would have been how much they

15   had deducted since I had returned January 6th of

16   2003.

17   THE ARBITRATOR:   So from 2003 to 2011 when you

18   were terminated -- when you terminated your

19   employment, the amount that would have been deducted

20   was $1,805, and that's what they refunded to you?

21   THE WITNESS:   Correct.

22   THE ARBITRATOR:   But it didn't include the

23   $2,514 which had accrued prior to the settlement in

24   December of '02?

25   THE WITNESS:   Correct.   And was described in the

77